INTERMODAL TRANSPORTATION AGREEMENT

THIS AGREEMENT is made and entered into this 12th day of August, 2004, by and between **NORFOLK SOUTHERN RAILWAY COMPANY**, acting for itself and its rail carrier subsidiaries, having an office at Three Commercial Place, Norfolk, VA 23510 (hereinafter referred to as "NS"); and **Yang Ming (America) Corp.** having an office at 525 Washington Blvd., 25th floor, Jersey City, NJ 07310, as agent for **Yangming Marine Transport Corporation, Ltd.**, 271 Ming De 1st Rd. Chidu, Keelung, Taiwan 206, R.O.C. and Yangming (UK) Ltd., 2nd Floor, Valentines House, 51-69 Ilford Hill, Essex IG1 2DG, England (hereinafter referred to as "Yangming").

RECITALS:

The parties desire to enter into an agreement whereby NS shall provide rail transportation of containers between points shown as origins and destinations in Exhibit 1.

NS shall perform the transportation services at the favorable rates described herein in exchange for Yangming's commitment to tender to NS certain minimum volume of loaded and empty containers for linehaul via NS, and to pay NS the charges specified in this Agreement.

AGREEMENT:

NOW, THEREFORE, for and in consideration of the provisions herein contained, the parties agree as follows:

1. TERM.

This Agreement will have a term commencing on June 1st, 2004 and continuing through May 31, 2009. This agreement may be renewed upon mutual agreement of the parties for another five year term, provided such an agreement is reached no less than 60 days prior to the end of the initial term. If an agreement concerning renewal is not achieved, then this agreement will terminate on May 31, 2009.

2. SCOPE OF SERVICE.

Except as otherwise stated herein, all loads or empties shipped and all transportation provided hereunder will be subject to the following documents:

A. Norfolk Southern Railway Company Exempt Intermodal Transportation Rules Circular No. 2, or successor document, in

Page 1                                        07/29/04



EXHIBIT 13

NSGENL 0001

effect on the date of tender for each shipment hereinafter referred to as the "Rules Circular").

   B.   Terms and conditions of the bill of lading in the form set forth in the Rules Circular which is in effect on the date of tender of a container for rail transportation.

3.   RATES.

   Subject to the terms and conditions of this Agreement, Quote Number NSPQ 4395, and Exhibit 1, attached hereto and made a part hereof as if set forth fully in this Agreement, NS will provide rail transportation service as follows:

   A.   NS will provide rail transportation between any two (2) points in Exhibit 1 at the applicable base rate listed in Exhibit 1 that are in effect on the date of tender of the shipment at the origin point.  If no base rate is listed in Exhibit 1 between two (2) points, special quotations or the linehaul rate between the two (2) points in NS's TOFC Rate Matrix 8407 series in effect on the date of tender of the shipment will apply.

   B.   The base rates in Exhibit 1 will govern until May 31, 2005. Thereafter, the base rates will be adjusted annually, beginning June 1, 2005, and on June 1 of any subsequent year while this Agreement remains in effect. The amount of each annual increase of the base rates will be equal to the amount of the increase specified in the unadjusted Rail Cost Adjustment Factor (RCAF) as of the date prior to June 1, which is the closest to June 1. The unadjusted RCAF shall be compared with the previous year's unadjusted RCAF to determine the amount of the increase, but said increase shall not exceed three and one-half percent (3.5%) per year.

   C.   The rates in Exhibit 1 may be used by Yangming, but are not applicable to traffic which is (i) moving for any steamship lines other than Yangming; (ii) controlled by any steamship lines other than Yangming. Any third party business related to other steamship line controlled traffic must be agreed upon by the parties under a separate rate authority and must move under a special quote, with such rates to be negotiated between the parties.

   D.   Rates for the transportation of materials in tank containers are included in the applicable NSPQ 50227 and notwithstanding anything contained in this Agreement to the contrary may be adjusted upon 30 days written notice.

Page 2                                                      07/29/04

NSGENL 0002

F. Rates for the transportation of coiled metals in containers (to the extent permitted by the Rules Circular) are included in the applicable NSPQ 17500. Notwithstanding anything contained in this Agreement to the contrary, the rates for the transportation of coiled metals in containers may be adjusted upon 30 days written notice.

G. Traffic moving under the rates listed in Exhibit 1 and in NSPQ 8407 shall be subject to fuel related surcharges adopted by NS from time to time. Fuel surcharges may be applied with five (5) days' notice. NS agrees that Fuel Surcharges on rates contained in this Agreement will only apply if a general fuel surcharge ("FSC") is declared by NS on Intermodal shipments. If NS declares a general FSC of less than 5.1%, then the Yangming fuel surcharge will be equal to the NS general FSC. If NS declares a general FSC between 5.1 and 9.9% (inclusive), then the fuel surcharge on Yangming traffic covered by this Agreement shall only be 5%. If NS declares a general FSC that exceeds 9.9%, then the Yangming fuel surcharge will equal the NS general FSC. The Yangming fuel surcharge shall be removed when the NS general FSC is lifted by NS.

H. At its discretion, NS may eliminate a lane or lanes covered by this Agreement due to a redesign of service. If this occurs, rates for this lane(s) shall be suspended. However, if service for such lane(s) is resumed and the interchanged point for such lanes(s) is not changed, then such suspended rate shall be reactivated upon the request of Yangming.

4. EQUIPMENT.

A. Yangming will furnish containers and chassis at the expense of Yangming. Except for such charges caused by the negligent act or negligent omission of NS, NS will not be responsible for any per diem, mileage, rental, or other such use or ownership charge applicable to said containers or chassis ("Ownership Charge"). In the event such Ownership Charges are caused by the negligent act of, or negligent omission by NS, then NS shall be responsible for such charges in direct proportion to the negligence of NS as compared to the negligence of all other actors in causing the imposition of such Ownership Charge. If any owner, lessor, lessee, or other party makes any claim against NS for any aforesaid Ownership Charge applicable to any container or chassis furnished by Yangming, NS will refer the claim to Yangming who will resolve it with the appropriate party.

B. In the event that equipment (containers and/or chassis) provided by Yang Ming is either lost, damaged or destroyed beyond repair while in possession of NS, Yangming shall be entitled to reimbursement as follows:

Page 3                                                           07/29/04

NSGENL 0003

REDACTED

(1) On Yangming-owned equipment, the amount of reimbursement due will be the cost to repair the equipment to serviceable standards or the depreciated value of the equipment, whichever is less. Depreciated value of the equipment shall be determined by using applicable AAR cost factors to determine the reproduction cost, less depreciation of ten percent (10%) per year, for each year the equipment has been in service up to a maximum of nine (9) years. Yangming-owned equipment would retain a residual value of ten percent (10%) on all owned equipment.

(2) On any other equipment provided by Yangming, a copy of the bill for damages or replacement cost will be submitted to NS along with a copy of the bill showing Yangming has paid lessor/owner in full for damages to, or replacement of, equipment. Yangming shall be reimbursed in full by NS not more than sixty (60) days from the date the bill is submitted to NS or Yangming for payment.

(c) Notwithstanding anything in the foregoing to the contrary, NS shall not be liable for consequential, punitive, indirect or special damages.

5. **VOLUME COMMITMENT AND INCENTIVES.**

A. For the purposes of this Agreement, a "Contract Period" shall be a twelve month period of time beginning with June 1.

B. During each Contract Period beginning with June 1, 2004, Yangming shall tender to NS a minimum of 90% of the traffic that it transports or arranges for transportation in the lanes listed in Exhibit 1, which may move via NS at Yangming's discretion. If the total number of such containers tendered to NS is less than 90% of the total available, then Yangming shall pay NS liquidated damages of [REDACTED] per container for each container necessary to fulfill said minimum commitment.

B. As an incentive for future growth, at the end of each Contract Period, NS will refund to Yangming a percentage of Yangming's linehaul revenue paid to NS based upon the following schedule:

| If Yangming's Volume Increases by: | NS will refund to Yangming: |
|---|---|
| 1,500 units over base volume | 1.0% of linehaul revenue Yangming has paid pursuant to this agreement for the prior year |
| 3,000 units over base volume | 1.5% of linehaul revenue Yangming has paid pursuant to this agreement for the prior year |

REDACTED

NSGENL 0004

The base volume of the first Contract Period will be equal to the total volume moved by Yangming in the lanes listed in Exhibit 1 during the 12 month period immediately proceeding the effective date of this Agreement (June 1, 2003 through May 31, 2004). Thereafter, the total volume moved in the lanes listed in Exhibit 1 during the previous Contract Period, will be used as the base volume for the following Contract Period.

6. Service Provision

NS and Yangming have agreed upon train schedules for particular lanes listed in Exhibit 2, and NS will have a goal of meeting those schedules 80% of the time during the term of this Agreement. On time is defined as being within two hours of scheduled availability, as that term is described in the applicable schedules. Measurements will be made on a container-by-container basis, and will not apply to containers for which there is incomplete paperwork, which have missed the cut-off at origin, are bad ordered, are subject to force majeure conditions, or other conditions not directly controlled by NS.

In the event NS does not meet the performance standard in one or more of the applicable lanes as measured over a two calendar month period, Yangming shall have the right, upon written notice, to temporarily divert traffic from NS in the applicable lane. Upon receipt of written notice Yangming, NS shall have 60 days to respond to such notice by providing and implementing action plans to improve service to acceptable level.

If NS has returned service to an acceptable level, then Yangming will return the diverted traffic to NS over the applicable lane.

If, after this 60 day period, however, NS's service does not meet the performance standard described above, Yangming shall have the right to divert such traffic in such lanes on an indefinite basis, until such time as NS demonstrates, by providing applicable data, to YangMing that the train service performance over the applicable lane has improved to 80% for two months, at which time then Yangming shall return the diverted traffic to NS over the applicable lane, as soon as is practical.

7. PITTSBURGH TERMINAL SPACE.

A. NS will guarantee Yangming 30 daily slots at the Pittsburgh Intermodal facility for storage of empty containers. Initial lift to/from the car is included in the linehaul rate. Yangming understands that empty units will not always be left on pool chassis and can be grounded at NS' discretion. All subsequent lifts shall have a ▮▮▮ fee per lift. Any special

request for lifts shall also be subject to a ▮ charge. Should Yangming exceed the daily slot limit, all units beyond the limit will be subject to ▮ storage charge per unit per day.

    B. A slot is defined as a grounded empty 20' or 40' container, a 20' or 40' chassis bare or mounted.

    C. The allocation of 30 free spaces at Pittsburgh in part 7.A above represents a higher number of spaces than previously allocated to Yangming. This higher allocation is based upon the anticipation that outbound loaded volumes from Pittsburgh will increase in the future. The outbound loaded volumes will be reviewed each ninety (90) days to check to see if such an increase in volume develops. If there is not a significant and consistent increase in the loaded outbound volumes from Pittsburgh, the space allocation will reduced to 20 spaces.

8. **E-RAIL STORAGE.**

Storage for loaded and empty containers at E-Rail will be negotiated directly between Yangming and The Rail-Bridge Terminals Corporation. Linehaul rates in Exhibit 1 to and from E-Rail include only haulage and delivery to and from this terminal. All lifts, CY service, equipment management, gate and other accessorial charges and services must be negotiated separately by Yangming and the terminal operator of E-Rail. NS is not the terminal operator, and does not include any of the above charges in Yangming's rates.

9. **CUSTOMS BONDS.**

All in bond shipments tendered to NS by Yangming will be under the Customs bond of Yangming. If contrary to the intent of this Agreement, the understanding of Yangming and NS, and applicable Customs regulations, any governmental employee, representative, or agent treats any container tendered to NS by Yangming as being covered by the Customs bond of NS, Yangming will perform all acts required to permit the container to clear Customs and will indemnify and hold NS harmless from and against claims, demands, losses, damages, penalties, fines, judgments, costs, and expenses, including but not limited to litigation costs and attorneys' fees, resulting directly or indirectly from any failure by Yangming to comply with all applicable Customs regulations.

10. **HAZARDOUS MATERIALS.**

    A. Yangming and NS will comply with all applicable international, federal, state, and local laws, rules,

REDACTED

NSGENL 0006

regulations, and ordinances governing air, water, noise, solid waste, hazardous material and commodities, and other pollution. Tender of a hazardous material or commodity for rail transportation and handling of hazardous materials and commodities during rail transportation will be governed by the Rules Circular, except as otherwise stated in this subsection.

    B. Before tendering for rail transportation a container that contains a hazardous material or commodity, Yangming will: (1) comply or arrange for compliance with all applicable federal regulations governing the transportation of hazardous materials and commodities, including but not limited to regulations concerning notification, loading, blocking and bracing, placarding, commodity mix, and commodity containers; (2) provide to NS identification by proper shipping name and hazardous class of each hazardous material and commodity; and (3) identify the specific container in which each hazardous material or commodity is tendered, in accordance with the Rules Circular.

    C. If a spill, release, or leakage from a container of any hazardous material or commodity, whether or not sudden in nature, occurs during rail transportation, NS will isolate the container or remove from the train the rail car holding the container, will take any immediate emergency action, and will make the notifications required by law to the appropriate agencies. Yangming will notify the originating shipper and upon request of the originating shipper, will assist in the cleanup response. No container leaking a hazardous material or commodity will be permitted to leave a NS intermodal facility until responsibility for the leaking container and the lading therein is determined, until the leakage is stopped, and until all notifications required by law are made.

    D. In addition to any allocation of responsibility in the Rules Circular, if Yangming or its customers fail to comply fully with or perform its undertakings under this subsection for a hazardous material or commodity in a container or if a hazardous material or commodity is spilled, released, or leaked from a container during rail transportation and complete information required by applicable federal regulations was not provided to NS before the container was tendered for rail transportation, Yangming will indemnify and hold harmless NS against all claims and all liability, cost, and expense of cleanup resulting from the nature or condition of the hazardous material or commodity or from spill, release, or leakage of the hazardous material or commodity.

11.   FORCE MAJEURE.

NSGENL 0007

If any party is unable to meet its obligations under this Agreement because of an occurrence beyond its control and arising without its fault or negligence, including but not limited to war, insurrection, riot, rebellion, or acts of the public enemy or lawful authorities; strike, lockout, or walkout; embargo; fire, explosion, or flood; Act of God; authority of law; or any other of NS or Yangming, said obligations of the party or parties affected by the Force Majeure occurrence will be excused for the duration of said occurrence. The party declaring the existence of Force Majeure will notify the other parties in writing promptly that Force Majeure exists, the nature of Force Majeure, and when Force Majeure is terminated. In the event of Force Majeure, the minimum volume commitment for the Contract Period in which the Force Majeure incident occurs shall be reduced proportionately. The party experiencing Force Majeure will use its best efforts to remove the causes of Force Majeure and will resume performance of its obligations under this Agreement immediately after said causes are removed. The suspension of any obligation under this Agreement as a result of the existence of Force Majeure will not cause the term of this Agreement to be extended and will not affect any rights or obligations accrued under this Agreement prior to existence of Force Majeure.

12. **LOSS AND DAMAGE**.

A. Except as provided in subsection B of this section, NS will be liable for and will hold Yangming harmless against loss of or damage to property of the parties to this Agreement or third parties and injury to or death of third parties, including but not limited to officers, employees, and agents of the parties to this Agreement or third parties, only to the extent that the sole proximate cause of said loss, damage, injury, or death is the negligence of NS in the performance of the services hereunder.

B. (1) NS will be liable for and will hold Yangming harmless against loss of or damage to freight in containers transported at the rates and charges provided in this Agreement and Exhibit 1 only to the extent that the sole proximate cause of said loss or damage is a railroad accident, derailment, or collision between railroad equipment negligently caused by NS. NS's liability for freight loss and damage will be subject to the dollar limitation set forth in the Rules Circular at the time a claim for freight loss and damage is made.

(2) At its sole discretion and upon written notice to NS, Yangming may elect for NS's liability for freight loss and damage to be at the level established pursuant to 49 U.S.C. ə 11707, subject to establishment by NS and payment by Yangming of a separate linehaul rate for transportation of said

NSGENL 0008

freight in containers under this Agreement at a level higher than the base rates provided in Exhibit 1.

(3) Yangming will comply with the time limits and procedures for making claims set forth in the Rules Circular at the time a claim for freight loss and damage is made. Upon written notice to NS, Yangming may assign to third parties its right to make claims against NS for freight loss and damage.

C. In the event where loss or damage is caused by the mutual negligence of the parties, the liabilities of each will be shared, and determined on the basis of the relative faults of the parties and the percent of the liabilities incurred as a result of the relevant negligent acts or omissions by each party.

D. NS will not be liable for punitive, indirect, or consequential damages as a result of this Agreement. No arbitration award issued pursuant to Section 16 of this Agreement will grant such damages or fees.

E. The parties to this Agreement will use their best efforts to mitigate all damages arising under this Agreement.

13. PAYMENT OF FREIGHT CHARGES.

A. All linehaul freight charges for any shipments will be paid to NS by Yangming within fifteen (15) days after receipt by Yangming via EDI, or such other method as the parties determine is appropriate.

B. If there is a default in timely payment by Yangming, then NS may advise Yangming upon ten (10) days' written notice that it will accept shipments for transportation on a cash basis only.

14. DELETION OF ANY UNLAWFUL TERMS.

If any provision of this Agreement is determined to be unlawful, said provision will be deleted, and this Agreement, without the deleted provision, will continue in full force and effect; provided, however, if a party is materially adversely affected by the deletion, the party may cancel this Agreement without penalty.

15. NOTICE.

NSGENL 0009

A. Any notice or other communication under this Agreement will be in writing and will be considered given if delivered in person or if sent by telecopy, overnight courier, certified, registered, or first class U.S. mail, or electronic transmission, addressed as shown in this section. Any notice will be deemed to be delivered, given, and received for all purposes as of the date received, if delivered by hand or telecopy, or as of the date which is two (2) days after the date on which the notice was deposited with the overnight courier or of the electronic transmission, or as of the date which is five (5) days after the date on which the notice was deposited in a regularly maintained receptacle for the deposit of U.S. mail, if sent by registered, certified or first class U.S. mail. Upon written notice to the other party, a party may change its address at any time.

B. Notices under this Agreement will be addressed as follows:

As to NS:

Vice President, Intermodal Marketing
Three Commercial Place
Norfolk, VA  23510

As to Yangming:

Assistant Vice President
Intermodal & Equipment Control
525 Washington Blvd.  25th Floor
Jersey City, NJ  07310

16. TERMINATION.

In the event of a breach of this Agreement, the party claiming the breach may give notice to the other party of such breach, and must give the other party sixty (60) days within which to effect a cure. If such breach is not cured within such sixty (60) day period, then the aggrieved party may terminate this Agreement upon thirty (30) days' written notice. Notwithstanding this clause, the parties may agree to specific remedies for deterioration of service which may obtain subject to Article 5 hereof, short of cancellation for breach.

17. ASSIGNMENT.

NSGENL 0010

Neither Yangming nor NS may assign its rights or duties hereunder to a third party without the written consent of the other party.

18. ARBITRATION.

Any controversy or claim in excess of $10,000 arising out of or relating to this Agreement or the breach hereof will be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Each party will bear its own costs and expenses of arbitration.

19. SUPERCESSION.

In the event that there is any conflict between the terms of this Agreement and the terms of NS's Intermodal Rule Circular, the provisions of this Agreement shall apply.

20. CONFIDENTIALITY.

This Agreement, the Exhibits, and the information therein are confidential and proprietary. If a party voluntarily reveals the terms of this Agreement to third persons, the other parties may be harmed thereby. The parties will not reveal the terms of this Agreement except (1) as may be required by law or regulation, (2) in response to legal service of process, (3) as required by AAR rules, (4) to a parent, subsidiary or affiliated company, internal auditor, or inspection bureau, (5) to the U.S. Bureau of Labor Statistics, or (6) if the information regarding this Agreement is in the public domain and all parties consent to the disclosure. The parties will seek confidentiality and agree not to disclose the terms of this Agreement further from any of the foregoing parties to whom they may disclose this Agreement.

21. NO THIRD PARTY BENEFICIARIES.

This Agreement is intended for the sole benefit of NS and Yangming. Nothing in this Agreement is intended or may be construed to give any person, firm, corporation, or other entity, other than NS and Yangming and their parents, subsidiaries, and affiliates any legal or equitable right, remedy, or claim under this Agreement.

NSGENL 0011

22. <u>WAIVER OF BREACH</u>.

At any time during the term of this Agreement, NS or Yangming may waive any breach or default of the other party under this Agreement without affecting or impairing any right arising from any other breach of or default under this Agreement. Any waiver at any time of any breach or default under any provision, condition, obligation, or requirement of this Agreement will extend only to the particular breach or default so waived and will not impair or affect the existence of this Agreement or the right of NS or Yangming to take action in the event of any subsequent breach or default.

23. <u>GOVERNING LAW</u>.

This Agreement will be deemed executed in the Commonwealth of Virginia and will be subject to and interpreted in accordance with the laws of the United States of America and of the Commonwealth of Virginia.

24. <u>CAPTIONS AND COUNTERPARTS</u>.

All headings in this Agreement are inserted for convenience only and will not affect construction or interpretation of this Agreement. This Agreement may be executed in any number of counterparts, each of which may be deemed an original for any purpose.

IN WITNESS WHEREOF, the parties, intending to be legally bound, have caused Agreement to be executed by their duly authorized officers as of the day and year first above written.

NORFOLK SOUTHERN RAILWAY COMPANY

By: _____

Title: VP-Intermodal Mktg.

Yang Ming (America) Corp as agent
For YANGMING MARINE TRANSPORT CORPORATION, LTD

By: _____

Title: SVP. OPERATIONS

July 29, 2004

Page 12                                      07/29/04

NSGENL 0012