DER-UP-C-21300
C.D. No. 54949-1

## EXEMPT RAIL TRANSPORTATION AGREEMENT

THIS AGREEMENT is made and entered into as of **August 1, 1997,** among UNION PACIFIC RAILROAD COMPANY, a Delaware corporation, having an office at 1416 Dodge Street, Omaha, Nebraska 68179 (hereinafter "UP") and KAWASAKI KISEN KAISHA, LTD. (KKK), a Japanese Corporation, with offices at 2-9 Nishi-Shinbashi 1-Chome, Minato-Ku, Tokyo 105, Japan, by and through its duly authorized agent and representative in the United States, THE RAIL-BRIDGE CORPORATION (RBC), a New Jersey corporation, with offices at 890 Mountain Avenue, Murray Hill, New Jersey, and "K" LINE AMERICA, INC. (KAM), a Michigan corporation, with offices at 301 Concourse Blvd., Suite 300, Glen Allen, VA, together hereinafter Kawasaki Kisen Kaisha, LTD., THE RAIL BRIDGE Corporation and "K" Line America, Inc. shall be collectively referred to as ("Customers").

## RECITALS

KKK is a corporation furnishing inland transportation service under its through bills of lading, and that RBC and/or KAM arrange for rail transportation, primarily in connection with movements for KKK involving prior or subsequent ocean transportation.

UP is a rail common carrier subject to the Interstate Commerce Act as amended.

The parties desire to enter into an agreement whereby UP shall provide rail transportation for Customers as the duly authorized agent of and representative for Customers.

## AGREEMENT:

NOW, THEREFORE, in consideration of the provisions herein contained, the parties agree as follows:

## Section 1.    DEFINITIONS.

(a)    Articulated Railcars shall mean railcars permanently or semi-permanently connected for operation as a unit.

(b)    Chassis shall mean the wheeled skeleton frame with all legally required equipment for handling and over-the-road carriage of Containers.

(c)    CLM shall mean Car Location Message.

(d)    Container shall mean any container, without Chassis, owned, leased, or controlled by the Ocean Carrier or Customers that moves under the terms of this Agreement. Each Container (loaded or empty) must conform to the TOFC/COFC Container and Trailer

KLINECFJ-A.doc

1

June 18, 2001



EXHIBIT 22

EXHIBIT V

Interchange Rules published by the Mechanical Division of the Association of American Railroads in effect at the time of tender to UP interchange.

(e)    DST Railcars shall mean well-type rail flatcars capable of handling containers stacked two-high.

(f)    Equipment Management Program (EMP) shall mean the interline domestic container program offered by Conrail, Norfolk Southern and UP.

(g)    FEU shall mean two (2) twenty-foot containers or a single container longer than twenty feet.

(h)    Genset shall mean a generator set attached to a chassis which supplies power to a thermostatically equipped refrigerator unit ("Reefer").

(I)    Intermodal Terminal Facility shall mean a location where Containers are made available by Customers for loading onto flatcars or made available to Customers for highway delivery.

(j)    International Service shall mean through water/rail transportation service in connection with intact containers moving via rail between a seaport and inland points or another port prior to and/or subsequent to international water transportation.

(k)    On-Dock shall mean a non-UP marine terminal at which Containers are loaded and unloaded to and from railcars.

(l)    Origin Rail Terminal/Destination Rail Terminal/Depot (ORT/DRT Depot) shall mean a rail facility for temporary storage of Containers; may also be referred to as "CY" (container yard).

(m)    Powerpack shall mean a self-powered unit attached to a railcar which supplies power to one or more Reefer containers transported via DST Railcars or other rail movement.

(n)    Quota Cargo shall mean Containers holding a trade restricted commodity for which Customers are awaiting U.S. Customs clearance.

(o)    Reefer shall mean a thermostatically equipped refrigerator Container used for the transport of perishable items.

(p)    Third Party International (TPI) is defined as International Intermodal business from those ocean carriers, Non Vessel Operating Common Carriers (NVOCC's) and Shipper Associations who do not have inland logistic management capability.

(q)    Unit shall mean a Container with or without wheels or a Chassis.

## Section 2.    TRANSPORTATION UNDER THIS AGREEMENT.

(a)    UP shall provide rail linehaul services for loaded or empty Containers on DST Railcars and other rail equipment as agreed by the parties between the origins and destinations set forth in Exhibits 1, 2 and 3 to this Agreement.

(b)    In addition to rail linehaul services, UP shall also perform the following services at the Intermodal Terminal Facility or point of interchange, as required:

(1)    Preparing container receipt and interchange inspection reports evidencing the apparent condition of the Containers at interchange.

(2)    Transferring, marshalling and repositioning Containers within rail terminals controlled or operated by UP as may be necessary or convenient for UP to effect the purposes of this Agreement.

(3)    All switching, as well as loading and unloading at terminals controlled or operated by UP, and spotting railcars at place of loading.

(4)    Provide data and other information as described herein and in Exhibits 1, 2 and 3 to this Agreement.

(5)    Any other services described in the Exhibits to this Agreement.

(c)    In order to facilitate the prompt and efficient transportation of Containers under this Agreement, Customers agree to provide UP with complete waybilling information no later than the time each Container is tendered to UP for transportation.

## Section 3.    MINIMUM TRANSPORTATION REQUIREMENT.

(a)    Customers agree that during each twelve (12) month period of this Agreement commencing August 1, 1997, Customers shall tender to UP not less than 95% of its Container traffic, including traffic interchanged with eastern connecting railroads, via the routings specified in Exhibits 1, 2 and 3 to this Agreement, provided, however, Customers shall not be required to tender 95% of its Container traffic in a corridor where restrictions on UP operations prevent UP from handling 95% of Customers container traffic in such corridor.

(b)    In the event Customers fail to tender the minimum transportation requirement of its Container traffic as stated Paragraph (a) in any 12 month period under this Agreement, Customers shall pay UP a shortage payment of $30 for each Container by which Customers fell short of meeting the applicable minimum transportation requirement, not as a penalty, but as compensation for the lost traffic volume. Customers shall make such payment within 30 days of invoice from UP.

(c)    The minimum transportation requirement shall be calculated annually for each 12 month period between August 1 and the succeeding July 31 during the term of this Agreement.

(d)    UP may not more than once per calendar year request that Customers send a letter to UP advising whether or not Customers have fulfilled the obligation under Paragraph (a) above. Within 60 days after receipt of such request, Customers shall send a letter to UP stating whether or not it has satisfied its obligation under Paragraph (a).    If Customers have failed to satisfy its minimum transportation requirement, Customers shall advise UP in writing of the number of Containers by which Customers failed to meet the obligation under the Minimum Transportation Requirement.

(e)    Upon request, Customers will make available to UP or UP's independent agent the records of all shipments Customers have made or caused to be made between the Origins and Destinations shown on Exhibits 1, 2 and 3 during any 12 month period covered by Paragraph (c).  UP may perform, at its own expense, reasonable audits of underlying documents and support for these records for the purpose of verifying the accuracy of the percentages claimed by Customers hereunder.  Customers shall preserve such records for at least three (3) years after the date of original shipment.

## Section 4.    SERVICE GUARANTEE.

When Customers tender 95% of all eligible Container rail traffic in any contract year, excluding that which is moved via the Southern Pacific contract, SP-T-5213, and balances operations to the extent possible, UP will commit to on-time service performance levels as set forth in Section 7(a) of this Agreement for the same period.

## Section 5.    SERVICE PERFORMANCE ANALYSIS PROCESS & MEASUREMENT.

UP will administer the measurement of rail service performance and provide performance data to Customers monthly.  Customers will have the right to audit the performance data provided.  The measures of service performance will begin with the open cycle events and end with the close cycle events as outlined immediately below under the caption "Measurement Definitions."  Measurement of rail service performance will be by Container and defined as the number of Containers on-time to standard as described in Exhibit 4 divided by the total number of Containers moved by Customers and eligible for measurement in a given contract year.

### Measurement Definitions

(a)    The open cycle event is Cut-off, Release, or Interchange Receipt, whichever is the first applicable event of the schedule standards set forth in Exhibit 4.

(1)    Cut-off is the time of day set by UP for delivery of Containers at the ORT Depot and shall be an open cycle event.

(2)   Train Release occurs when Customers or their agent provide UP with authorization to begin train movement to destination and shall be the open cycle event for eastbound on-dock unit trains.

(3)   Interchange Receipt is the first measurement event for eastbound Tacoma on-dock unit trains, and is the Transportation Control System (TCS) reporting time of UP receiving traffic from a connecting Railroad.

(b)   The close cycle event is the availability or interchange delivery as defined below, whichever is the last applicable event of the schedule standards set forth in Exhibit 4.

(1)   Availability is the time of day when UP makes a Container available at a UP Intermodal Terminal Facility for pick-up by Customers and shall be fixed when UP transmits a van notification to Customers via facsimile or EDI transmissions.   Availability is the last measurement event for containers destined to UP intermodal terminal facilities.

(2)   Interchange Delivery is the last measurement event for traffic interchanging to Eastern railroads, and shall mean the TCS reporting time of UP delivering traffic to a connecting railroad.

**Commitment Delays & Resulting Impact on Measurement**

The following events will be given the specified consideration in determining UP's service performance:

| COMMITMENT IMPACT: | IMPACT ON MEASUREMENT: |
| --- | --- |
| Unavailable Customers Chassis at destination Intermodal Terminal Facility | Eliminate Container(s) from measurement |
| Late Vessel | Commitment extended by total late time plus 4 hours |
| Unscheduled Set-out en route (by Customers Request) | Eliminate Container(s) from measurement |
| Unscheduled Pick-up en route (by Customers Request) | Eliminate Container(s) from measurement |
| Late Interchange Receipt/Train Release | Commitment extended by total late time plus 4 hours |
| Late/Change Load Plan (by Customers Request) | Commitment extended by total late time plus 4 hours |
| Unscheduled Interchange | Eliminate container(s) from measurement |
| Bad Order caused by defect in railcar or Container | Commitment extended 24 hours |
| Bad Order caused by Load Shift | Eliminate container(s) from measurement |

| COMMITMENT IMPACT: | IMPACT ON MEASUREMENT: |
|---|---|
| Force Majeure | Eliminate container(s) from measurement |
| Unit Train Less than 120 FEU | Generic train service schedules will be measured. |

## Section 6.    SERVICE/OPERATING PLAN.

### Dedicated Double-Stack Rail Service

UP will provide dedicated Double-Stack rail service to Customers when Customers tender a minimum of 120 FEU's.

### Generic Double-Stack Rail Service

When Customers tender less than 120 FEUs, UP will provide generic Double-Stack rail service to Customers. Generic Double-Stack rail service will be measured by the published schedules in the Union Pacific Intermodal Resource Guide then in effect on the date of the measurement. The generic intermodal rail service schedules are subject to change. UP will advise Customers 14 days in advance of intended changes to the daily generic schedules. Customers may, at their sole discretion, advise UP that the revised service schedules are not marketable. Customers have 14 days from the date of UP's notification to advise UP, after which, UP has 14 days to reply to Customers or modify the schedules. If UP is unable to provide the previous level of service and the service is unmarketable, Customers may, at their sole discretion, following UP's 14 days review, divert traffic from the corridor affected by the schedule change after providing UP advance notification of their intention to divert the traffic. Such diverted traffic will be excluded from Customers Minimum Transportation Requirement as defined in Section 3 of this Agreement.

**Section 7.    CONTRACT GOALS.**

(a)    Service Performance:  UP will meet the following on-time service performance levels:

| Service Type | Years 1 through 6 | Years 7 through 9 |
|---|---|---|
| Dedicated Double Stack Rail Service | 85% | 85% |
| Generic Double-Stack | 80% | 80% |

The foregoing service performance levels will be increased to reflect improvement in UP's service above those levels but will not be reduced.

(b)    Neutral Chassis Pools:  UP will establish neutral Chassis pools as set forth below:

| Completion Date: | % of Traffic Converted |
|---|---|
| January 1999 | 33% |
| July 1999 | 66% |
| December 1999 | 100% |

(c)    Event Reporting Timeliness:  Event Reporting Timeliness of a car location message (CLM) is measured by the elapsed time from when an event occurs and is subsequently reported to Customers.  An electronic Data Interchange (EDI 622) message is measured from the time when an EDI 622 is transmitted by UP to receipt of the EDI 622 by Customers.

| Contract Year: | % of CLM's Transmitted within Minutes |
|---|---|
| AUG 1997 to JUL 1998 | 65%  60 min. |
| JUL 1998 to JUL 1999 | 75%  60 min. |
| JUL 1999 to JUL 2000 | 90%  60 min. |
| JUL 2000 to JUL 2001 | 80%  45 min. |
| JUL 2001 to JUL 2002 | 90%  45 min. |
| JUL 2002 to JUL 2003 | 80%  30 min. |
| JUL 2003 to JUL 2004 | 90%  30 min. |
| JUL 2004 to JUL 2005 | 90%  30 min. |

| JUL 2005 to JUL 2006 | 90%   30 min. |
|---|---|

| Contract Year: | % of 622's Transmitted within Minutes |
|---|---|
| AUG 1997 to JUL 1998 | 80%   30 min. |
| JUL 1998 to JUL 1999 | 90%   30 min. |
| JUL 1999 to JUL 2000 | 75%   15 min. |
| JUL 2000 to JUL 2001 | 80%   15 min. |
| JUL 2001 to JUL 2002 | 85%   15 min. |
| JUL 2002 to JUL 2003 | 90%   15 min. |
| JUL 2003 to JUL 2004 | 90%   15 min. |
| JUL 2004 to JUL 2005 | 90%   15 min. |
| JUL 2005 to JUL 2006 | 90%   15 min. |

(d)     Technology:

    (1)     Electronic Data Interchange:  UP and Customers specifically are to mutually review the implementation of ANSI EDI Transaction Sets set forth below:

| EDI Transaction Set: | Implementation Goal: |
|---|---|
| EDI Booking (301) | December 1997 |
| Freight Release (315) | Specific business requirement TBD to develop & support System programming. |
| USCS Release (315) | Specific business requirement TBD to develop & support System programming. |
| EDI Intermodal Reporting (ANSI 322) | Convert from current ANSI 633 Version |
| EDI Bill of Lading (ANSI 404) | December 1997 |
| Electronic Freight Bill (ANSI 410) | August 1997 |
| Automated Load Plan (ANSI 418) | December 1997 |
| Electronic TIRs via EDI (622/322) | Specific business requirement TBD to develop & support System programming. |
| Freight Payment (820) | June 1998 |

    (2)     Communication:  UP and Customers specifically are to mutually review the implementation of communication improvements as set forth below:

| Technology: | Implementation Goal: |
|---|---|
| Direct Data Communications | December 1998 |
| ISM | January 1999 |

## Section 8.    EQUIPMENT.

(a)    Containers and Chassis

(1)    Customers shall furnish all Containers and, until UP establishes neutral Chassis Pools pursuant to Section 7(c), all Chassis for movements under this Agreement.  UP shall have no responsibility to supply Containers; however, Customers reserve the right to use available rail-supplied Chassis as needed at charges as agreed by the parties to be paid to UP monthly.

(2)    The responsibility of UP for loss, damage, destruction, maintenance and repair of Containers while Containers are under the control of UP shall be governed by the Uniform Intermodal Interchange Agreement (UIIA).

(b)    Railcars

(1)    UP will provide all necessary railcar equipment upon receiving 5 days advance forecast from Customers.  If a sufficient number of DST Railcars are not available, UP will provide non-DST Railcars articulated or non-articulated railcars to accommodate all Customers containers at the same double-stack rates and charges provided in this Agreement for Containers moving in DST Railcars.  When the forecast specifies a beneficial owner requirement for DST Railcars, UP will provide DST Railcars or be responsible for trucking.

(2)    Customers will furnish to UP information as to the number of 45 foot, 40 foot, and 20 foot Containers 5 days prior to tender of Containers to UP.

(3)    Loaded traffic left behind 24 hours from tender to any Union Pacific Intermodal Terminal Facilities (including On-Dock) will be trucked to the final ramp location even if this is not a UP site, upon Customers request; e.g., if the ramp-to-ramp rail movement was billed Los Angeles to Atlanta, UP will truck from Los Angeles to Atlanta.  Customers will reimburse UP for the UP rail rate and will reimburse UP for the other railroad's fee based upon $0.70 per highway mile.

(4)    The responsibility of Customers and UP for loss, damage and/or destruction of the DST Railcars shall be governed by the then-current Office and Field Manuals of the AAR Interchange Rules.

## Section 9.    TRANSPORTATION RATES.

TMBL switch charge shall be translated from the current per car charge of $87 to a per container equivalent charge. 10 containers per railcar will be applied resulting in a base per Container charge of $9.

Should UP receive notice from the Tacoma Municipal Belt Line of an increase in the per car rate, the new per car rate will be divided by 10 and the difference between the new per container charge and $9 will be added to the existing Contract Rate levels.

UP agrees to work with Customers to push for productivity gains to minimize or eliminate excessive charges. When UP and Customers achieve the productivity gains, all net cost savings will be shared equally. For example, if UP can gain direct access to spot trains at Tacoma North Intermodal Yard, UP will replace the current switch charge with the increased operating cost to UP and share equally the remaining savings with Customers.

## Section 13.  BILLING AND PAYMENT PROCEDURES.

Unless otherwise provided in this Agreement, Customers shall pay UP the charges set forth in Exhibits 1, 2 and 3 to this Agreement within 30 days of waybill date as compensation for the transportation services provided by UP. Customers will submit payment via electronic fund transfer or wire transfer. Customers shall be liable for all charges for transportation services provided by UP under this Agreement. If Customers do not pay UP within 30 days of waybill date, Customers shall also pay to UP an interest charge on the monthly unpaid and undisputed bill (including any accrued interest) of 1% per month until fully paid.

## Section 14.  INCENTIVE REFUNDS.

(a)    **Quick-Pay:**  UP agrees to pay a refund on one percent (1%) of the total freight revenue for transportation for movements by Customers when payment is made to UP and received by UP within 7 days from freight bill date, EDI time-stamped. Weekends and holiday due dates will roll to the next business day. Only conventional and double-stack train line haul payments qualify. UP will provide Customers with the incentive refund payment along with supporting detail thirty (30) days or sooner after the end of a calendar quarterly period.

(b)    **Slot Utilization Incentive:**  UP agrees to incent Customers for each whole percent improvement in slot utilization, when considered in the aggregate, over a base slot utilization of 95%. The Slot Utilization Incentive payment shall be equal to $200,000.00 for each percent improvement above 95%. E.g., if Customers achieve 97% slot utilization, when considered in the aggregate, UP's Slot Utilization Incentive payment to Customers will be $400,000.00. If Customers achieve 100% slot utilization, when

considered in the aggregate, UP's Slot Utilization Incentive payment to Customers will be $1,000,000.00. UP will measure slot utilization on unit trains and measure boxes tendered at individual intermodal terminal facilities for non-unit train volumes. Slot utilization will be measured annually beginning August 1, 1998. Any Slot Utilization Incentive payment due to Customers will be paid 30 days thereafter.

Section 15.   ELECTRONIC DATA INTERCHANGE (EDI).

(a)   EDI Commerce Application.

(1)   UP will provide 100% EDI exchange with Customers in return for Customers agreement to provide 100% EDI exchange to UP, providing that all EDI segments and/or elements conform to ANSI standards.

(2)   UP and Customers agree to establish direct connection between UP and "K" Line America's systems. UP and Customers further agree that all future ANSI approved EDI Transaction Sets will be implemented via a direct connection, not through a third party EDI provider.

(b)   Event Reporting. Event reporting timeliness is defined as the measurement of time from when an event occurs and is subsequently electronically reported to Customers. EDI Timeliness is defined as the measurement of time from when the event is transmitted by UP to when Customers receive the electronic communication. Event reporting completeness is defined as the accuracy of event information electronically transmitted. As specified under Section 7, Contract Goals section of this Agreement, UP and Customers agree to mutually pursue the timely and accurate transmission of event reporting.

Section 16.   COMPETITIVE RATE PROTECTION.

UP states that as of August 1, 1997, UP is not charging any steamship line and/or double-stack operator of smaller size, as determined by freight revenue, lower rates when considered in the aggregate than those contained in Exhibits 1, 2 and 3 of this Agreement. If during the term of this Agreement, UP has in effect a tariff or a transportation contract with another party for the movement of containers in double-stack service between the origins and destinations listed in Exhibits 1, 2 and 3 this Agreement under the terms including but not limited to route, duration, service guarantees and volume guarantees, which UP determines are essentially the same as those included in this Agreement, and said tariff or contract is determined by UP to result in lower effective freight rates than the Contract Rates under this Agreement, the affected rates in this Agreement will be adjusted to a level equal to the effective freight rate set forth in said tariff or contract. Nothing in this Section shall be construed to require UP to breach any obligation, including but not limited to confidentiality provisions, in any agreements to which UP is, or may become, a party. Upon reasonable request by Customers, UP shall

furnish an officer's certification from time to time during the term of this Agreement stating that UP has complied with the requirements of this Section.

## Section 17.  NEW BUSINESS OPPORTUNITIES.

As new vessel service lanes, not presently protected by any rail corridor in this Agreement are established, UP agrees to propose rail transportation services and rates. To the extent UP's proposed rail transportation services and rates meet current competitive conditions, UP will be awarded the business. To the extent UP's proposed rail transportation services and rates do not meet current competitive conditions and UP is unable or willing to counter-propose alternative rail transportation services and rates which meet current competitive conditions, Customers will have the right to pursue and accept other rail carrier services and rates and the new container traffic will be considered ineligible traffic under the terms and conditions of this Agreement.

## Section 18.  OMAHA REEFER TERMINAL SERVICE.

UP will provide Customers free storage for a maximum of 80 empty reefer containers under the terms and provisions outlined in the rate exhibit. UP is agreeable to providing a mutually acceptable allocation of additional storage as Customers Omaha reefer volume grows. The allotted container space will be reviewed annually at the end of each contract year. If Customers Omaha reefer rail volume declines below the prior year's volume, UP reserves the right to reduce the allocated spaces by an equal percentage to that of the market decline.

UP will provide Customers with shore power directly proportionate to the percentage of loaded reefer container units Customers ship on UP at an intermodal facility as compared to all other loaded reefer container units shipped via the same intermodal facility. For example, if Customers constitute 90% of all reefer container units shipped out of the UP Omaha intermodal facility, Customers will be assigned 90% of all existing shore power. If Customers loaded reefer container units grow beyond existing shore power capacity, Customers and UP will jointly pursue the addition of shore power and share in all shore power construction costs equally.

## Section 19.  LATHROP CONTINGENCY PLAN.

The Lathrop Service Contingency Plan will be implemented on those occasions when the train is running behind schedule, but the commitment to the vessel can be made by deramping the reefer containers at Lathrop.

(1)    UP's Harriman Dispatch Center (HDC) and National Customer Service Center (NCSC), along with Customers National Transportation Group (NTG), will jointly determine when deramping is required at Lathrop. At the time of agreement, a UP NCSC Problem Log must be established; this will be coordinated between NTG and the NCSC.

(2)     In those instances where Lathrop is required, HDC will coordinate with NTG to determine the estimated time of arrival (ETA) at Lathrop. Based upon this information, NTG will coordinate the drayage.

(3)     Customers will dispatch the trucker to bring a bare chassis (with or without gensets) from Oakland to Lathrop to await the arrival. The trucker will invoice the UP directly for all trucking charges including any stand-by time resulting from an inaccurate ETA. An estimate of the expected trucking charges must be provided to the NCSC by the NTG prior to the actual dray, so that all estimated costs are recorded in the UP Problem Log.

(4)     UP will provide qualified mechanics on site at Lathrop to perform the same services provided at Oakland. These services include disconnecting the electrical cables between the genset/powerpack units and the reefer containers. "K" Line will not be required to arrange for sub-contracting. UP will absorb the cost of this service.

(5)     UP is agreeable to pay all trucking cost between Oakland and Lathrop including stand-by time resulting from a late train, if and when this contingency service is required under the agreement. The contingency plan will be implemented on those occasions when the train is running behind schedule, but the commitment to the vessel can be made by deramping the reefer containers at Lathrop.

Section 20.  TERMINAL SERVICES.

(a)     UP agrees to provide Customers with storage for empty Containers and/or Chassis as set forth below:

| ORT/DRT LOCATION: | ALLOCATED SPACE: |
| --- | --- |
| CHICAGO | 850 |
| DALLAS | 150 |
| DENVER | 200 |
| HOUSTON | 400 |
| KANSAS CITY | 275 |
| LATHROP | 25 |
| MEMPHIS | 300 |
| MINNEAPOLIS/ST. PAUL | 0 |
| NEW ORLEANS | 0 |
| OMAHA | 0 |

| SALT LAKE CITY | 0 |
|---|---|
| ST. LOUIS | 150 |

(b)    **Container/Chassis Storage Facility Use.**

(1)    Allocated space is defined as space available for empty containers, empty containers on chassis, and/or bare chassis, hereinafter collectively referred to as unit(s).

(2)    Only equipment repair vendors approved by UP will be permitted on the facility.

(3)    Allocated space shall apply only for Containers having a prior loaded move on UP.

(4)    UP reserves the right to limit the allocated space to the aforementioned number of units to ensure intermodal Terminal Facility operations remain fluid.

(5)    Allocated space will be reviewed following the establishment of a neutral chassis pool at each individual location. The percentage of Chassis versus Containers will be the factor used to adjust allocated space. For example, if history indicates 85% Containers and 15% Chassis on a facility, then the allocated spaces may be adjusted by 15%. The allocated space may be modified based upon 12 months historical use. Customers needs will also be considered. Chassis used by Customers in the neutral Chassis pools established under Section 7(c) will not be counted in determining allocated space.

(6)    Where zero (0) allocated space is noted in the table above, it is specifically agreed if the UP should establish or expand upon an Intermodal Terminal Facility, UP will consider providing allocated container yard space to Customers. It is specifically agreed that the decision to provide allocated space will be based upon Customers needs and UP's satisfactory return on investment/assets.

(c)    **Accessorial Fee Schedule & Fee Application.**

(1)    Daily charge applies for each space exceeding the agreed to number of allocated spaces at an Intermodal Terminal Facility, i.e., inventory of Customers controlled containers will be taken daily and a charge of $65.00 for each space in excess of the agreed-to number will apply. Customers agree to immediately dray off units exceeding number of allocated spaces.

(2)    $50.00 per extra Container lift will apply. Extra lifts are defined as any lift required beyond the original ramp to, or deramp from, railcar, including lifts from

C:\TEMP\KLINECFJ-A.DOC                                      23

ground to chassis, chassis to ground, or chassis to chassis. Extra flips resulting from UP placing Customers containers on foreign chassis will not be assessed an extra lift fee.

(d)     **Billing and Extra Free Time**.

(1)     UP will invoice monthly for services provided in this Section 20.

(2)     Customers will make payment of charges no later than 20 days from the date of the invoice.

(3)     Customers will be granted Extended Free Time (EFT) under the following conditions:

a.     EFT will be granted on Quota Cargo. 25 days on a maximum of 10 containers at any one time per ramp (25 at Global 2). After 25 days, a charge of $65.00 per day per container will apply after expiration of free time.

b.     Customers must send a written request for EFT 5 business days prior to container arriving at destination ramp, outlining the EFT required on Quota Cargo.

(e)     **Terminal Services**.

(1)     **Empty Container**

a.     Intermodal Terminal Facilities will inspect at in-gate for damage in accordance with AAR Interchange Rules. Driver to open door and unit will be inspected for cleanliness.

b.     UP will notify Customers via automated facsimile transmission of the J-1 form units mechanically unsafe for rail movement.

c.     Customers will provide UP the booking number. Drivers will not be allowed to remove a container from the Intermodal Facility without a booking number.

d.     Lifts ("flips") will be completed during published hours by individual ramp. Specific ramp lift periods are individual ramp based and subject to change.

e.     Special terminal services handled on a case-by-case basis. Customers will provide specific details on services required which will enable UP to determine:

1.    If UP can provide the special handling requested, and

2.    What fee will be applied to the special handling services to be provided.

(2)    **Loaded Container**.

a.    UP will provide notification of container availability via automated facsimile and/or EDI transmission.

b.    Intermodal Terminal Facilities will enter out-gated loads in the van departure screen along with the seal number as provided by the driver. The out-gate inspection and seal verification of outbound loads is the responsibility of the driver.

c.    Intermodal Terminal Facilities will physically check the container and chassis and record the seal number in the van arrival screen on in-gated loads.

d.    Intermodal Terminal Facilities will enter the receipt of bare chassis into System.

e.    Intermodal Terminal Facilities will enter the booking number on in-gate loads in the van arrival screen. The booking number must be provided by the driver.

f.    Lifts ("flips") will be completed during published hours by individual ramp. Specific ramp lift periods are individual ramp based and subject to change.

g.    (3)    **Reporting Requirements**.

a    UP will send a daily inventory of containers and chassis on Intermodal Facilities. The daily inventory will include whether containers are mounted, grounded or if the chassis is bare at OASIS terminals only.

b.    UP will report on the daily inventory the length of time a unit has been on the Intermodal Facility. The report will note the container number, chassis number and dwell time.

c.    UP will notify Customers by automated facsimile of any unit mechanically unsafe for rail movement.

d.    EDI 622 messages will be sent on all in and out-gate events.

Section 21.  <u>NON-STANDARD SERVICE OPTIONS.</u>

<u>Third Party International (TPI)</u>  TPI business is International Intermodal business from those ocean carriers, Non Vessel Operating Common Carriers (NVOCC's) and Shipper Associations who do not have inland logistic management capability or no current contractual arrangement for transportation services with UP.  Customers may market and UP will transport TPI business under the guidelines noted herein:

(1)     Following prior consultation with Customers, UP will have the right to work directly with the TPI accounts that may be at the time working through Customers. UP desires to maintain the right to discuss any business with any potential customer(s) if the potential customer(s) requests a direct business relationship with UP.  UP will consult with Customers prior to advancing any direct business relationship with the TPI account who is working through Customers.

(2)     The duration of the TPI rates will have a standard of short term durations and be published in the UP Special Commodity Quote format.  TPI rates will not be added to Exhibits 1, 2 and 3.

(3)     UP's Contract Rates with Customers are not available for application with TPI.  Customers must advise UP regarding the TPI opportunity for UP's review.

(4)     Customers must provide all necessary facilities, services and Chassis required to support its TPI movements, including container yard storage, if necessary.

(5)     All TPI shipments must be made in Containers owned or leased by the TPI entity.  The TPI account cannot use the rates and services provided by Customers for any third party shipments.

(6)     Customers may also pursue the arrangement of TPI agreements with Non-Vessel Owner Common Carriers.

(7)     If Customers are required to establish a term which extends beyond the previously outlined TPI guideline, Customers may pursue the extended term upon prearrangement of rates and terms with UP.

Section 22.  <u>OTHER APPLICABLE PROVISIONS.</u>

(a)     Services or other matters not specifically addressed in this Agreement shall continue to be governed by and paid for in accordance with the rules and provisions that would have applied in the absence of this Agreement, such as Exempt Circular No. 20, including any amendments or supplements thereto or reissues thereof.  To the extent any such rules or provisions as they relate to the parties are inconsistent with the terms of this Agreement, the terms of this Agreement shall govern.

(b)      In the event loaded Containers moving under this Agreement must be transloaded to different Containers or reloaded because of cargo damage or leakage, Customers shall bear all expenses involved in transloading or reloading the Container; PROVIDED, HOWEVER, that Customers shall not be responsible for transloading or reloading expenses incurred due to Container damage or leakage caused by UP's negligence. If the transloading or reloading expenses are not the result of an action by the contract signatories, UP and Customers shall cooperate to recover those expenses from the responsible person or entity.

## Section 23.  TERM RENEGOTIATION/TERMINATION.

(a)      This Agreement is effective from August 1, 1997 ("Effective Date"), and shall continue in effect for a period of 9 years, consisting of 2 Contract Periods, the initial Contract Period shall be the first 6 annual periods, the subsequent Contract period shall be the remaining 3 annual periods through and including August 1, 2006. For purposes of this Agreement, an Annual Period shall begin on August 1 and end on July 31, during the 9 year term of this Agreement.

(b)      If performance of the terms of this Agreement shall cause a material adverse effect on any party due to causes beyond the control of that party, the party suffering the material adverse effect may request in writing that any and all terms of this Agreement be renegotiated; PROVIDED, HOWEVER, that competitive transportation proposals shall not be grounds for renegotiation. New terms so renegotiated shall be reduced to writing in the form of an addendum to this Agreement. The written request for renegotiation under any part of this Section shall specify the reason for renegotiation and a proposed schedule for beginning the negotiations within 30 days if possible. If, after renegotiation in good faith, the parties cannot agree upon new terms within 60 days of the written request for renegotiation, this Agreement shall be terminated but, in order to allow the parties sufficient time to conclude the affected business, termination shall not be effective sooner than 180 days from the date of the written request for renegotiation.

(c)      Termination of this Agreement for any reason shall not release any party from any obligation that may have accrued before such termination.

(d)      It is specifically agreed that discontinuation of all rail services due to insolvency by one or more of the Class I railroads in the United States, or if a U.S. Rail Transcontinental merger is approved by the Surface Transportation Board, or following the first 2 years of this Agreement Congress enacts radical changes in the Shipping Act of 1984, either party can initiate renegotiation of this Agreement by giving 90 days written notice of its intention to renegotiate. Such written notice must be given not later than 120 days after the effective date of the event which is the cause for the request for renegotiation. If written notice is not given within 120 days of the event, the right to renegotiation is waived.

(e)      At the end of each Contract Year, this Agreement shall be reviewed against

the performance goals specified under this Agreement. It is specifically agreed that if UP meets the performance goals, then the Agreement will automatically continue through Contract Years seven, eight and nine. If UP fails to meet the performance goals by the end of Contract Year 6, Customers can initiate renegotiation or termination of this Agreement by giving 60 days written notice of this intention. If written notice is not given within 120 days following the end of the Contract Year under review, the right to renegotiation is waived, and the next Contract Year will commence.

## Section 24.  FORCE MAJEURE.

(a)    In the event any party is unable to meet its contract obligations as a result of acts of God, war, insurrection, strikes, embargoes, lockout, derailments on foreign railroads, impassable mainline derailments on UP, or any like causes beyond its control, occurring on the UP or foreign railroads, the parties' obligations which are affected by the force majeure condition shall be suspended for the duration of the condition; PROVIDED, HOWEVER, that the parties shall make all reasonable efforts to continue to meet their obligations for the duration of the force majeure condition; and PROVIDED, FURTHER, that the party declaring force majeure shall notify the other parties promptly in writing of when the force majeure begins, the nature of the force majeure condition and when the condition is terminated. All units diverted to alternative means of transportation during the period that Force Majeure isa in effect will be excluded from the minimum Transportation Requirement set forth in section 3(a) of this Agreement.

(b)    The suspension of any obligation owing to force majeure shall neither cause the term of this Agreement to be extended nor affect any rights accrued under this Agreement prior to the force majeure condition.

## Section 25.  NOTICES.

Except as otherwise provided in this Agreement, any notices given by any party under this Agreement shall be in writing, and shall be effective upon delivery to the applicable parties by hand, by wire or other electronic device, or by U.S. Certified Mail, Return Receipt Requested, addressed as follows:

To UP:          Union Pacific Railroad Company
                1416 Dodge Street
                Omaha, Nebraska 68179
                ATTN:  Vice President & General Manager Intermodal
                Phone No.: (402) 271-3841 or 3848
                Fax No.:  (402) 271-4280


To Customers:   K-Line America
                301 Concourse Blvd., Suite 300
                Glen Allen, VA

ATTN: President and CEO
Phone No.: (804) 935-3100
Fax No.: (804) 935-3100 or 3101

## Section 26. ASSIGNMENT.

No party hereto may assign this Agreement, in whole or in part, without the prior written consent of the other parties, which consent shall not be unreasonably withheld. Any assignment of this Agreement, without such consent in writing, shall be absolutely void, and at the option of the parties whose written consent should have been obtained, this Agreement may be terminated. Subject to this Section, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns.

## Section 27. LIABILITY INDEMNITY.

(a)     Transportation rates set forth in this Agreement are considered release value rates and are established in consideration of limiting the liability of UP. Liability for freight loss and damage to lading while under the control of UP shall be governed by applicable rules circulars. UP's liability for freight loss and damage to the contents of any one Container is limited to $250,000 per Container. Claims for freight loss and damage shall be submitted to UP within 1 year of date of occurrence.

(b)     On eastbound shipments in doublestack service, UP shall be deemed to be in possession of the Container from the time the Container is interchanged by Customers or the agent at origin terminal or on Railcars to UP or its agent, and shall end when the Container is interchanged at interchange point to a connecting railroad or to Customers or the agent at UP's terminal. On westbound shipments in doublestack service, UP shall be deemed to be in possession of the Container from the time the connecting railroad has performed physical interchange of the Container to UP at the interchange point, or from the time the Container is tendered to UP by "K"Line or the agent at origin terminal, and shall end at the time Railroad or its agent releases the Container to Customers or the agent at the destination.

## Section 28. NONDISCLOSURE/CONFIDENTIALITY.

No party may disclose any of the terms of this Agreement to any non-party without the prior written consent of the other parties except (1) as required by law; (2) to a corporate parent, subsidiary or affiliate; or (3) to auditors retained by a party for the purpose of assessing the accuracy of freight charges, if, and only if, the auditor agrees in a legally binding instrument that it will abide by this confidentiality clause as if auditor were party to this Agreement. Each party agrees to indemnify the other from and against any damage suffered by a party as a result of any disclosure by auditor(s) in violation of this CONFIDENTIALITY provision.

## Section 29. HAZARDOUS MATERIALS PROVISIONS.

C:\TEMP\KLINECFJ-A.DOC

(a)    In the event that a Container contains hazardous material, and such hazardous material is identified by the consignor, the Customers shall obtain certification on the shipping documents received from the consignor that the consignor has complied with all appropriate Federal regulations governing the transportation of such hazardous materials, including, but not limited to, description, classification, marking, labeling, loading, blocking and bracing, placarding, commodity mix, and commodity Containers. Customers will assure that hazardous materials shipments are properly identified by consignors in shipping documents tendered to UP and shipments are properly placarded by consignors.

(b)    Containers discovered leaking hazardous materials at any Intermodal Terminal Facility by UP will not be allowed to leave the premises until responsibility therefore is determined, the leak is repaired, and any notice required by law is provided to parties.  UP shall notify Customers or the person identified on the shipping papers promptly upon discovering Containers leading, releasing or discharging hazardous materials at any time while being transported by UP.  Customers shall contact immediately the consignor or any party listed on the shipping papers to be notified after receiving notice from UP.  All parties shall cooperate to complete cleanup, disposal and other remedial actions reasonably necessary to expeditiously and prudently abate or eliminate any hazard.

(c)    Customers shall cause consignors to be aware that shipments must comply with (i) all applicable laws and regulations governing the transportation of hazardous materials by rail and (ii) the provisions of UP's Exempt Circular No. 20-series pertaining to "Prohibited Articles," and "Hazardous Materials," and related and successor provisions having to do with the governing rules and requirements applicable to hazardous materials and the identification of certain commodities which are prohibited by UP from movement over its lines of UP.

(d)    In those situations when Customers receive notification from a consignor that a commodity not acceptable for shipment over UP has been tendered, or that an explosive, dangerous article or other hazardous material requiring identification, placarding, or other notification to UP has been tendered, and Customers do not notify UP as required or does not provide proper information on hazardous materials shipping papers, Customers and UP agree to apportion liability for any injury to or death of persons, damage to property, including contamination of soil, water or air, or any other harm, including fines and/or penalties imposed by any governmental entity, and cleanup costs caused by leakage, spill, discharge, or release of the commodity as follows: (i) If the commodity is one that UP has indicated in its Rules Circulars (or successor circular to Tariff) it will not carry in intermodal service, or one that government regulations prohibit in intermodal service in the form tendered, Customers will defend, indemnify and hold UP harmless for any loss or damage to property, injury to or death of persons, any fines or cleanup cost and any violation of law, caused by the leakage, spill, discharge, or release of the commodity, regardless of degree of fault of Customers or UP; (ii) If the commodity is one not covered in (i) above, Customers and UP will apportion liability as between them

for any leakage, spill, discharge, or release of the commodity in accordance with the principles of pure comparative negligence.

(e)     Customers and UP shall cooperate to obtain recovery for all claims arising out of loss, damage, death or injury caused by any defects in privately owned or leased Containers, improper loading, blocking or bracing of Containers or failure of consignor or Customers to properly close, secure and tender Containers to UP for transportation.

(f)     UP reserves the right to amend the Exempt Circular Items pertaining to hazardous materials (or successor circular or tariff) on not less than 10 days notice.

## Section 30.  ARBITRATION.

(a)     If any dispute between the parties should arise regarding the interpretation, application or enforcement of any of the terms of this Agreement, and such dispute cannot be resolved by the parties within 60 days after either of the parties notified the other of its desire to arbitrate the dispute, then the dispute shall be settled by arbitration at a location to be selected by the arbitrators in accordance with the commercial arbitration rules of the American Arbitration Association then in effect.  For arbitration, a panel of three arbitrators shall be named, one to be selected by the two arbitrators so selected.  If the two arbitrators previously appointed by UP and Customers cannot agree upon the third arbitrator within 15 days, then either party may apply to the presiding judge of any court of competent jurisdiction for appointment of the third arbitrator.  In the alternative, the parties may agree on a sole arbitrator.

(b)     Determination of the arbitrators shall be binding upon the parties and each party hereby consents to the entry of judgment by any court of competent jurisdiction in accordance with the decision of the arbitration panel.  No rule of arbitration which would deprive a party of the right to be represented by counsel, to present evidence or to cross-examine witnesses presented by the other party shall be effective in any arbitration proceeding arising out of this Agreement.

(c)     The arbitrators shall have no power to modify any of the contract provisions without all the parties' consent and their jurisdiction is limited accordingly.  The decision of the arbitrators shall be rendered within 90 days after the matter has been submitted.

(d)     Each of the parties shall be responsible for the expenses incurred by the arbitrator appointed by said party, and the expenses, fees and cost of the third arbitrator, or sole arbitrator shall be borne equally between the parties.

(e)     Any terms and conditions of this Agreement as well an any confidential cost information which must be disclosed by any party during the course of arbitration shall only be disclosed pursuant to the arbitrators' execution of a non-disclosure agreement acceptable to all parties.

Section 31.  <u>CHOICE OF LAW</u>.

        The law of the State of New York shall govern the performance and enforcement of the rights and obligations of the parties to this Agreement.

Section 32.  <u>NON-WAIVER</u>.

        The failure of any party to enforce any provision of this Agreement shall not be construed as a waiver of that provision.

Section 33.  <u>ENTIRETY, AMENDMENTS AND SEVERABILITY</u>.

     (a)    This Agreement comprises the entire agreement and understanding between the parties.  All amendments, supplements, modifications to and waivers of the terms of this Agreement shall be in writing and signed by the parties.  This Agreement supersedes any prior agreement between the parties.  However, the execution of this Agreement shall not release any party from any obligation that may have accrued for rail transportation provided prior to the effective date of this Agreement.

     (b)    If any provision of this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 34.  <u>APPLICATION & INTENTION TO COMBINE SP CONTRACT SP-T-5123 INTO THIS AGREEMENT</u>.

        UP and Southern Pacific Transportation Company ("SP") contracts will be combined into one agreement as the traffic of the two railroads is combined into one operating plan.  Combined operations notwithstanding, SP will still be identified as a separate party because it is a separate railroad under Common Control by UP.  Until SP is merged out of existence we will acknowledge SP's participation in the routes and rates.

        As the traffic of the UP and SP is combined into one operating plan there may be conflicting contractual ramifications.  For example, there may be a Customers move on the SP that when moved over the UP may be in conflict with another contractual commitment.  In this case, a negotiated solution for that conflict may be required.