UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/20/08

- - - - - - - - - - - - - - - - - -x

SOMPO JAPAN INSURANCE COMPANY OF      :
AMERICA and SOMPO JAPAN INSURANCE,
INC.,                                 :

                    Plaintiffs,       :        **OPINION**

          - against -                 :        07 Civ. 2735 (DC)

NORFOLK SOUTHERN RAILWAY              :
COMPANY et al.,
                                      :
                    Defendants.       :

- - - - - - - - - - - - - - - - - -x

**APPEARANCES:**    MALOOF BROWN & EAGAN LLC
                         By:  David T. Maloof, Esq.
                              Thomas M. Eagan, Esq.
                    411 Theodore Fremd Avenue, Suite 190
                    Rye, New York  10580-1411
                       Attorneys for Plaintiffs

                    KEENAN COHEN & HOWARD P.C.
                         By:  Charles L. Howard, Esq.
                    One Pitcarin Place
                    Jenkintown, Pennsylvania  19046
                              - and -
                    GUTTERMAN & ASSOCIATES
                         By:  Barry N. Gutterman, Esq.
                    The Lincoln Building
                    60 East 42nd Street, 46th Floor
                    New York, New York  10165
                       Attorneys for Defendants

**CHIN, District Judge**

        In March 2006, four companies arranged to have their

goods -- including tractors, automotive components, ice makers,

sushi cases, and copying machines -- shipped from Asia to Long

Beach, California by boat, and then transported across the United

States by train to Georgia.  The train, however, derailed in

Texas on April 18, 2006, and the cargo aboard was damaged.  Sompo

Japan Insurance Company of America and Sompo Japan Insurance Inc.

(together, "Sompo"), which insured the companies' cargo, filed this action against the railroad carriers to recover for the damage.

Before the Court is plaintiffs' motion for partial summary judgment. Plaintiffs ask the Court to decide one issue -- whether their recovery is limited by various contracts among the railroad defendants, shipping companies, and insureds, or whether they may recover the full value of the damaged cargo. The answer hinges on whether certain contracts between the railroad carriers and the shipping companies were entered into pursuant to 49 U.S.C. § 10709, and, if so, whether the rail companies were required to offer the insureds an option for full liability under 49 U.S.C. § 11706, popularly known as the Carmack Amendment.

Plaintiffs' motion for partial summary judgment is granted. For the reasons set forth below, I hold that the rail carrier defendants' liability is not limited by its contracts with the shipping companies or the insureds' contracts with the shipping companies, and plaintiffs may seek recovery for the full value of the damaged cargo.

## BACKGROUND

### A.    The Facts

The facts are drawn from the pleadings, declarations, exhibits, and the parties' Rule 56.1 statements. For purposes of this motion, the facts are construed in the light most favorable to defendants as the parties opposing partial summary judgment, and conflicts in the evidence have been resolved in their favor.

The damaged cargo at the center of this case was shipped by boat from various points in Asia in late March 2006 to the Port of Long Beach, California, and then transported by a train owned and/or operated by defendants. The cargo owners -- plaintiffs' insureds -- arranged for transport of the cargo with shipping companies, who in turn contracted for the rail transportation leg of the trip with the defendant rail carriers. On April 18, 2006, that train carrying the insureds' cargo derailed in Texas and the containers aboard were damaged.

1.  **The Bills of Lading**

On March 31, 2006, Yang Ming Transport Corporation ("Yang Ming") issued sixteen waybills for the carriage of Kubota New Agricultural Tractors shipped by Kubota Corporation from Tokyo aboard the M/V Cherokee Bridge to the Port of Long Beach, California, and from there to Jefferson, Georgia. (Eagan Decl. Ex. 3). The Yang Ming bill of lading standard terms provided that the carrier's liability was limited with respect to the goods to $500 per package or, when the goods were not shipped in packages, to $500 per customary freight unit, subject to various other provisions. (Id. Ex. 9 ¶ 23).

On March 31, 2006, Nippon Express issued a bill of lading for the carriage of 7,570 cartons of automotive component parts shipped by Hitachi, Ltd. from Tokyo aboard the M/V Cherokee Bridge to the Port of Long Beach, California, and from there to Monroe, Georgia. (Id. Ex. 5). Nippon Express engaged Yang Ming to perform the carriage, and Yang Ming issued a waybill for the carriage of the 7,570 cartons. (Id. Ex. 4). The Nippon Express

bill of lading provided that the carrier's liability would not exceed $500 per package or unit unless the merchant declared a higher value for the goods with the consent of the carrier, in which case the higher value would be the limit on liability. The bill of lading further specified that damages claimed could not exceed actual loss. (Id. Ex. 11 ¶ 7).

On March 28, 2006, Sumitrans issued a bill of lading for the carriage of 495 cartons of ice makers and sushi cases shipped by Hoshizaki Electric Co., Ltd. from Tokyo aboard the M/V Cherokee Bridge to the Port of Long Beach, California, and from there to Griffin, Georgia. (Id. Ex. 7). The Sumitrans bill of lading "Terms and Conditions" stated that the carrier's liability would not exceed $500 per package or unit unless the merchant had declared a higher value with the consent of the carrier. (Id. Ex. 7 ¶ 6).

On March 26, 2006, NYK Line issued a waybill for the carriage of a container of copying machines and accessories shipped by Canon Finetech Industries Development Co., Ltd. from Yantain, China aboard the M/V OOCL Ningbo to the Port of Long Beach, California, and from there to Georgia.[1] (Id. Ex. 8). The NYK Line bill of lading provided that carrier liability was limited to $500 per package or customary freight unit. (Id. Ex. 10 ¶ 26).

---

[1] The parties' Rule 56.1 statements indicate that the final destination for the shipment was Georgia. The bill of lading, however, identifies Long Beach, California as the "place of delivery." For purposes of this motion, it is assumed that the cargo was on the train when it derailed in Texas.

None of the bills of lading for any of the shipments mentioned the option of electing full "Carmack Liability."

## 2. Other Waybills

The cargo described above was transported by ship, discharged in the Port of Long Beach, California, and placed on rail lines owned and operated by the BNSF Railway ("BNSF"). (Luebbers Decl. ¶ 7). BNSF generated its own waybills when it accepted the containers from the ocean carriers in Long Beach. (Id. ¶ 3). For all the containers except one, Yang Ming Marine Line was identified as shipper and consignee of the containers. (Id. ¶ 4). For the remaining container, NYK International was identified as the shipper and consignee. (Id. ¶ 5).

The Yang Ming bills of lading standard terms and conditions from its website state:

> Notwithstanding the foregoing, in the event there is a private contract of Carriage between the Carrier and any Underlying Carrier, such Multimodal Transportation will be governed by the terms and conditions of said contract which shall be incorporated herein as if set forth at length and copies of such contract(s) shall be available to the Merchant at any office of the Carrier upon request.

(Eagan Decl. Ex. 9 ¶ 7(2)(B)).

In Dallas, Texas, the containers were interchanged from BNSF to Norfolk Southern Railway Corporation ("NSR") for the final leg of carriage inland.[2] (Luebbers Decl. ¶ 7). NSR

_____

[2] The cargo was technically loaded on a train operated by Kansas City Southern Railway Company ("KCSRC") in Dallas, Texas. KCSRC was to transport the containers to Meridian, Mississippi, where they were to be loaded onto a train operated by NSR. Pursuant to an agreement between KCSRC and NSR, KCSRC was transporting the containers on behalf of NSR, and NSR was

produced "Miscellaneous Waybills" when the containers were interchanged in Dallas. (Eagan Decl. Ex. 12). These "Miscellaneous Waybills" did not mention the option of electing full "Carmack Liability" or 49 U.S.C. § 10709. (Id.)

### 3. The Intermodal Transportation Agreements

Prior to arranging this shipment, the shipping companies -- Yang Ming and NYK International -- had entered into general agreements for the transport of goods with NSR. In August 2004, NSR executed an Intermodal Transportation Agreement ("ITA") with Yang Ming that addressed the shipment of all intermodal containers tendered by Yang Ming to NSR for rail transport. (Howard Decl. Ex. B). This agreement, which expires in May 2009, provides for specific services at specific rates and conditions for whenever NSR provides rail services to Yang Ming. (Id.). The Yang Ming ITA section addressing "Loss and Damage" states that Yang Ming will be held harmless for loss occurring by NSR's fault (including derailment), and that NSR's "liability for freight loss and damage will be subject to the dollar limitation set forth in the Rules Circular at the time a claim for freight loss and damage is made." (Id. Ex. B at 8). It also states that the agreement is "intended for the sole benefit of NS and Yang Ming." (Id. Ex. B at 11).

In April 2003, NSR entered into an ITA with NYK Line which addresses the shipment of intermodal containers tendered by

---

therefore responsible for the containers while they were in KCSRC's possession. (See Defs.' Rule 56.1 Counter-Statement ¶ 29 & n.1).

NYK Line to NSR for rail transport. (Id. Ex. C). That contract, which was extended through October 2007, provides for specific services at specific rates and conditions for whenever NSR provides rail services to NYK Line. (Id.). The NYK Line ITA purports to incorporate NSR's "Rules Circular No. 2" by reference. (Id.). It does not contain a section addressing loss and damage. (Id.). It states that the agreement "is intended for the sole benefit of NS and NYK." (Id.).

### 4. **The Rules Circulars**

NSR's Intermodal Rules Circular #2, which is available on the company's website, provides that NSR's liability for loss, damage, or delay to any shipments under the circular would be limited to the lesser of the value of the cargo at the destination and $250,000. (Eagan Decl. Ex. 14 ¶ 8.3.3). The Rules Circular #2 further states that "Carmack liability is offered only for shipments which would have been subject to [Carmack] if intermodal traffic were not exempt from [Carmack], and not for any foreign, ocean or other movement to which the Statute is otherwise applicable." (Id. Ex. 14 ¶ 8.4.1). KCSRC also published a Rules Circular which provided a Carmack liability option, but only for shipments originating domestically. (Id. Ex. 19 at 3).

NSR never entered into any transportation contracts with the insureds Kubota Corp., Hitachi, Ltd., Hoshizaki Electric Co., Ltd., or Canon Finetech Industries Development Co., Ltd. (See Tr. 31-32).[3]

---

[3] "Tr." refers to the transcript of the November 21, 2007 oral argument.

## B. **Procedural History**

On April 4, 2007, Sompo filed the instant complaint against defendants NSR, KCSRC, and Norfolk Southern Corporation. On August 30, 2007, plaintiffs moved for partial summary judgment, and on August 31, 2007, defendants moved to transfer the case. The Court received opposition and reply papers for both motions.

On October 4, 2007, defendants submitted a letter to the Court requesting leave to file a sur-reply in connection with plaintiffs' partial summary judgment motion. On October 5, 2007, plaintiffs submitted a letter requesting leave to file a sur-reply in connection with defendants' motion to transfer, appending a sur-reply memorandum of law to their letter. I denied both requests on October 22, 2007, and notified the parties that I would disregard plaintiffs' sur-reply and that oral argument was scheduled for November 21, 2007.

The Court held oral argument for both motions on November 21, 2007. I denied defendants' motion to transfer from the bench and reserved decision on plaintiffs' motion for partial summary judgment. Following oral argument, the parties submitted letters that addressed two questions raised at oral argument: (1) what constitutes a "10709 contract" and (2) whether a recent decision by Judge Batts in the matter <u>Sompo Japan Insurance Co. v. Union Pacific Railroad Co.</u> provides authority for the Court's decision on related issues in this case. Pursuant to my order dated January 15, 2008, I accepted final letter submissions on these two issues until January 24, 2008.

## DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate only where the parties' submissions "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Summary judgment is inappropriate if the Court, resolving all ambiguities and drawing all reasonable inferences against the moving party, finds that the dispute about a material fact is "such that a reasonable jury could return a verdict for the nonmoving party."  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

### B.  The Statutory Scheme

Congress passed the Interstate Commerce Act (the "ICA") in 1887 and created the Interstate Commerce Commission (the "ICC").  24 Stat. 379.  The ICA empowered the ICC to regulate railroad rates.  Under the ICA, freight rates were established by tariff filings with the ICC, and the ICC had the ability to declare a rate discriminatory and unreasonable.  Maislin Indus., U.S., Inc. v. Primary Steel, Inc., 497 U.S. 116, 126-129 (1990).  Later, Congress shifted the regulatory responsibility to the Surface Transportation Board (the "STB").  See ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803.

## 1. **The Carmack Amendment**

Congress added the Carmack Amendment ("Carmack") to the ICA in 1906.[4] Carmack created "'a national scheme of carrier liability for goods damaged or lost during interstate shipment under a valid bill of lading.'" Sompo Japan Ins. Co. of Am. v. Union Pac. R.R. Co., 456 F.3d 54, 58 (2d Cir. 2006) (quoting Ting-Hwa Shao v. Link Cargo (Taiwan) Ltd., 986 F.2d 700, 704 (4th Cir. 1993)). One purpose of Carmack was to prevent transportation companies from undermining the ICC's regulatory tariff scheme by setting off damages as a method of discounting shipping rates to favored customers. Consol. Rail Corp. v. Primary Indus. Corp., 868 F. Supp. 566, 576 (S.D.N.Y. 1994) (citing Chicago & N.W. Ry. Co. v. Lindell, 281 U.S. 14, 16 (1930)). Carmack permits a shipper to recover for the actual damage or loss from either the delivering carrier or the carrier issuing the bill of lading or receipt.[5] Sompo, 456 F.3d at 59.

Accordingly, Carmack requires that a rail carrier providing transport issue a receipt or bill of lading for property it receives and makes it liable for the actual loss or injury to the property it transports by rail. 49 U.S.C. §

---

[4] Originally codified at 49 U.S.C. § 20(11), Carmack was recodified in 1978 at 49 U.S.C. § 11707 and then recodified again in 1996 at 49 U.S.C. § 14706. See DiPaolo Mach. Works, Ltd. v. Prestige Equip. Corp., 998 F. Supp. 229, 233 n.1 (E.D.N.Y. 1998). The current version of Carmack is codified at 49 U.S.C. § 11706. See Jessica Howard Ltd. v. Norfolk S. R.R. Co., 316 F.3d 165, 166 n.3 (2d Cir. 2003).

[5] Bills of lading are contracts that record that a carrier has received goods from the shipping party, state the terms of carriage, and are evidence of a contract for carriage. Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 18-19 (2004). Intermodal through bills (or intermodal bills of lading) are those that contemplate multiple modes of transportation. See Sompo, 456 F.3d at 56.

11706(a). Carmack specifically covers "the inland [rail] leg of an overseas shipment conducted under a single 'through' bill of lading.'" <u>Neptune Orient Lines, Ltd. v. Burlington N. & Santa Fe Ry. Co.</u>, 213 F.3d 1118, 1119 (9th Cir. 2000).

## 2. <u>The Staggers Act</u>

A series of statutes passed in the 1970s and 1980s deregulated the railroad industry. One example of this deregulation was the Staggers Rail Act of 1980 ("Staggers"), Pub. L. No. 96-448, 94 Stat. 1895. Staggers provided mechanisms for rail carriers to transport goods at negotiated contract rates rather than at prescribed common carrier rates. <u>See</u> <u>Sompo</u>, 456 F.3d at 59. Carriers moving cargo under common carrier arrangements are still required to quote and make common carrier rates available, but the dissemination and availability of rates to shippers can be accomplished by means other than tariff filing, including by electronic transmission. <u>See</u> 49 U.S.C. § 11101. In 2004, the House Subcommittee on Railroads estimated that 40% of rail traffic moved under common carrier rates and 60% moved under contract rates. <u>See</u> Subcommittee on Railroads, <u>Hearing on the Status of Railroad Economic Regulation</u>, Mar. 31, 2004, <u>available</u> <u>at</u> http://www.railcure.org/pdf/033104 househearing.pdf.

### a. <u>Exemption under § 10502</u>

Staggers gave the ICC the ability to exempt rail carriers providing transportation subject to the jurisdiction of the ICC -- including "transportation that is provided by a rail carrier as part of a continuous intermodal movement" -- from

regulation under "this part," including rate regulation. 49
U.S.C. § 10502(a), (f). "This part" refers to 49 U.S.C. Subtitle
IV, Part A, which encompasses 49 U.S.C. §§ 10101-11908. Pursuant
to its authority under § 10502, the ICC exempted rail carriers
that operate one leg of a continuous intermodal movement. See 49
C.F.R. § 1090.2.[6]

Section 10502(e) further provides: "Nothing in this
subsection or [Carmack] shall prevent rail carriers from offering
alternative terms nor give the Board the authority to require any
specific level of rates or services based upon [Carmack]."
Courts have interpreted this provision to permit carriers and
shippers to contract out of Carmack's provisions in whole or in
part, including contracting for lower rates not subject to tariff
filing requirements. See Sompo, 456 F.3d at 59-60; Tamini
Trasformatori S.R.L. v. Union Pac. R.R., No. 02 Civ. 129 (AGS),
2003 WL 135722, at *4 (S.D.N.Y. Jan. 17, 2003); Ferrostaal, Inc.
v. Union Pac. R.R. Co., 109 F. Supp. 2d 146, 149 (S.D.N.Y. 2000).

_____

[6] This regulation provides:

> Exemption of rail and highway TOFC/COFC
> service. Except as provided in 49 U.S.C.
> 10505(e) and (g), 109229(1), and 10530, rail
> TOFC/COFC service and highway TOFC/COFC
> service provided by a rail carrier either
> itself or jointly with a motor carrier as
> part of a continuous intermodal freight
> movement is exempt from the requirements of
> 49 U.S.C. subtitle IV. . . . Tariffs
> heretofore applicable to any transportation
> service exempted by this section shall no
> longer apply to such service. The exemption
> does not . . . operate to relieve any carrier
> of any obligation it would otherwise have,
> absent the exemption, with respect to
> providing contractual terms for liability and
> claims.

With respect to liability, the exemption authority granted under Section 10502 is not boundless.  Section 10502(e) also provides:  "No exemption order issued pursuant to this section shall operate to relieve any rail carrier from an obligation to provide contractual terms for liability and claims which are consistent with the provisions of section 11706 of this title."  Courts have concluded that, despite the ability of exempt contracts to offer non-tariff rates for particular services, "the combined effect of § 10502(e) and § 11706(a) is that rail carriers that wish to limit their liability must offer the shipper the option of full Carmack coverage, which includes both the Carmack version of strict liability and full coverage for loss."  Sompo, 456 F.3d at 60; see Tokio Marine & Fire Ins. Co. v. Amato Motors, Inc., 996 F.2d 874, 879 (7th Cir. 1993) ("rail carriers still must offer full rates, but they may offer alternative terms as well"); Tamini, 2003 WL 135722, at *4 ("Section [10502(e)] requires carriers to provide terms consistent with Carmack in the first instance. . . . [U]nless the shipper affirmatively elects the alternative limited liability terms, the Carmack terms should apply."); Consol. Rail Corp. v. Sobiech, 710 F. Supp. 988, 990 (S.D.N.Y. 1989) (carriers must initially provide liability terms consistent with Carmack and then may offer alternative terms).

While non-exempt rail contracts are subject to Carmack rules for liability (that is, carriers are liable for the full cost of any damage or loss), exempt rail contracts may include alternative liability terms and lower shipping rates, so long as

a shipper first is presented the option of selecting full Carmack liability terms (and presumably higher prices).  <u>Tamini</u>, 2003 WL 135722, at *7.  "If an exempt rail carrier fails to offer the shipper the option of coverage for the actual loss or injury to the property, then the shipper may sue the carrier under Carmack."  <u>Sompo</u>, 456 F.3d at 60.

####    b.  <u>Section 10709</u>

Title 49, Section 10709 -- also a part of Staggers -- provides that "[o]ne or more rail carriers providing transportation subject to the jurisdiction of the Board under this part may enter into a contract with one or more purchasers of rail services to provide specified services under specified rates and conditions."  49 U.S.C. § 10709(a).  This section, like § 10502, permits parties to contract for specific rates.  Section 10709 further provides that a "party to a contract entered into under this section shall have no duty in connection with services provided under such contract other than those duties specified by the terms of the contract."  49 U.S.C. § 10709(b).  Section 10709(c)(1) provides that a "contract that is authorized by this section, and transportation under such contract, shall not be subject to this part."  "This part" refers to 49 U.S.C. Subtitle IV, Part A, which includes Carmack.  Most courts have concluded that this language indicates that § 10709 contracts are not subject to Carmack, and need not offer a full Carmack liability option before properly limiting carrier liability.  <u>See, e.g.</u>, <u>Am. Rock Salt Co. v. Norfolk S. Corp.</u>, 387 F. Supp. 2d 197, 200 (W.D.N.Y. 2005) ("Contracts entered into pursuant to § 10709,

- 14 -

then, are not subject to the Carmack Amendment."); <u>Siemens Power Transmission & Distrib., Inc. v. Union Pac. R.R. Co.</u>, No. Civ. A. H-03-0298, 2005 WL 2647977, at *2 (S.D. Tex. Oct. 17, 2005).

How one identifies a § 10709 contract is not entirely clear. In 1986, a regulation was promulgated requiring that contracts entered into under § 10713 (the predecessor to § 10709) state so on their face. That regulation, 49 C.F.R. § 1313.1, provided that contracts "entered into by one or more rail carriers and one or more purchasers of rail service, to provide specified services under specified rates, charges and conditions" under that section were required to "specify that the contract is made pursuant to" the statute. 51 Fed. Reg. 45898 (Dec. 23, 1986).

The current version of the regulation, which has been in force since 1996, does not specifically require that § 10709 contracts identify themselves as such on their face. This regulation, however, now applies only to the transport of agricultural products. <u>See</u> 49 C.F.R. § 1313.1 ("For purposes of this part, the term contract means an agreement, including any amendment thereto, entered into by one or more rail carriers and one or more purchasers of rail services to provide specified transportation of agricultural products . . . under specified rates and conditions."); <u>see also</u> 61 Fed. Reg. 68668 (Dec. 30, 1996).

In April 2007, the STB acknowledged that the question of how to identify a § 10709 contract is unsettled by requesting comments on a proposal to interpret the term "contract" in §

10709 for the purpose of revising the regulations. See 72 Fed. Reg. 16316 (Apr. 4, 2007).[7] In its request, the STB noted "there is no clear distinction in the statute or our precedent between a contract and a common carrier rate," and expressed "serious concerns about the lack of any clear demarcation between contract and common carrier rates." Id. Just last week, after facing opposition from both shippers and carriers, the STB announced it would not to adopt the proposed rule. STB Ex Parte No. 669, 2008 WL 657934 (Mar. 12, 2008). The STB instead instituted a new rulemaking proceeding to

> consider imposing a requirement that each rail carrier provide a full disclosure statement when it seeks to enter into a rail transportation contract under 49 U.S.C. 10709. The statement would explicitly advise the shipper that the carrier intends the document to be a rail transportation contract, and that any transportation under the document would not be subject to regulation by the Board.

73 Fed. Reg. 13523 (Mar. 13, 2008). The carrier would also provide the shipper with an opportunity to sign an informed consent where the shipper affirmatively elects to forgo its regulatory options. Id.

Courts have also noted that there is little guidance on how to identify a § 10709 contract. See, e.g., Babcock & Wilcox Co. v. Kansas City S. Ry. Co., Civ. No. 06-6015 (DRD), 2007 WL

_____

[7] The STB sought comments "on a proposal to interpret the term 'contract' in 49 U.S.C. 10709 as embracing any bilateral agreement between a carrier and a shipper for rail transportation in which the railroad agrees to a specific rate for a specific period of time in exchange for consideration from the shipper, such as a commitment to tender a specific amount of freight during a specific period or to make specific investments in rail facilities." 72 Fed. Reg. 16316 (Apr. 4, 2007).

4440163, at *3 & n.1 (D.N.J. Dec. 17, 2007). Even after the revision of 49 C.F.R. § 1313.1 in 1996, several courts have still held that a § 10709 contract must specifically state on its face that it is entered into pursuant to 49 U.S.C. § 10709. See e.g., PCI Transp., Inc. v. Fort Worth & W. R.R. Co., 418 F.3d 535, 541 (5th Cir. 2005) (citing STB decision that contracts are governed by § 10709 when the "contract affirmatively stated that it was made pursuant to § 10709"); Babcock, 2007 WL 4440163, at *2 ("[O]ne would expect to find at least an implicit indication in such a contract of the parties' intention to invoke § 10709."); Schoenmann Produce Co. v. Burlington N. & Santa Fe Ry. Co., 420 F. Supp. 2d 757, 761 (S.D. Tex. 2006) ("Nothing in the transportation documents nor the Rules Book stated that the shipments at issue were under section 10709. Contracts entered into under section 10709 specifically cite the statute."); see also Glenn Hunter & Assocs. v. Union Pac. R.R. Co., 135 Fed. App'x 849, 854 (6th Cir. 2005) (noting that the contract at issue expressly stated "This CONTRACT is made pursuant to 49 U.S.C. § 10709" and therefore "49 U.S.C. § 11706, with its distinct set of rights and remedies, did not apply"); Am. Rock Salt, 387 F. Supp. 2d at 201 (concluding that Carmack applied despite the fact that the contract stated that it was "made pursuant to 49 U.S.C. § 10709" because other provisions in the contract provided for Carmack's application). But see Tokio Marine & Fire Ins. Co. v. Mitsui O.S.K. Lines, Ltd., No. CV 02-3617 (ER), 2003 WL 23181013, at *1 (C.D. Cal. June 27, 2003) ("The Agreement provides for rail transportation pursuant to specified rates and conditions, so it

falls within those contracts exempt from the Carmack Amendment under § 10709(a).").

### 3. The Interplay Between § 10709, § 10502, and Carmack

Courts have varied wildly on how these sections of Staggers and Carmack work together. In Schoenmann Produce Co. v. Burlington Northern & Santa Fe Railway Co., a Southern District of Texas court addressed the interplay between a particular § 10502 exemption -- the exemption for the shipment of potatoes -- and § 10709, concluding that the contract for alternative terms at issue in the case fell under § 10502 and not § 10709. Schoenmann Produce Co., 420 F. Supp. 2d at 757. The court rejected plaintiff's argument that the contract for rail transportation at issue was a § 10709 contract (and therefore not subject to Carmack) simply because it offered contract terms. Rather, it concluded that it was a § 10502 contract (with the requirement that it initially offer the option of full Carmack liability) because it was a type of contract specifically exempted by the STB:

> Plaintiffs presented no evidence to support
> their argument that the potato shipments at
> issue were governed by section 10709.  As
> noted, that section by its terms applies only
> to 'transportation subject to the
> jurisdiction of the Board under this part.'
> 49 U.S.C. § 10709(a).  Section 10502 granted
> the Board authority to exempt certain rail
> services from Subtitle VI of Title 49, which
> includes section 10709. . . . The Board
> exempted rail shipments of certain
> agricultural commodities, including potatoes.

Id. at 760-61. The court ultimately concluded "section 10709 by its terms does not apply to exempt shipments." Id. at 761.

The most detailed discussion of the interplay between
§ 10709, § 10502, and Carmack from this district appears in
Tamini Trasformatori S.R.L. v. Union Pacific Railroad, 2003 WL
135722.  In Tamini, defendant Union Pacific argued that its
liability was validly limited by contract even though it did not
initially offer full Carmack liability, in part because the
contract at issue was a § 10709 contract.  Judge Schwartz
rejected the § 10709 argument, concluding that it could not
prevail when the contract was exempted by the STB under § 10502.

> UP is certainly correct to the extent
> that if [the contract] is a valid contract
> under 49 U.S.C. § 10709, then the Carmack
> protections (including full liability) do not
> apply.  However, UP reads 49 U.S.C. § 10709
> in a vacuum, without regard to the other
> statutes concerning common rail carriers.
> Specifically, UP ignores the fact that 49
> U.S.C. § 10502(e) mandates that before an
> alternative contract is agreed to, the
> statutory Carmack terms must be offered . . .
> . [A] § 10709 contract can be entered into
> only if the carrier also offers the shipper
> Carmack terms.  If the shipper chooses the
> Carmack terms (and ostensibly pays a higher
> shipping rate), then the Carmack terms
> govern.  If the shipper chooses the
> alternative terms (and a corresponding lower
> shipping rate), then those terms govern and,
> under the terms of 49 U.S.C. § 10709, the
> shipper loses the protections of Carmack.
> Thus, while it is true that Carmack
> protections do not apply to 49 U.S.C. § 10709
> contracts, the existence of such a contract
> presupposes that the shipper turned down
> Carmack terms.  That never happened in this
> case, because, as UP concedes, it never
> offered . . . Carmack terms.

Id. at *7.

At least one district court has concluded that
contracts can be construed as § 10709 contracts simply because
they are for specific rates and conditions, regardless of the

- 19 -

fact they are subject to a § 10502 exemption.  See <u>Tokio Marine &</u>
<u>Fire Ins. Co.</u>, 2003 WL 23181013, at *1 ("[T]ransportation
undertaken pursuant to a contract entered into under § 10709(a)
is not subject to Carmack.").

## C.    **Application**

        I conclude that defendants may not limit their
liability under any of the contracts in this case for the
following reasons:

### 1.    **The Bills of Lading Fail to Initially Offer Full Carmack Liability**

        There is no evidence that defendants or the shipping
companies made an initial offer of full Carmack liability to the
merchant insureds in the bills of lading.  In fact, defendants do
not argue -- in their briefs, at oral argument, or in their
supplemental letter briefs -- that they offered full Carmack
liability to the insureds in <u>any</u> of the contracts.  At oral
argument, they conceded this point:

> Mr. Howard [counsel for defendants]:  Norfolk
> Southern never -- none of the railroads ever
> made an offer of full Carmack liability to
> any of Sompo's insureds.  Never.
>
> The Court:  I see. . . .
>
> Mr. Howard:  No, didn't happen.  None of the
> railroads ever had any contact, any business
> dealings with any of Sompo's insureds.  They
> are strangers to the rail portion of this
> movement.
>
> The Court:  But must an offer have been made
> to them; is that what the Second Circuit
> holds [in <u>Sompo</u>]?
>
> Mr. Howard:  That's certainly what counsel
> has argued, that the offer has to be made to
> the insureds.

The Court: Okay. So you concede that there was no offer made to the insureds.

Mr. Howard: We concede that, yes. . . .

(Tr. 31-32).

Rather, defendants' position is that they made such an offer to the shipping companies, but could not have made the offer to the insureds because (1) the waybills do not identify the insureds, (2) the rail carriers did not contract directly with the insureds, and (3) for the shipping companies, who contracted with defendants, to go back and notify the insureds that their terms had changed in light of an offer of full Carmack liability would be impracticable. They instead argue that the ITAs they had in place with the shipping companies relieved them of the requirement to offer full Carmack liability to the insureds.

Pursuant to §§ 10502 and 11706, an initial offer of full Carmack liability had to have been made to the insureds for the limits on liability contained in the bills of lading to be effective. Because no evidence has been presented that the insureds were offered an initial option of full Carmack liability in the bills of lading, the limits on liability contained therein are not effective.

## 2. The ITAs Are Not § 10709 Contracts

Defendants hang their hats on one argument in this motion: that the ITAs between the shipping companies and defendants are the operative agreements in this case, those agreements are § 10709 contracts, and therefore defendants were not required to offer full Carmack liability to the insureds for

the contractual liability limit to apply. The NSR Rules Circular #2, which is incorporated by reference into the ITAs, limits NSR's liability to $250,000 per container. Defendants urge the Court to adopt the holding of the California district court in Tokio Marine that § 10709 contracts are entirely exempt from Carmack, regardless of the requirements of § 10502 and Carmack.

It is not clear, however, that the ITAs were entered into pursuant to § 10709. Defendants argue that their contracts with the shipping companies are § 10709 contracts simply because the terms are such that "one or more rail carriers" is providing "specified services under specified rates and conditions" to "one or more purchasers of rail services." This argument, however, must fail. Section 10709 is not mentioned in the ITAs. It is not mentioned in the bills of lading, the Miscellaneous Waybills, the NSR Rules Circular #2, or the KCSRC Rules Circular. Defendants have not offered any evidence that these contracts were entered into pursuant to § 10709 or that there was a meeting of the minds between the contracting parties that § 10709 governed the agreements.

Absent (1) a statement as to the statutory authorization for the contracts on their face or (2) evidence of such an understanding between the parties, and because (3) the previous regulations required this statement, (4) the current regulations do not affirmatively exempt this statement, and (5) the STB has noted confusion on this issue, there is no basis for concluding that the ITAs are § 10709 contracts. Furthermore, plaintiffs submitted compelling evidence that NSR has included a

§ 10709 statement on the face of its contracts in the past. (See Eagan Dec. 11, 2007 Letter Ex. 25). Plaintiffs have also offered compelling evidence that peer rail carriers include such a statement. (Id.).

In light of the above, I hold that no reasonable factfinder could conclude that the ITAs are § 10709 contracts. Accordingly, these agreements are subject to the requirements of Carmack, and defendants' failure to make an initial offer of full Carmack liability to the insureds negates any stated limitations on liability. Therefore, the $250,000 limit on liability contained in the NSR Rules Circular #2 is not effective.

### 3. Full Carmack Liability Must Be Offered to the Insureds Regardless of Whether the ITAs are Interpreted as § 10709 Contracts

Because I conclude that the ITAs are not § 10709 contracts, I need not reach the question of whether § 10709 contracts covering the rail leg of a continuous intermodal movement must offer full Carmack liability. Nonetheless, given the muddled state of the law and the close attention paid to this and similar cases, and because resolution of the issue provides an additional, independent ground for the disposition of this motion, I address the issue.[8]

---

[8] Several courts have noted that this issue has not been adequately addressed. See, e.g., Gateway, Inc. v. Burlington N. & Santa Fe Ry. Co., No. 01 C 9482, 2002 WL 1822919, at *3 n.2 (N.D. Ill. Aug. 8, 2002) (noting defendant's argument that the transportation at issue was exempt under § 10502 and therefore not subject to § 10709, but that the court was "not able to find any cases that dealt with this exact situation, or that discussed § 10709 in the context of § 10502"); M.R. Swanson, Inc. v. Burlington N. & Santa Fe Ry. Co., No. CVF995496AWISMS, 2001 WL 201378, at *6 n.5 (E.D. Cal. Feb. 21, 2001) ("Because Circular

As a preliminary matter, I agree with the numerous courts that have held that § 10709 contracts are not, standing alone, required to initially offer full Carmack liability for a contractual limitation on liability to be effective. The plain language of the statute -- that these contracts may "provide specified services under specified rates and conditions" with "no duty in connection with services provided under such contract other than those duties specified by the terms of the contract" -- makes this clear. See Community for Creative Non-Violence v. Germain, 490 U.S. 730, 739 (1989) ("The starting point for [the] interpretation of a statute is always its language.")

What is not clear from the statutory language or the case law, however, is how to read § 10502 and § 10709 in tandem. I conclude that rail contracts for the movement of cargo traveling on the domestic rail leg of a continuous intermodal movement, such as the ITAs in this case, should be read as § 10502 and not § 10709 contracts.

First, the comparative language of the statutory sections and their placement within the statutory scheme compel this conclusion. Section 10709 does not specify that it applies to exempted rail carriers that operate one leg of a continuous intermodal movement. By its own terms, it merely applies to "one

_____

2-A was also authorized under section 10502 and 49 C.F.R. 1313, it is unclear what effect section 10709 has on Circular 2-A. In addition, section 10709(c)(2)'s limitation on jurisdiction provision is uncertain in light of cases that have required disputes over products shipped pursuant to a contract to be litigated under the Carmack Amendment.").

or more purchasers of rail services." Section 10502, on the
other hand, specifies its application to this particular class of
rail services purchasers under this specific type of movement.
In arguing that Staggers segregated rail transportation provided
under contract from rail transportation provided pursuant to a
common carrier tariff rate, defendants fail to recognize that a
third category -- exempt contracts -- are also at play.
Additionally, § 10709 falls under the "rates" section of the
statute. Its predecessor, § 10703, clearly addressed rates and
whether they had to be filed with the ICC. Nothing in § 10709
indicates that it is intended to alter the statutory liability
scheme specifically.

Second, this conclusion is necessary to prevent a
conflict between § 10502 and § 10709. Both § 10502 and § 10709
permit parties to contract for specific rates. Both were
included in Staggers. It would be nonsensical for (1) § 10502 to
permit a certain category of rail contracts to offer specific
rates and terms but require an initial offer of full Carmack
liability and (2) § 10709 to permit the same category of rail
contracts to offer specific rates and terms with no such
requirement of an initial offer of full Carmack liability. I
agree with the Schoenmann court that § 10709 contracts cannot be
used for exemptions under § 10502. Contracts exempt under §
10502 are exempt from rate regulation like § 10709 contracts, but
are still subject to the rules of Carmack liability. Section
10709 simply cannot be used as a tool to extract contracts
governing exempted rail carriers that operate one leg of a

continuous intermodal movement from the regulatory demands of §
10502 and Carmack.

The generic ITAs at issue here covered all movement
between the shipping companies and the defendants. They were not
entered into for purposes of this particular shipment and were
drafted years before the bills of lading for these shipments were
generated. Presumably, the ITAs have been applied to
transportation other than one leg of a continuous intermodal
movement. Even if I were to conclude that the ITAs were,
standing alone, § 10709 contracts, they must be subject to the
same requirements as § 10502 contracts when they govern the
domestic rail leg of a continuous intermodal movement of cargo.

Third, requiring ITAs to make an initial offer of full
Carmack liability to the insureds comports with the Second
Circuit's holding in Sompo. In Sompo Japan Insurance Co. of
America v. Union Pacific Railroad Co., 456 F.3d 54 (2d Cir.
2006), the Court held that "Carmack applies to the domestic rail
portion of an international shipment originating in a foreign
country and traveling under a through bill of lading."[9] See
Sompo, 456 F.3d at 75. While the Sompo court did not directly
address the § 10709 argument, the contracts in that case and the
instant case are substantially similar. Both shipments involved
nearly identical set of documents -- intermodal through bills of
lading, separate rail waybills, rail transportation agreements
between the shipping companies and the rail carriers, and rail

_____

[9] The Second Circuit decided Sompo after Tokio Marine and
other cases cited by defendants.

- 26 -

circulars published by the rail carriers. (See Eagan Decl. Ex. 17, 21). In both cases, the intermodal bills of lading were issued for shipments traveling from abroad to the United States and cargo that was damaged during the inland domestic rail leg of the shipment. The rail transportation agreements between the shipping companies and the rail carriers were similar to those in this case. The Second Circuit did not qualify its Sompo holding.

Furthermore, defense counsel in this case conceded that in Sompo, the "Second Circuit had before it an intermodal movement of freight which under 10502 has been exempted from STB regulation. When you have that circumstance, then, yes, the rail carrier has to make an offer of full Carmack liability under those circumstances because of what is says in 10502." (Tr. 32). That is precisely the situation we have here.

Judge Batts recently examined intermodal through bills of lading and associated shipping contracts that offered specified services under specified rates, charges, and conditions in an unrelated case, Sompo Japan Insurance Co. v. Union Pacific Railroad Co., No. 02 Civ. 9523 (DAB), 2007 WL 4859462 (S.D.N.Y. Sept. 26, 2007). The facts of that case closely mirror the facts in this case. Relying on the Second Circuit's decision in Sompo, Judge Batts concluded that the rail carrier were required to make an initial offer of full Carmack liability before liability could properly be limited by contract, without discussing a possible exception for § 10709 contracts between the shipping company and

the rail carrier.[10]  Judge Batts also raised an ancillary concern that I share:  First, it is not clear that the shippers in these cases are on actual notice of either the ITAs or the rail carrier circulars or have the opportunity to review them and, second, there are too many steps incorporated by reference to properly charge the shippers with notice of their terms.  Id. at *5.

        Rail carriers who enjoy the financial benefits of doing business with insureds are required, in conjunction with the shipping companies, to ensure that a full offer of Carmack liability is made to enjoy any contractual limit on liability.  But I am not unsympathetic to defendants' position.  They were not in a position to make an offer of full Carmack liability to the merchants, as they had no contracts or direct contact with them.  It is not lost on the Court that the parties contracting directly with the insureds and the rail carriers and the entities best suited to make the full Carmack offer -- the shipping companies -- are not parties in this case.  Yang Ming is the defendant in a related case before me, but that case was not filed until December 14, 2007, months after this motion was made.

        In Norfolk Southern Railway Co. v. Kirby, 543 U.S. 14 (2004), the Supreme Court faced an analogous situation.  In that

_____

        [10]  The defendant in Judge Batts's case briefed its § 10709 argument on October 16, 2006.  It argued:  "In its entirety, the shipping contract is comprised of the aforementioned documents, along with the K-Line waybill/bill of lading, which contains the actual $500 per package limitation of liability." (Eagan Dec. 21, 2007 Letter Ex. 27 at 3).  It went on to argue that the Circular limited liability to $500 per package, and because it was a § 10709 contract, outside of Carmack's purview, it could effectively limit liability.  (Id. Ex. 27).  Judge Batts issued her decision on September 26, 2007 without mention of this stance.

case, the subcontractor carrier of a non-party intermediary freight forwarding company invoked a limitation on liability to which the merchant did not itself agree. The merchant's insurer retained the ability to sue the freight forwarding company with whom the merchant contracted. The Court noted, "It seems logical that the [freight forwarder] -- the only party that definitely knew about and was party to both of the bills of lading at issue here -- should bear responsibility for any gap between the liability limitations in the bills." Id. at 399. In the instant case, NSR may have alternative options for enforcing the terms of their ITAs with the shipping companies.

### CONCLUSION

Defendants have failed to properly limit their liability under the requirements of the statutory scheme. Accordingly, plaintiffs are free to pursue damages in excess of the limits on liability set forth in any of the contracts.

SO ORDERED.

Dated:   New York, New York
         March 20, 2008

DENNY CHIN
United States District Judge