DAVID T. MALOOF (DM 3350)
THOMAS M. EAGAN (TE 1713)
MALOOF BROWNE & EAGAN LLC
411 Theodore Fremd Avenue, Suite 190
Rye, New York 10580-1411
(914) 921-1200
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SOMPO JAPAN INSURANCE, INC. and                  :
SOMPO JAPAN INSURANCE COMPANY OF
AMERICA                                          :         **07 Civ. 2735 (DC)**

                      *Plaintiffs,*                  :
    - against -                                                **RULE 56.1 STATEMENT**
                                                 :         **OF UNCONTESTED FACTS**

NORFOLK SOUTHERN RAILWAY
COMPANY, NORFOLK SOUTHERN                        :
CORPORATION and THE KANSAS CITY
RAILWAY COMPANY                                  :

                      *Defendants.*
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Plaintiffs Sompo Japan Insurance, Inc. and Sompo Japan Insurance Company of America submit this Statement of Undisputed Material Facts pursuant to Local Rule 56.1 in support of their motion for summary judgment.

**Kubota Tractor Claim**

        1.    Kubota Corporation is located in Japan and is engaged in the business of, *inter alia*, manufacturing and shipping tractors. The Kubota factory located in Tskuba, Japan manufactures tractor model numbers 9540, 8540, 6040 and 5040 (Ex. 3, Deposition of Kazuhiro Aikoh, Inspection Engineer, Kubota Corporation, Tr 7).

        2.    At all relevant times the Tskuba factory was ISO 9001 approved (Ex. 4, ISO Certification; Ex. 3, Aikoh Dep., Tr 11). The ISO is the International Organization for Standards located in Geneva, Switzerland. The ISO-9001 standards pertain to the quality control of the

manufacturing process—from purchasing the component parts to the inspection of the finished product and also includes proper recordkeeping (Ex. 3, Aikoh Dep., Tr 9-11; Wikipedia "ISO 9000" Wikipedia, The Free Encyclopedia. 24 February 2009, 13:25 UTC. Wikimedia Foundation, Inc. 24 Feb. 2009. <http://en.wikipedia.org/wiki/ISO_9001>).  The Tsukuba factory is audited every six months by external ISO auditors to ensure compliance with the standards (Ex. 3, Aikoh Dep., Tr 11).

      3.      On completion of manufacturing, each tractor is subjected to an inspection of over 50 items ranging from lights, horn, oil pressure, throttle function, various safety devices and physical damage (Ex. 3, Aikoh Dep., Tr 12-49; Ex. 4, Kubota Inspection Certificates; Ex. 5, Translation of Kubota Inspection Certificates).

      4.      The personnel performing the inspection at the Tsukuba plant are specially trained and qualified (Ex. 3, Aikoh Dep. Tr 15).

      5.      At the time of such inspection a checklist is filled out and signed.  Each tractor is identified on the sheet by serial number.  Any items needing correction are noted and must be corrected prior to shipment (Ex. 3, Aikoh Dep., Tr 14-16, 38, 45, 53).

      6.      Once every item of inspection is found to be acceptable, a stamp is placed on the report that the tractor has passed (Ex. 3, Aikoh Dep., Tr 14, 45).

      7.      Kubota followed its inspection procedures and ISO 9001 with respect to the tractors at issue in this litigation (Ex. 3, Aikoh Dep., Tr 48-49).

      8.      The tractors at issue in this litigation were found to have passed each item of inspection following completion of the manufacturing process at the Tsukuba factor and to be in good working order (Ex. 3, Aikoh Dep., Tr 46-49; Ex. 5, Ex. 8).

      9.      Each certificate of inspection for the tractors at issue contains a "pass" stamp (Ex.

3, Tr 46; Ex. 5; Ex. 5).

10.     During the tractor design process, Kubota also designs the metal shipping frames on which tractors are placed for shipment. The frames were designed so that the tractors can withstand the expected rigors of transit (Ex. 7, Deposition of Takehashi Yokoo, Section Manager, Logistics Group, Kubota Corporation, Tr 10-12). In-house Kubota engineers and outside engineers are utilized in the frame design process (Ex. 7, Tr 18).

11.     Various tests were performed on the frames designed for the tractors at issue (such as a drop test, strength test, vibration test, braking test)(Ex. 7, Yokoo Dep., Tr 16-28).

12.     The frames for the models at issue in this litigation were designed, tested, and approved by Kubota to carry the respective tractors without damage (Ex. 7, Yokoo Dep., Tr 27-29).

13.     Following the final inspection, the tractors were placed into the shipping frames at the Tsukuba factor (Ex. 7, Yokoo Dep., Tr 29-30). The tractors were then transported 100-200 meters from the factory to a warehouse by the Mitsukaido Truck Cooperative, a careful and reliable trucker who has been performing this task for over 30 years (Ex. 7, Yokoo Dep., Tr 31).

14.     This adjacent warehouse is operated by the Ksuwasoko Company, who placed each tractor in the shipping containers (three tractors per container for the 9540 and 8540 models; ten per container for the 6040 and 5040 models)(Ex. 7, Yokoo Dep., Tr 32-33, 36).

15.     The containers were trucked from the warehouse by Tatsumi Shokai Company to the loadport (Tokyo)(a distance of about 65 kilometers) and delivered to Yang Ming Lines (Ex. 7, Yokoo Dep., Tr 33-34). Each truck transported one container (Ex. 7, Tr 35). Tatsumi Shokai has been performing this task for Kubota for 30 years, and is a careful and reliable company (Ex. 7, Tr 34).

16. Kubota issues a packing list, invoice with CIF value and notification of serial numbers for each consignment of tractors it ships. It issued such documents for the tractors in this case (Ex. 7, Yokoo Dep., Tr 44-45, Ex. 8).

17. Yang Ming issued bills of lading to Kubota covering each tractor shipped (Ex. 7, Yokoo Dep., Tr 45, Ex. 9).

18. No exception is taken on the bills of lading to the condition of the container or the cargo (Ex. 9).

19. If there was any incident or accident during the time each tractor left the factory until delivery to Yang Ming, Kubota would have been notified by the warehouse or the respective trucker and received a record (Ex. 7, Yokoo, Tr 48-49).

20. Kubota received no such report for these tractors (Ex. 7, Yokoo Dep., Tr 48-49).

21. If the cargo had been involved in an incident or accident during or after the ocean voyage, Kubota would have received notice from Yang Ming (Ex. 7, Yokoo Dep., Tr 49).

22. Kubota received no such notice for these tractors (other than the derailment at issue)( Yokoo Dep., Tr 49).

23. In response to subpoena requesting all records dealing with the Shipment, Yang Ming did not produce any record showing accident or incident (other than the train derailment). Yang Ming advised there were no such records because the transit was "uneventful" except for the derailment (Ex. 10).

24. On or about April 16, 2006, the train carrying the Shipment derailed in the vicinity of Scroggins, Texas.

25. Containers YMLU8294100, FSCU6904489, CLHU8586100, XINU8033402, YMLU8217892, YMLU8264472, CRXU9841070, YMLU8190019, TGHU8035818,

YMLU8131839, CRXU9505408, INKU6363983, BHCU4940820, CRXU9829536, TRLU8116442, YMLU8223405 were damaged to such an extent that they could no longer be used and the Kubota Shipment had to be transferred into other containers in order to continue the transit (Exhibit 11, NS Response to Request for Admission, par. 2 and 3; Ex. 19, NS Damage Reports).

26. Each of the tractors was inspected on arrival in Georgia (Ex. 12, Johnson Dep., Tr 12). 42 tractors (thirty of the 9540 models and twelve of the 8540 models) suffered severe physical damage and were declared a total loss (Ex. 2, photographs; Ex. 13, GA Robinson Final Reports; Ex. 12, Deposition of Jeff Johnson, Tr. 13-14, 74-75, 78-96, 99, 103; Ex. 14, Inventory of Damaged Tractors). Damages included compromise of the rollover protection system (Ex. 12, Johnson Dep., Tr 41-42).

26A. The arrived sound market value of the 42 tractors was $1,162,156.50, based on the price Kubota Tractor Corporation had already sold the units to dealers; the tractors were in high demand (Ex. 14, Declaration of Curtis Bishop and Ex. A thereto).

27. The purchase price of the 42 damaged tractors was $911,063.91 (Ex. 8; Ex. 14; Declaration of Curtis Bishop and Exhibit B thereto).

28. The salvage value of the 42 damaged tractors was $200,000.00 (Ex. 12, Johnson Dep., Tr 31, 24-25, 55, Salvage Bid).

29. Four of the 6040 and 5040 tractors were damaged by the derailment in the amount of $3,284.72 (Ex. 13; Ex. 12, Johnson Dep., Tr. 75-77).

30. The derailment was not caused by an act of God, act of shipper, public enemy, inherent vice, or public authority (Ex. 11, Defendants' response to Requests for Admission, par. 9)(the only defenses available under the Carmack Amendment). NS admitted the derailment was

their responsibility (Ex. 12, Johnson Dep., Tr 31-32, 61).

31.     Sompo incurred expenses of $13,951.92 in connection with survey and inspection of the damaged Kubota Tractors (Ex. 16, GAB Robins invoice; Ex. 12, Johnson Dep., Tr 105-106).

32.     Sompo Japan Insurance Company of America paid its assured Kubota Tractor Corporation the sum of $955,441.22 (Ex. 17, Declaration of Christopher Perfect and Exhibit A thereto).

**Unisia Autoparts Claim**

33.     Hitachi Limited is located in Japan and is engaged in the business of, *inter alia*, manufacturing and shipping industrial parts including automotive parts from its facility located in Atsugi, Japan (Ex. 20, Deposition of Yosiyuki Kato, Quality Engineer, Hitachi Limited, Tr 7). Its United States customers include Ford, General Motors and Subaru (Kato, Tr 95).

34.     On completion of manufacturing, each part is inspected and tested (Ex. 20, Kato Dep., Tr 18-19; Ex. 21, Hitachi Inspection Certificates; Ex. 22, Translation of Hitachi Inspection Certificates).

35.     Since the parts are intended for use in automobile engines, as a matter of safety they need to be in 100% good working order (Ex. 20, Kato Dep., Tr 13; Ex. 25, Hoover Dep., Tr 37-38).

36.     The autoparts at issue were all inspected and tested in accordance with Hitachi and industry guidelines and procedures prior to shipment (Ex. 20, Kato Dep., Tr 19-20, 117).

37.     If any part failed inspection it was discarded (Ex. 20, Kato Dep., Tr 28).

38.     At the time of inspection a checklist is filled out and signed for each piece (Ex. 20, Kato Dep., Tr 19-35; Ex. 21 and 22 at pp. 122-129).

39. Every autopart at issue in this litigation was in good order and condition at the time of shipment from the Hitachi plan (Kato Dep., Tr 95-96).

40. The Housing Sub-Assemblies at issue were inspected and approved in good order at the Atsugi factory prior to shipment (Ex. 20, Kato Dep., Tr 19-35; Ex. 21 and Ex. 22 at pp. 122-129). The part supports the valve timing control, which is then attached to the engine (Ex. 20, Kato Dep., Tr 13-14).

41. The VTC (Valve Timing Control) Assemblies at issue were inspected and approved in good order at the Atsugi factory prior to shipment (Ex. 20, Kato Dep., Tr 36-38; Ex. 21, pp. 15-27). The part controls the engine valve timing (Kato Dep., Tr 14).

42. The Solenoid Assemblies at issue in this litigation were inspected and approved in good order at the Atsugi factory prior to shipment (Ex. 20, Kato Dep., Tr 48-58; Ex. 21, 22 at pp. 31-38). The part moves the oil to the VTC assembly (Ex. 20, Kato Dep., Tr 15).

43. The Vane VTC's at issue in this litigation were inspected and approved in good order at the Atsugi factory prior to shipment (Ex. 20, Kato Dep., Tr 58-62; Ex. 21, 22 at pp. 40-49). The part is a component part of the VTC assembly (Ex. 20, Kato Dep., Tr 16).

44. The Bolt Washers at issue were inspected and approved in good order prior to shipment (Ex. 20, Kato Dep., Tr 62-64; Ex. 21, 22 at pp. 51). The part is a component part of the VTC assembly (Ex. 20, Kato Dep., Tr 16).

45. The VTC Pin Locks at issue were inspected and approved in good order prior to shipment from the Atsugi factory (Kato Dep., Tr 64-68; Ex. 21, 22 at pp. 54-64).

46. The Spring Seal VTC's at issue were inspected and approved in good order prior to shipment (Kato Dep., Tr 68-71; Ex. 21, 22 at 74).

47. The Retainer VTC's at issue were all inspected and approved in good order prior

to shipment (Kato Dep., Tr 71-73; Ex. 21, 22 at pp. 79-108). They are component parts of the VTC Assembly (Ex. 20, Kato Dep., Tr 18).

48. The filters at issue were all inspected and approved in good order prior to shipment (Kato Dep., Tr 74-75; Ex. 21, 22 at pp. 89-108). They are part of Housing and sub-assembly (Ex. 20, Kato Dep., Tr 18).

49. The Valve Assembly Purge, Damper Paper, Seal Oil and Plate SOL Valve were produced by subcontractors. The valve assembly purge controls vaporization of gasoline (Ex. 20, Kato Dep., Tr 15); the dampen paper is used inside the propeller shaft (Ex. 20, Kato Dep., Tr 17); the plate valve is a component part of the Valve Assembly Purge (Ex. 20, Kato Dep., Tr 17). These subcontracts must follow strict quality assurance requirements of Hitachi. All these items were in good order and condition at the time of shipment (Ex. 20, Kato Dep., Tr 80-81).

50. Hitachi designs the cartons carrying the Autoparts so they are able to withstand the rigors of transport (Ex. 25, Tr 8-9). The autoparts at issue were packed in such manner (Ex. 25, Tr 13-14). There have been no complaints about the packaging for at least the last 11 years (Ex. 25, Hoover Dep., Tr 33-34).

51. The autoparts at issue were loaded into Container TEXU 7204601 and YMLU 4455172 (Ex. 26).

52. If there had been an incident regarding the containers between the time they left the Atsugi factory until arrival at loadport Yokohuna, Unisia would have received a record. No such record was received by Unisia (Ex. 25, Hoover Dep., Tr 20-21).

56. Unisia issues a packing list and invoice for each consignment of autoparts it ships. It issued such documents for the autoparts in this case (Hoover Dep., Tr 21-22; Ex. 27, 28).

57. Nippon Express issued bills of lading to Unisia covering the autoparts shipped

(Ex. 25, Hoover Dep., Tr 22; Ex. 29), as did Yang Ming (Ex. 29A).

58. No exception was taken on the bills of lading to the condition of the container or the cargo (Ex. 29).

59. In response to subpoena requesting all records dealing with the Shipment, Yang Ming did not produce any record showing accident or incident (other than the train derailment) and advised there were no such records because the transit was "uneventful" except for the derailment (Ex. 10).

60. Containers YMLU4455172 and TEXU7204601 were damaged in the Derailment to such an extent that they could no longer be used and the Unisia Shipment had to be transferred into other containers in order to continue the transit (Exhibit 11, NS Response to Request for Admission, par. 6).

61. The autoparts cargo arrived in Georgia with significant damage (Ex. 20, Kato Dep., Tr 83-84; Ex. 23 – photographs).

62. Unisia of Georgia inspected the autoparts cargo (Ex. 20, Kato Dep., Tr 84-86).

63. 32 pallets of VTC Assemblies were found to have bent target fingers, rendering them unusable (Kato Dep. Tr 88-89; Ex. 24). Unisia was also concerned about internal damage due to the impact of the train derailment that could not be tested for (Kato, Tr 89).

64. 32 pallets of Solenoid VTC assemblies were found to have loose connectors; resulting in high probability of being inoperable (Ex. 20, Kato Dep., Tr 89-90; Ex. 24). There were also concerns about internal damage due to the impact of the train derailment that could not be tested for (Kato, Tr 89).

65. 3 pallets of the assembly purge were found to have broken resin (Ex. 20, Kato Dep., Tr 90; Ex. 24). There were also concerns about internal damage due to the impact of the

train derailment that could not be tested for (Kato, Tr 89).

66. 12 pallets of the vane VTC were found to have scratches and dents and water which adversely affect the product (Ex. 20, Kato Dep., Tr 90-91; Ex. 24).

67. 3 boxes of the bolt washers were found to have damaged threads (Ex. 20, Kato Dep., Tr 91; Ex. 23).

68. One box of pin locks had scratches and dents rendering them unusable (Kato Dep., Tr 92; Ex. 23).

69. 6 boxes of damper paper were found bent and torn rendering them unusable (Kato Dep., Tr 93; Ex. 23).

70. 3 boxes of SPR seal were found deformed rendering them unusable (Kato Dep., Tr 93; Ex. 23).

71. 5 boxes of Plate SOL Valve were found to have scratches, dents and rust preventative scratched off (Kato Dep., Tr 93; Ex. 23).

72. 2 boxes of VTC retainers were found to have scratches and deformations rendering them unusable (Kato Dep., 93-94; Ex. 23).

73. 12 boxes of filters were found to have scratches rendering them unusable (Kato Dep., Tr 94; Ex. 23).

74. 74 pallets of Housing Sub-Assemblies (right and left) were found to have scratches and dents, rendering them deformed and unusable (Kato Dep., Tr 94-95; Ex. 23).

75. 1605 of the Housing Sub-Assembly parts were found unusable (Ex. 30; Ex. 25, Hoover Dep., Tr 30-31).

76. The CIF value of the damaged parts is $335,294.50 (Ex. 27; 28; 30; Hoover Dep. Tr 28-30).

77. The damaged parts were unusable and had to be scrapped (Ex. 25, Hoover Dep., Tr 31; Ex. 31; Ex. 32, Hoover Dec.). Unisia would have breached its obligations to its customers had it used any of the items (Ex. 25, Tr 38-39).

78. Sompo Japan Insurance Company of America paid its assured Unisia of Georgia the sum of $394,606.02 (Ex. 25, Hoover Dep., Tr 32-33; Ex. 33; Ex. 17, par. 2 and Ex. 3 thereto).

**Hoshizaki Sushi Case/Icemakers Claim**

79. Hoshizaki Electric Company, Limited ("Hoshizaki") is located in Japan and engaged in the business of, *inter alia*, manufacturing and shipping commercial kitchen equipment and appliance such as sushi cases and icemakers. The Hoshizaki factory located in Shimano, Japan manufactured the sushi cases and icemakers at issue in this litigation (Ex. 34, Deposition of Yosiyuki Iwaki, Manager, Production Control Department, Hoshizaki, Tr 9-10). The Shimano factory is ISO 9001 certified (Ex. 34, Tr 14).

80. Hoshizaki issued Production Inspection Certificates which confirm that every item at issue in this litigation was inspected (such as insulation resistance, appearance, and pressure tests) and found to be in good working order on leaving the Shimano Factory (Ex. 35, Inspection Certificates; Ex. 34, Iwaki Dep., Tr 13-22).

81. Each unit must pass inspection before it can leave the factory (Ex. 34, Iwaki Dep., Tr 67-68).

82. After manufacturing, each item was placed in a cardboard carton packaged with insulating material (Ex. 34, Tr 23).

83. Hoshizaki designed and tested the type of cartons utilized to ensure the goods could withstand the normal rigors of transit (Ex. 34, Tr 24-25).

84. Hoshizaki issued a shipping report confirming that the items at issue were shipped from the Shimano Plant (Ex. 36; Ex. 34, Tr 26-27).

85. The product was transported by truck (by Nihon Truck) from Shimano to the loadport Kobe, Japan (Ex. 34, Tr 27).

86. Hoshizaki issued packing lists and invoices concerning the products at issue in this case (Ex. 37; Ex. 38; Ex. 34, Tr 32-34).

87. Sumitrans issued a Sea Waybill covering the shipment at issue in this case (Ex. 39; Ex. 34, Tr 34-35), as did Yang Ming (Ex. 39A). There are no exceptions taken to the condition of the containers or their contents on these documents.

88. Hoshizaki did not receive any notice from Sumitrans or Nihon Truck of any incident or accident involving the shipment from the time it left Shimano until arrival at Kobe (Ex. 34, Tr 35-38).

89. In response to subpoena requesting all records dealing with the Shipment, Yang Ming did not produce any record showing accident or incident (other than the train derailment). Yang Ming advised there were no such records because the transit was "uneventful" except for the derailment (Ex. 10).

90. Hoshizaki manufactures between 2000-3000 units of its icemakers and sushi cases annually at the Shimano factory. They receive quality complaints of less than 1% (Ex. 34, Tr 39-41).

91. As a result of the derailment, three containers containing Hoshizaki cargo were damaged to such an extent that they were unusable to continue to carry the cargo to destination:

        YMLU4515760

        YMLU4746964

YMLU 4889482

(Ex. 11, par. 8).

92.     Container YMLU 4515760 contained 84 icemakers, Container YMLU 474694 contained 132 sushi cases, and Container YMLU 4889482 contained 56 ice makers (Ex. 40; 41).

93.     On arrival in Atlanta, the contents which were shipped in containers YMLU4515760 were found heavily damaged (Ex. 41, VeriClaim Report p. 5-6).  The contents which had been shipped in Container YMLU4746964 were found damaged (Ex. 41, p. 6; Ex. 42 – photos; Ex. 43, Tr 56-57).  The contents of container YMLU4889482 were found damaged (Ex. 41; Ex. 43, Venneman Dep., Tr 59 ("creasing and tearing and compression")).

94.     The refrigeration circuits in the 3 containers were compromised by the derailment, subjecting Hoshizaki to future warranty claims (Ex. 45 and 45A with Exhibits).

95.     The 270 units of sushi cases and icemakers in the three containers were destroyed (Ex. 44; Ex. 43, Tr 65-67; Ex. 45).

96.     Of the seven containers shipped, Hoshizaki had no complaint about the quality of the goods in the four which were not involved in the derailment (Ex. 45, Declaration of Bill Anderson of Hoshizaki).

97.     The invoice value (purchase price) of the damaged Hoshizaki goods was $215,822.00 (Exs. 38, 41).

98.     Sompo incurred survey fees of $1,092.70 in connection with the Hoshizaki loss (Ex. 41).

99.     Sompo Japan paid its assured $237,404.20 for the damaged cargo (Ex. 17, par. 3 and Ex. C thereto).

**Canon Photocopiers Claim**

100. Canon Finetech is located in Shenzhen, China and manufactured the photocopies at issue in this litigation (Ex. 46, Declaration of Tsutomu Miyajima, General Manager, Production Control Department, Canon Finetech, par. 1 and 2).

101. The copy machines at issue were in good working order and properly packed at the time of shipment (Ex. 46, par. 3 and 4; Ex. A thereto).

102. In 2006 the factory shipped 54,090 units of Model 9563A001AA copiers, and none were returned for manufacturing defects (Ex. 46, par. 5).

103. The consignment was loaded into 2 containers--NYKU8214688 and NYKU8223329. Each contained 240 units on 60 pallets (Ex. 46, Ex. A; Ex. 47; Ex. 46, Declaration of Atsumo Sudo).

104. NYK issued bill of lading number NYKS479204457 for the shipment of the copiers at issue (Ex. 47).

105. No exceptions were taken to the condition of the Container or contents within (Ex. 47). The bill of lading is clean (Ex. 47; Ex. 48, Deposition of Eliza Hooker of NYK Lines, Tr 17-18).

106. NYK Line had no record of any incident with container NYKU8214688 other than the derailment. Had there been any other incident, NYK would have made and kept a records (Ex. 48, Tr 6-7).

107. Container NYKU8214688, as a result of the derailment, was damaged to such an extent it was unusable to continue to carry the Canon cargo to destination (Ex. 11, par. 10).

108. On arrival in Atlanta, 101 of the 240 cartons were found without dents or creases, and appeared undamaged (Ex. 49).

109. The apparent sound cartons were still shrinkwrapped on pallets (Ex. 51, Deposition of Patrick Davidson, Tr 47-48).

110. On arrival, 137 cartons had dents and creases and two were missing (Ex. 49; Ex. 52; Ex. 51, Tr 48-49). These cartons were no longer shrinkwrapped or on pallets (Ex. 51, Tr 49-50).

111. Canon inspected the copiers and found 139 to be damaged beyond repair and destroyed (Ex. 50, Declaration of Atsumo Sudo, par. 3, 4 and 5; Exs. A, B and C thereto).

112. Canon's findings of 139 damaged were reasonable and consistent with those of the independent marine surveyor (Ex. 51, Tr 62).

113. The invoice price of each copier was $448.71 (Ex. 50, par. 6 and Ex. D thereto). The invoice price of the 139 units was $62,370.69.

114. Sompo Japan paid Canon $71,057.63, the insured value of the claim (Ex. 17, par. 3 and Ex. D thereto).

115. The photocopiers in the other container shipped (NYKU8232329) which was not involved in the derailment arrived without complaint and in sound condition (Ex. 50, par. 7).

116. Sompo incurred survey fees of $1,378.23 in connection with the Canon claim (Ex. 51, Tr 64).

117. Norfolk Southern is the delivering rail carrier of the Shipments at issue (Ex. 53; 54, par. 4).

118. Kansas City Railway Company is a rail carrier of the Shipments at issue, and owned, operated and maintained the rail line on which the Shipments were damaged (Ex. 53; 54, par. 5).

Dated: Rye, New York
      March 17, 2009

                                                  MALOOF BROWNE & EAGAN LLC

By: s/ Thomas M. Eagan
    David T. Maloof (DM 3350)
    Thomas M. Eagan (TE 1713)
411 Theodore Fremd Avenue – Suite 190
Rye, New York 10580
Tel: (914) 921-1200
Fax: (914) 921-1023
Email: dmaloof@maloofandbrowne.com
         teagan@maloofandbrowne.com

*Attorneys for Plaintiffs*

TO:    All Counsel

F://WP-Docs/2503.81/022809 Pl's 56.1 Statement.doc