DAVID T. MALOOF (DM 3350)
THOMAS M. EAGAN (TE 1713)
MALOOF BROWNE & EAGAN LLC
411 Theodore Fremd Avenue, Suite 190
Rye, New York 10580-1411
(914) 921-1200
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| SOMPO JAPAN INSURANCE, INC. and SOMPO JAPAN INSURANCE COMPANY OF AMERICA | : : : | **07 Civ. 2735 (DC)** |
| *Plaintiffs,* | : | |
| - against - | : | **PLAINTIFFS' RESPONSE TO DEFENDANTS'** |
| NORFOLK SOUTHERN RAILWAY COMPANY, NORFOLK SOUTHERN CORPORATION and THE KANSAS CITY RAILWAY COMPANY | : : : | **STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1 AND COUNTER-STATEMENT** |
| *Defendants.* | | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiffs Sompo Japan Insurance, Inc. and Sompo Japan Insurance Company of America, respond to Defendants' Concise Statement of Material Facts Pursuant to Local Rule 56.1, and submit their Counter-Statement.

1. Plaintiff Sompo Japan Insurance Company of America ("Sompo America") is an insurance company organized and existing under the laws of the State of New York with its principal place of business in New York, New York, and is the insurer of one or more of the Shipments that are the subject of this action, as more fully described below. Plaintiffs' Complaint (Dkt. No. 1)("Complaint") at ¶ 2.

**Response:** Not disputed.

2. Plaintiff Sompo Japan Insurance Inc., ("Sompo Japan") is an insurance company organized and existing 'under the laws of Japan, and is the insurer of one or more of the

Shipments that are the subject of this action, as more fully described below. Complaint at ¶ 3.

> **Response:** Not disputed.

3.      Defendant Norfolk Southern Railway Company (hereinafter "Norfolk Southern") is a corporation organized and existing under the laws of Virginia, was and is doing business as a common carrier of goods by rail for hire, and was the delivering rail carrier of the Shipments at issue. Complaint at ¶ 4.

> **Response:** Not disputed.

4.      The Kansas City Southern Railway Company (hereinafter "KCSR") is a corporation organized and existing under the laws of the state of Missouri, and was and is doing business as a common carrier of goods by rail for hire, and does business within this District. Kansas City was a rail carrier and/or delivery rail carrier of the Shipments at issue. Complaint at ¶ 5.

> **Response:** Not disputed.

**[Kubota Tractors]**

5.      On or about March 31,2006, at the Port of Tokyo, Japan, there was shipped by Kubota Corporation ("Kubota") and loaded aboard the M/V Cherokee Bridge a consignment of Agricultural Tractors, in Containers YMLU8294100, FSCU6904489, CLHU 8586100, X1NU8033402, YMLU8217892, YMLU8264472, CRXU9841070, YMLU8I90019, TGHU8035818, YMLU8131839, CRXU9505408, 1NKU6363983, BHCU4940820, CRXU9829536, TRLU8116442, YMLU8223405 (the "Kubota Shipment"). The Kubota Shipment was discharged at the Port of Long Beach, California and thereafter delivered to The BNSF Railway Company ("BNSF") for rail transport. Complaint at ¶ 7; Declaration of Chris D. Luebbers in Support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment

(Dkt. No. 21)("Luebbers Decl.").

          **Response:** Not disputed.

      6.     Kubota manufactured the tractors at its plant in Tsukuba, Japan. Deposition of Takeshiyo Yokoo ("Yokoo Dep.") 7:22 – 8:25, relevant excerpts from which are attached as Exhibit A to the Second Declaration of Charles L. Howard (Howard Decl.). Tsukuba is located approximately 50 km from Tokyo. See excerpt from City of Tsukuba, Japan website attached as Exhibit M to Howard Decl. After manufacture, Kubota transported the tractors to a warehouse located near its plant *via* truck. Yokoo Dep. at 30:10 – 20. The tractors were then placed into containers for shipment to the United States. Yokoo Dep. at 32:21 – 33:3. Kubota was not involved in the placing of the tractors into the shipping containers. Yokoo Dep. at 31:24 – 32:24. Each of the containers was then transported, *via* truck¸ to the port of Tokyo. Yokoo Dep. at 33:21 – 34:2.

          **Response:** Dispute in part as follows: the tractors are placed into the shipping frames (specially designed, tested and approved) at the Tsukuba factory on the same day the tractors pass final inspection (Ex. 7, Yokoo Dep. 27-30). The tractors were then transported 100-200 meters from the factory to a warehouse by the Mitsukaido Truck Cooperative, a careful and reliable trucker who has been performing this task for over 30 years (Ex. 7, Yokoo Dep., Tr 31). This adjacent warehouse is operated by the Ksuwasoko Company, who placed each tractor in the shipping containers (three tractors per container for the 9540 and 8540 models; ten per container for the 6040 and 5040 models)(Ex. 7, Yokoo Dep., Tr 32-33, 36). Ksuwasoko has performed this service for over 30 years, and is careful and reliable (Ex. 7, Tr 32, 34).

      7.     Yang Ming Marine Transport Corporation ("Yang Ming") issued a separate bill of lading for each of the containers which made up the Kubota Shipment ("Kubota Bills of

Lading"). Each of the Kubota Bills of Lading identified Tokyo, Japan as the "port of loading" and Jefferson, Georgia (USA) as the "place of destination." Exhibit 3 to Declaration of Thomas M. Eagan in Support of Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 12-3)("Eagan Decl.").

        **Response:** Not disputed.

8.      Norfolk Southern generated waybills for the rail transport of each of the containers which made up the Kubota Shipment ("NS Kubota Waybills"). Each of the NS Kubota Waybills identifies Long Beach, California as the rail origin and Austell, Georgia as the rail destination. The NS Kubota Waybills also indicate that the Kubota Shipment was originally tendered for rail transport to the BNSF Railway in Long Beach, California and then interchanged with Norfolk Southern in Dallas, Texas. Exhibit 12 to Eagan Decl. (Dkt. No. 12-12) and Luebbers Decl.

        **Response:** Not disputed.

9.      Sompo America insured the Kubota Shipment. Complaint at ¶ 10.

        **Response:** Not disputed.

10.     Sompo America's insured executed a "Subrogation Receipt" in exchange for the payment of insurance proceeds by Sompo America to its insured for claims related to the Kubota Shipment. Sompo America's insured agreed "to cooperate fully with [Sompo America] in the prosecution of [any subrogation claims], and to procure and furnish all papers and documents necessary in such proceedings and to attend court and testify if [Sompo America] deems such to be necessary." See Kubota Subrogation Receipt attached as Exhibit B to Howard Decl.

        **Response:** Disputed in part (including the portion in brackets). Sompo refers to the terms of the entire document (Ex. B to Howard Decl.).

11.     In response to Defendants' notice of deposition pursuant to Fed. R. Civ. P. 30(b)(6), plaintiffs did not designate or produce anyone to testify as to the condition of the Kubota Shipment inside the containers when it was tendered for domestic rail transportation to BNSF or Norfolk Southern. Deposition of Kazuhiro Aikoh ("Aikoh Dep") 54:17 – 55:2, relevant excerpts from which are attached as Exhibit C to Howard Decl.

**Response:** Disputed as follows:  Neither plaintiffs nor their assureds had a witness on the scene at the time the shipment was tendered to BNSF or Norfolk Southern.  That information was not known or reasonably available to plaintiffs, and therefore plaintiffs could not produce such a witness for deposition.  However, plaintiffs disclosed the existence of Yang Ming and BNSF in its Initial Disclosures regarding the delivery of the shipment for rail carriage and cargo condition (Ex. E to Howard Declaration, p. 2).  Moreover, in response to subpoena seeking all documents including the interchange between Yang Ming and the railroads, Yang Ming's attorney (also NS' attorney Mr. Howard) represented that transit from Japan to Georgia was "uneventful" except for the NS derailment (Ex. 10 to plaintiffs' summary judgment motion). Moreover, the undisputed evidence adduced during discovery shows that the goods were in good order and condition in that (i) the goods were in good order and condition on leaving the factory; (ii) the goods were packed to withstand the normal rigors of transport; (iii) that there were no transportation events involving the cargo (other than the derailment); (iv) no exceptions were taken to the condition of the containers or their contents at point of rail carriage; (v) the derailment was not caused by inherent vice or act of shipper; (vi) that the derailment severely damaged the 40-foot containers in which the Shipment was carried; and (vii) from the type of damage it is self-evident the damaged condition resulted from the derailment.   Plaintiffs incorporate by reference their Rule 56.1 Statement, pars. 1-32, with referenced Exhibits therein.

5

12.    Plaintiffs disclosed no information whatsoever during discovery concerning the condition of the Kubota Shipment inside the containers when it was tendered for domestic rail transportation to the rail carrier in Long Beach, California. See Plaintiffs' Responses to Defendants Requests for Admission at ¶ 1, attached as exhibit D to Howard Decl.

**Response:** Disputed.  Plaintiffs' specifically denied that request.  The undisputed evidence adduced during discovery shows that the goods were in good order and condition in that (i) the goods were in good order and condition on leaving the factory; (ii) the goods were packed to withstand the normal rigors of transport; (iii) that there were no transportation events involving the cargo (other than the derailment); (iv) no exceptions were taken to the condition of the containers or their contents at point of rail carriage; (v) the derailment was not caused by inherent vice or act of shipper; (vi) that the derailment severely damaged the 40-foot containers in which the Shipment was carried; and (vii) from the type of damage it is self-evident the damaged condition resulted from the derailment.  Plaintiffs incorporate by reference their Rule 56.1 Statement (pars. 1-32 with referenced Exhibits).

13.    Plaintiffs have never disclosed the identity of any individual with knowledge of the condition of the Kubota shipment at rail origin, nor have plaintiffs produced evidence of any inspection of the freight inside the containers when the containers were tendered for domestic rail transport. See Plaintiffs' Rule 26(a) Initial Disclosures at ¶ 1-A, attached as exhibit E to Howard Decl.

**Response:** Disputed.  Plaintiffs' Initial Disclosures identified Yang Ming and BNSF as having such knowledge (Ex. E to Howard Declaration).  Yang Ming was subpoenaed and confirmed there were no other incidents involving the cargo other than the derailment (Ex. 10 to plaintiffs' summary judgment motion).  Defendants took the deposition of two of the

shippers' representatives from Japan concerning the good order of the machine and packaging (Ex. 3, Aikoh Dep.; Ex. 7, Yokoo Dep.).

**[Unisia Autoparts]**

14.    On or about March 31, 2006, at the Port of Tokyo, Japan, there was shipped by Hitachi, Ltd. ("Hitachi"), and loaded aboard the M/V Cherokee Bridge a consignment of Automobile Parts in Containers YMLU4455172 and TEXU7204601 (the "Unisia Shipment"). The Unisia Shipment was discharged in Long Beach, California and thereafter delivered to BNSF for rail transport. Complaint at ¶ 13; Luebbers Decl.

> **Response:** Not disputed, but for sake of completeness two other containers (not involved in the derailment) of Hitachi autoparts were shipped at the same time and for which no claim for damage has been made (Ex. 29 and 29A).

15.    Hitachi packaged the automobile parts which made up the Unisia Shipment. Deposition of Yukio Hoover ("Hoover Dep."), 8:9 – 22, relevant excerpts from which are attached as Exhibit F to Howard Decl.

> **Response:** Not disputed.  For sake of completeness, Plaintiffs would add that most of the parts were also manufactured at the Atsugi factory (Plaintiffs' Rule 56.1 Statement pars. 33-49 and Exhibits referred to therein).

16.    Hitachi's plant is located in Atsugi, Japan, approximately 30 km from the port of Yokohoma. Hoover Dep. at 49: 11 – 14. After manufacture, Hitachi transported the auto parts to a warehouse in Yokohoma. Hoover Dep. at 15:12 – 16:7. There the auto parts were loaded into containers for shipment to the United States. Hitachi was not involved in placing the freight into the shipping containers. Hoover Dep. at 18:15 – 21.

> **Response:** Disputed in part as follows:.  Hitachi designed the shipping cartons in

which the autoparts are placed to withstand the normal rigors of transit. The autoparts at issue were packed in such manner. The parts are placed into these shipping cartons at the Atsugi factory. There have been no complaints about the packaging for at least the last 11 years (Ex. 25, Hoover Dep., Tr 13-15, 33-34). Vantech places the cargo in the containers. Vantech has been performing these services for Hitachi for over 11 years (Ex. 25, Tr 17-18).

17.    Nippon Express ("Nippon") issued a bill of lading for the containers which made up the Unisia Shipment ("Unisia Bill of Lading") The Unisia Bill of Lading identified Tokyo, Japan as the "port of loading" and Monroe, Georgia (USA) as the "place of destination." Exhibit 5 to Eagan Decl. (Dkt. No. 12-5).

      **Response:** Not disputed.

18.    Nippon engaged Yang Ming to perform the actual carriage of the Unisia Shipment. Yang Ming issued a waybill which identified Tokyo, Japan as the origin and Atlanta, Georgia as the destination. Exhibit 4 to Eagan Decl. (Dkt. No. 12-4).

      **Response:** Not disputed.

19.    Norfolk Southern generated waybills for the rail transport of each of the containers which made up the Unisia Shipment ("NS Unisia Waybills"). Each of the NS Unisia Waybills identifies Long Beach, California as the rail origin and Austell, Georgia as the rail destination. The NS Unisia Waybills also indicate that the Unisia Shipment was originally tendered for domestic rail transport to the BNSF Railway in Long Beach, California and then interchanged with Norfolk Southern in Dallas, Texas. Exhibit 12 to Eagan Decl. (Dkt. No. 12-12) and Luebbers Decl.

      **Response:** Not disputed.

20.    Sompo America insured the Unisia Shipment. Complaint at ¶ 16.

**Response:** Not disputed.

21.     Sompo America's insured executed a "Letter of Subrogation" in exchange for the payment of insurance proceeds by Sompo America to its insured for claims related to the Unisia Shipment. Sompo America's insured agreed "to render [Sompo America] every assistance in any [subrogation action] . . . in respect of this loss." See Unisia Letter of Subrogation attached as Exhibit K to Howard Decl.

**Response:** Disputed as incomplete.  Also, the bracketed portions do not appear in the document.  Plaintiff refers to the entire document.

22.     In response to Defendants' notice of deposition pursuant to Fed. R. Civ. P. 30(b)(6), plaintiffs failed to designate or produce anyone to testify as to the condition of the Unisia Shipment inside the containers when it was tendered for domestic rail transportation to BNSF or Norfolk Southern. Deposition of Yosiyuki Kato ("Kato Dep."), 96:18 – 98:11, relevant excerpts from which are attached as Exhibit G to Howard Decl.

**Response:** Disputed as follows:  neither plaintiffs nor their assureds had witness on the scene at the time the shipment was tendered to BNSF or Norfolk Southern.  That information was not known or reasonably available to plaintiffs, and therefore plaintiffs could not produce such a witness for deposition.  However, plaintiffs disclosed the existence of Yang Ming and BNSF in its Initial Disclosures regarding the delivery of the shipment for rail carriage and cargo condition (Ex. E to Howard Declaration, p. 4).  Moreover, in response to subpoena seeking all documents including the interchange between Yang Ming and the railroads, Yang Ming's attorney (also NS' attorney Mr. Howard) represented that transit from Japan to Georgia was "uneventful" except for the NS derailment (Ex. 10 to plaintiffs' summary judgment motion).  Moreover, the undisputed evidence adduced during discovery shows that the goods were in good

order and condition in that (i) the goods were in good order and condition on leaving the factory; (ii) the goods were packed to withstand the normal rigors of transport; (iii) that there were no transportation events involving the cargo (other than the derailment); (iv) no exceptions were taken to the condition of the containers or their contents at point of rail carriage; (v) the derailment was not caused by inherent vice or act of shipper; (vi) that the derailment severely damaged the 40-foot containers in which the Shipment was carried; and (vii) from the type of damage it is self-evident the damaged condition resulted from the derailment.  Plaintiffs incorporate by reference their Rule 56.1 Statement, pars. 33-78, with referenced Exhibits therein.

23.    Plaintiffs disclosed no information whatsoever during discovery concerning the condition of the Unisia Shipment inside the containers when it was tendered for domestic rail transportation to the rail carrier in Long Beach, California. See Plaintiffs' Responses to Defendants Requests for Admission at ¶ 2, attached as Exhibit D to Howard Decl.

**Response:** Disputed.  Plaintiffs' specifically denied that request.  The undisputed evidence adduced during discovery shows that the goods were in good order and condition in that (i) the goods were in good order and condition on leaving the factory; (ii) the goods were packed to withstand the normal rigors of transport; (iii) that there were no transportation events involving the cargo (other than the derailment); (iv) no exceptions were taken to the condition of the containers or their contents at point of rail carriage; (v) the derailment was not caused by inherent vice or act of shipper; (vi) that the derailment severely damaged the 40-foot containers in which the Shipment was carried; and (vii) from the type of damage it is self-evident the damaged condition resulted from the derailment.  Plaintiffs incorporate by reference their Rule 56.1 Statement (pars. 33-78 with referenced Exhibits).

24.    Plaintiffs have never disclosed the identity of any individual with knowledge of

the condition of the Unisia shipment at rail origin, nor have plaintiffs produced evidence of any inspection of the freight inside the containers when the containers were tendered for domestic rail transport. See Plaintiffs' Rule 26(a) Initial Disclosures at ¶ 1-B, attached as Exhibit E to Howard Decl.

**Response:** Disputed. Plaintiffs' Initial Disclosures identified Yang Ming and BNSF as having such knowledge (Ex. E to Howard Declaration). Yang Ming was subpoenaed and confirmed there were no other incidents involving the cargo other than the derailment (Ex. 10 to plaintiffs' summary judgment motion). Defendants took the deposition of the shippers' representative from Japan (and the consignee from Georgia) concerning the good order of the machine and packaging (Ex. 20, Kato Dep.; Ex. 25, Hoover Dep.).

**[Hoshizaki Sushi Cases/Freezers]**

25.     On or about April 11, 2006, at the port of Kobe, Japan, there was shipped by Hoshizaki Electric Company ("Hoshizaki") and loaded aboard the M/V Cherokee Bridge a consignment of Icemakers and Sushi Cases in Containers YMLU4515760, YMLU4746964 and YMLU4889482, (the "Hoshizaki Shipment"). The Hoshizaki Shipment was discharged in Long Beach, California and thereafter delivered to BNSF for rail transport. Complaint at ¶ 18; Luebbers Decl.

**Response:** Not disputed. For sake of completeness, Hoshizaki shipped 4 other containers at the same time which were not involved in the derailment and for which no claim for damage was made (Exs. 39 and 39A).

26.     Hoshizaki manufactured the icemakers and sushi cases at its plant in Shimane prefecture in Japan. Deposition of Yosiyuki Iwaki ("Iwaki Dep."), 6:23 – 7:4; 9:17 – 25; and 10:13 – 17, relevant excerpts from which are attached as Exhibit H to Howard Decl. Upon

11

completion of manufacture, the icemakers and sushi cases were placed in cartons at the Hoshizaki plant and transported to a warehouse near Hoshizaki's plant. Iwaki Dep. at 22:19 – 23:15. The products were then trucked to a warehouse near the port of Kobe, Japan, where they were then "stuffed" into containers for their ocean voyage. Iwaki Dep. at 31:8 – 20. Hoshizaki was not involved in placing the freight into the shipping containers. Iwaki Dep. at 31:21 – 32:4. The distance between the Hoshizaki plant and the port of Kobe is approximately 250 km. Iwaki Dep. at 80:10 – 13.

> **Response:** Disputed as follows: after manufacturing, each item was placed in a cardboard carton packaged with insulating material (Ex. 34, Tr 23). Hoshizaki designed and tested the type of cartons utilized to ensure the goods could withstand the normal rigors of transit (Ex. 34, Tr 24-25). Sumitrans (hired by Hoshizaki) arranged the stuffing of the shipping cartons into the 40 ft. shipping containers (Ex. 34, Tr 29-30). Hoshizaki instructs Sumitrans as to the loading of the cartons into the containers (Ex. 34, Tr 32); they have a good relationship with Sumitrans over a number of years (Ex. 34, Tr 38). The shipping cartons were transported from the factory to the load port by Nihon Trucking (Ex. 34, Tr 37). Hoshizaki has been doing business with Nihon for over 30 years and has had a very good experience with them (Ex. 34, Tr 37-38). Hoshizaki manufactures between 2000 and 3000 sushi cases/icemakers for export, and received virtually no complaints from customers about the quality—less than 1% (Ex. 34, Tr 40-41). Hoshizaki received no notice from Sumitrans or Nihon about incidents involving this cargo (Ex. 34, Tr 35-38).

27. Sumitrans Corporation ("Sumitrans") issued a bill of lading for the containers which made up the Hoshizaki Shipment ("Hoshizaki Bill of Lading") The Hoshizaki Bill of Lading identified Kobe, Japan as the "port of loading" and Griffin, Georgia (USA) as the "place

of destination." Exhibit 7 to Eagan Decl. (Dkt. No. 12-7).

>**Response:** Not disputed.

28.    Sumitrans engaged Yang Ming to perform the actual carriage of the Hoshizaki Shipment. Yang Ming issued a waybill which identified Kobe, Japan as the origin and Griffin, Georgia as the destination. Exhibit 6 to Eagan Decl. (Dkt. No. 12-6).

>**Response:** Not disputed.

29.    Norfolk Southern generated waybills for the rail transport of each of the containers which made up the Hoshizaki Shipment ("NS Hoshizaki Waybills"). Each of the NS Hoshizaki Waybills identifies Long Beach, California as the rail origin and Austell, Georgia as the rail destination. The NS Hoshizaki Waybills also indicate that the Hoshizaki Shipment was originally tendered for rail transport to the BNSF Railway in Long Beach, California and then interchanged with Norfolk Southern in Dallas, Texas. Exhibit 12 to Eagan Decl. (Dkt. No. 12-12) and Luebbers Decl.

>**Response:** Not disputed.

30.    Sompo Japan insured the Hoshizaki Shipment. Complaint at ¶ 21.

>**Response:** Not disputed.

31.    Sompo Japan and its insured executed a "Letter of Subrogation" in exchange for the payment of insurance proceeds by Sompo Japan to its insured for claims related to the Hoshizaki Shipment. Sompo Japan's insured agreed "to render [Sompo America] every assistance in any [subrogation action] . . . in respect of this loss." See the Hoshizaki Electric Company Letter Subrogation attached as Exhibit I to Howard Decl.

>**Response:** Disputed as incomplete.  Also, the bracketed portions do not appear in the document.  Plaintiff refers to the entire document.

32.    In response to Defendants' notice of deposition pursuant to Fed. R. Civ. P. 30(b)(6), plaintiffs did not designate or produce anyone to testify as to the condition of the Hoshizaki Shipment when it was tendered to BNSF or Norfolk Southern for rail transport. Iwaki Dep. at 57:24 – 58:6.

**Response:** Disputed as follows:   Neither plaintiffs nor their assureds had a witness on the scene at the time the shipment was tendered to BNSF or Norfolk Southern.  That information was not known or reasonably available to plaintiffs, and therefore plaintiffs could not produce such a witness for deposition.  However, plaintiffs disclosed the existence of Yang Ming and BNSF in its Initial Disclosures regarding the delivery of the shipment for rail carriage and cargo condition (Ex. E to Howard Declaration, p. 6).  Moreover, in response to subpoena seeking all documents including the interchange between Yang Ming and the railroads, Yang Ming's attorney (also NS' attorney Mr. Howard) represented that transit from Japan to Georgia was "uneventful" except for the NS derailment (Ex. 10 to plaintiffs' summary judgment motion).  Moreover, the undisputed evidence adduced during discovery shows that the goods were in good order and condition in that (i) the goods were in good order and condition on leaving the factory; (ii) the goods were packed to withstand the normal rigors of transport; (iii) that there were no transportation events involving the cargo (other than the derailment); (iv) no exceptions were taken to the condition of the containers or their contents at point of rail carriage; (v) the derailment was not caused by inherent vice or act of shipper; (vi) that the derailment severely damaged the 40-foot containers in which the Shipment was carried; and (vii) from the type of damage it is self-evident the damaged condition resulted from the derailment.   Plaintiffs incorporate by reference their Rule 56.1 Statement, pars. 79-99, with referenced Exhibits therein.

33.    Plaintiffs disclosed no information whatsoever during discovery concerning the

condition of the Hoshizaki Shipment when it was tendered for rail transportation to the domestic rail carrier in Long Beach, California. See Plaintiffs' Responses to Defendants Requests for Admission at ¶ 3, attached as Exhibit D to Howard Decl.

      **Response:** Disputed.  Plaintiffs' specifically denied that request.  The undisputed evidence adduced during discovery shows that the goods were in good order and condition in that (i) the goods were in good order and condition on leaving the factory; (ii) the goods were packed to withstand the normal rigors of transport; (iii) that there were no transportation events involving the cargo (other than the derailment); (iv) no exceptions were taken to the condition of the containers or their contents at point of rail carriage; (v) the derailment was not caused by inherent vice or act of shipper; (vi) that the derailment severely damaged the 40-foot containers in which the Shipment was carried; and (vii) from the type of damage it is self-evident the damaged condition resulted from the derailment.  Plaintiffs incorporate by reference their Rule 56.1 Statement (pars. 79-99 with referenced Exhibits).

    34.    Plaintiffs have never disclosed the identity of any individual with knowledge of the condition of the Hoshizaki shipment at rail origin. See Plaintiffs' Rule 26(a) Initial Disclosures at ¶ 1-C, attached as exhibit E to Howard Decl.

      **Response:** Disputed.  Plaintiffs' Initial Disclosures identified Yang Ming and BNSF as having such knowledge (Ex. E to Howard Declaration).  Yang Ming was subpoenaed and confirmed there were no other incidents involving the cargo other than the derailment (Ex. 10 to plaintiffs' summary judgment motion).  Defendants took the deposition of the shipper's representative from Japan concerning the good order of the machine and packaging (Ex. 34, Iwaki Dep.).

**[Canon Copiers]**

35.     On or about March 26, 2006, at Yantian, China; there was shipped by Canon Finetech Industries and loaded aboard the M/V OOCL Ningbo a consignment of copying machines and accessories in Containers NYKU8214688 and NYKU8223329 (the "Canon Shipment'). The Canon Shipment was discharged in Long Beach, California and thereafter delivered to BNSF for rail transport.. Complaint at ¶ 23; Luebbers Decl.

    **Response:** Not disputed, but for sake of completeness only Container NYKU 8214688 was involved in the derailment.  No claim was made for cargo in the other container (Ex. 11, Ex. 50).

36.     NYK Line ("NYK") issued a bill of lading for the containers which made up the Canon Shipment ("Canon Bill of Lading"). The Canon Bill of Lading identified Yantian, China as the "port of loading" and Long Beach, California (USA) as the "place of delivery." Exhibit 8 to Eagan Decl. (Dkt. No. 12-8).

    **Response:** Not disputed., except that the bill of lading (Ex. 47) shows Georgia as the place of delivery.

37.     Norfolk Southern generated waybills for the rail transport of each of the containers which made up the Canon Shipment ("NS Canon Waybills"). Each of the NS Canon Waybills identifies Long Beach, California as the rail origin and Austell, Georgia as the rail destination. The NS Canon Waybills also indicate that the Canon Shipment was originally tendered for rail transport to the BNSF Railway in Long Beach, California and then interchanged with Norfolk Southern in Dallas, Texas. Exhibit 12 to Eagan Decl. (Dkt. No. 12-12); Luebbers Decl.

    **Response:** Not disputed.

16

38.    Sompo Japan insured the Canon Shipment. Complaint at ¶ 26.

**Response:** Not disputed.

39.    Sompo Japan and its insured executed a "Subrogation Receipt" which governed the payment of insurance proceeds by Sompo Japan to its insured for claims related to the Kubota Shipment. Sompo Japan's insured agreed "to cooperate fully with [Sompo Japan] in the prosecution of [any subrogation claims], and to procure and furnish all papers and documents necessary in such proceedings and to attend court and testify if [Sompo America] deems such to be necessary." See Canon Letter of Subrogation attached as Exhibit J to Howard Decl.

**Response:** Disputed as incomplete.  Also, the bracketed portions do not appear in the document.  Plaintiff refers to the entire document.

40.    In response to Defendants' notice of deposition pursuant to Fed. R. Civ. P. 30(b)(6), plaintiffs did not designate or produce anyone to testify as to the condition of the Canon Shipment when it was tendered to BNSF or Norfolk Southern for rail transport. Deposition of Patrick Davidson ("Davidson Dep.") 6:21 – 7:23, relevant excerpts from which are attached as Exhibit L to the Howard Decl.

**Response:** Disputed as follows:  Neither plaintiffs nor their assureds had a witness on the scene at the time the shipment was tendered to BNSF or Norfolk Southern.  That information was not known or reasonably available to plaintiffs, and therefore plaintiffs could not produce such a witness for deposition.  However, plaintiffs disclosed the existence of Yang Ming and BNSF in its Initial Disclosures regarding the delivery of the shipment for rail carriage and cargo condition (Ex. E to Howard Declaration, p. 8).  Moreover, in response to subpoena seeking all documents including the interchange between Yang Ming and the railroads, Yang Ming's attorney (also NS' attorney Mr. Howard) represented that transit from Japan to Georgia

17

was "uneventful" except for the NS derailment (Ex. 10 to plaintiffs' summary judgment motion). Moreover, the undisputed evidence adduced during discovery shows that the goods were in good order and condition in that (i) the goods were in good order and condition on leaving the factory; (ii) the goods were packed to withstand the normal rigors of transport; (iii) that there were no transportation events involving the cargo (other than the derailment); (iv) no exceptions were taken to the condition of the containers or their contents at point of rail carriage; (v) the derailment was not caused by inherent vice or act of shipper; (vi) that the derailment severely damaged the 40-foot containers in which the Shipment was carried; and (vii) from the type of damage it is self-evident the damaged condition resulted from the derailment.    Plaintiffs incorporate by reference their Rule 56.1 Statement, pars. 100-118, with referenced Exhibits therein.  See also Ex. 58, NYK Line's survey report and photographs of damaged container; Ex. 48, Tr 6-8.

41.    Plaintiffs disclosed no information whatsoever during discovery concerning the condition of the Canon Shipment when it was tendered for rail transportation to the domestic rail carrier in Long Beach, California. *See* Plaintiffs' Responses to Defendants Requests for Admission at ¶ 4, attached as exhibit D to Howard Decl.

**Response:** Disputed.  Plaintiffs' specifically denied that request.  The undisputed evidence adduced during discovery shows that the goods were in good order and condition in that (i) the goods were in good order and condition on leaving the factory; (ii) the goods were packed to withstand the normal rigors of transport; (iii) that there were no transportation events involving the cargo (other than the derailment); (iv) no exceptions were taken to the condition of the containers or their contents at point of rail carriage; (v) the derailment was not caused by inherent vice or act of shipper; (vi) that the derailment severely damaged the 40-foot containers

in which the Shipment was carried; and (vii) from the type of damage it is self-evident the damaged condition resulted from the derailment. Plaintiffs incorporate by reference their Rule 56.1 Statement (pars. 100-118 with referenced Exhibits).

42.    Plaintiffs have never disclosed the identity of any individual with knowledge of the condition of the Canon shipment at rail origin. See Plaintiffs' Rule 26(a) Initial Disclosures at ¶ 1-D, attached as exhibit E to Howard Decl.

**Response:** Disputed. Plaintiffs' Initial Disclosures identified Yang Ming and BNSF as have such knowledge (Ex. E to Howard Declaration). Yang Ming was subpoenaed and confirmed there were no other incidents involving the cargo other than the derailment (Ex. 10 to plaintiffs' summary judgment motion).

43.    Plaintiff has never disclosed the identity of any expert to testify on any issue in this matter. Howard Decl. at ¶ 15.

**Response:** Not disputed; as given the state of the unrefuted and obvious evidence and admissions, no expert evidence is needed.

<u>**COUNTER-STATEMENT OF FACTS**</u>

Plaintiffs attach hereto and incorporate by reference each of the facts in paragraphs 1 to 118 set forth in their own 56.1 Statement [D.E. 49]; as if fully set forth herein. In addition:

1.    Over 25 million cargo containers arrive in the U.S. per year (Ex. 55 to April 29, 2009 Eagan Declaration).

Dated: Rye, New York                    MALOOF BROWNE & EAGAN LLC
       April 30, 2009

                                        By: s/ Thomas M. Eagan
                                            David T. Maloof (DM 3350)
                                            Thomas M. Eagan (TE 1713)
                                        411 Theodore Fremd Avenue – Suite 190

Rye, New York 10580
Tel: (914) 921-1200
Fax: (914) 921-1023
Email: dmaloof@maloofandbrowne.com
        teagan@maloofandbrowne.com

*Attorneys for Plaintiffs*

TO:    All Counsel

F://WP-Docs/2503.81/040909 Resp to Def's 56.1 Statement.doc