UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

SOMPO JAPAN INSURANCE COMPANY OF      :
AMERICA and SOMPO JAPAN INSURANCE,
INC.,                                 :

               Plaintiffs,      :

     - against -                    :        07 Civ. 2735 (DC)

NORFOLK SOUTHERN RAILWAY COMPANY,     :
NORFOLK SOUTHERN CORPORATION and
THE KANSAS CITY SOUTHERN RAILWAY      :
COMPANY,
               Defendants.      :

- - - - - - - - - - - - - - - - - -x        **OPINION**

NIPPONKOA INSURANCE COMPANY LTD.,     :

               Plaintiff,       :

     - against -                    :        07 Civ. 10498 (DC)

NORFOLK SOUTHERN RAILWAY COMPANY      :
and THE KANSAS CITY SOUTHERN
RAILWAY COMPANY,                      :

               Defendants.      :

- - - - - - - - - - - - - - - - - -x

**APPEARANCES:**        (See last page)

**CHIN, Circuit Judge**

       Plaintiffs Sompo Japan Insurance Company of America and

Sompo Japan Insurance, Inc. (together, "Sompo") and Nipponkoa

Insurance Company Limited ("Nipponkoa") insured cargo carried on

a train that derailed near Dallas, Texas, on April 18, 2006.

Defendants Norfolk Southern Railway Company, Norfolk Southern Corporation, and Kansas City Southern Railway Company operated the derailed train and the track on which it ran.

In these separate but related actions,[1] Sompo and Nipponkoa, as subrogees of the insureds, sued defendants[2] alleging claims under various federal laws and common law theories.  Before the Court are the parties' cross-motions for summary judgment.  For the reasons stated below, defendants' motions for summary judgment are granted in part and denied in part and plaintiffs' motions are denied.

## BACKGROUND

I have previously issued four opinions related to this train derailment:  two in Sompo, one joint opinion in both Sompo and Nipponkoa, and a third opinion in an additional related case. See Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co., 652 F. Supp. 2d 537 (S.D.N.Y. 2009), vacated in part sub nom. Nipponkoa Ins. Co., Ltd. v. Norfolk S. Ry. Co., 394 F. App'x 751 (2d Cir.

---

[1]     In this decision, I refer to Sompo's case against defendants as Sompo and Nipponkoa's case against defendants as Nipponkoa.

[2]     Norfolk Southern Corporation, a holding company and parent corporation of Norfolk Southern Railway Company, is named as a defendant only in Sompo.

2010) (summary order); <u>Sompo Japan Ins. Co. of Am. v. Yang Ming
Marine Transp. Corp.</u>, 578 F. Supp. 2d 584 (S.D.N.Y. 2008),
<u>abrogated in part by</u> <u>Rexroth Hydraudyne B.V. v. Ocean World
Lines, Inc.</u>, 547 F.3d 351 (2d Cir. 2008); <u>Sompo Japan Ins. Co. of
Am. v. Norfolk S. Ry. Co.</u>, 553 F. Supp. 2d 348 (S.D.N.Y. 2008);
<u>Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.</u>, 540 F. Supp.
2d 486 (S.D.N.Y. 2008).  The relevant facts are described in
detail in those opinions, particularly in this Court's March 20,
2008 decision, <u>see</u> <u>Sompo</u> 540 F. Supp. 2d at 488-91, and are not
disputed.  Familiarity with those opinions is assumed, and the
facts and procedural history of these cases, to the extent they
have been previously discussed, will be repeated here only to the
extent necessary for an understanding of the issues.

A.   <u>Facts</u>

   1.   <u>Sompo-Insured Cargo</u>

      Sompo's insureds include Kubota Tractor Corporation
("Kubota"), Hoshizaki Electric Co., Ltd. ("Hoshizaki"), Canon,
Inc. ("Canon"), and Unisia of Georgia Corporation ("Unisia"),
each acting as consignee and "notify party" for manufacturer and
shipper Hitachi, Ltd. ("Hitachi").  (<u>See</u> Sompo's Resp. to Defs.'
Rule 56.1 Statement ¶¶ 5, 20, 28, 35, 41, 44; Ex. 24 to Decl. of
Charles L. Howard in Supp. of Defs.' Mot. for Summ. J. in <u>Sompo</u>

- 3 -

("Howard Sompo Decl.")).  Transport of the insured cargo involved several carriers and different types of goods being shipped from Japan and China to various locations in the state of Georgia.

Kubota hired Yang Ming Marine Transport Corporation ("Yang Ming"), an ocean carrier, for the shipment of tractors from Japan to Jefferson, Georgia.  (Sompo's Resp. to Defs.' Rule 56.1 Statement ¶¶ 24-25; Howard Sompo Decl. Exs. 3, 9).  Canon engaged Nippon Yusen Kaisha ("NYK"), also an ocean carrier, for the carriage of copiers from China to Georgia.[3]  (Sompo's Resp. to Defs.' Rule 56.1 Statement ¶¶ 32-33; Howard Sompo Decl. Exs. 8, 10).  Hoshizaki employed Sumitrans Corporation ("Sumitrans"), a non-vessel operating common carrier ("NVOCC"),[4] for the

_____

[3]    Defendants' Rule 56.1 Statement indicates that the final destination for the shipment was Georgia.  (Defs.' Rule 56.1 Statement ¶ 32).  The bill of lading, however, identifies Long Beach, California, as the "place of delivery."  (Howard Sompo Decl. Ex. 8).  Sompo does not dispute that Georgia was the final destination for the goods.  (See Sompo's Resp. to Defs.' Rule 56.1 Statement ¶ 32).  See also Sompo, 540 F. Supp. 2d at 489 & n.1.

[4]    An NVOCC provides transportation for hire and assumes liability for the goods it agrees to ship but does not undertake actual transportation of the goods or operation of the vessel on which the goods are transported.  Royal & Sun Alliance Ins., PLC v. Ocean World Lines, Inc., 612 F.3d 138, 140 n.2 (2d Cir. 2010) (citing 1-1 Saul Sorkin, Goods in Transit § 1.15(8)).  It issues a bill of lading to the shipper and delivers the shipment to another carrier for transportation.  Id.

transport of appliances from Japan to Griffin, Georgia.  (Sompo's Resp. to Defs.' Rule 56.1 Statement ¶¶ 13-14; Howard Sompo Decl. Exs. 7, 12).  And finally, Hitachi, through its consignee, Unisia, contracted Nippon Express U.S.A. (Illinois) ("Nippon Express"), also an NVOCC, for the shipment of auto parts from Japan to Monroe, Georgia.  (Sompo's Resp. to Defs.' Rule 56.1 Statement ¶¶ 39-40; Howard Sompo Decl. Exs. 5, 11).  Yang Ming, NYK, Sumitrans, and Nippon Express each issued a bill or several bills[5] of lading to its respective customer.  (Howard Sompo Decl. Exs. 3, 5, 7-12).  Both Sumitrans and Nippon Express, subsequently engaged Yang Ming to execute shipment of the Hoshizaki appliances and Hitachi auto parts.  (Sompo's Resp. to Defs.' Rule 56.1 Statement ¶¶ 17, 41).

        The cargo was transported by ship to California where it was discharged in the Port of Long Beach and placed on rail lines owned and operated by Burlington Northern Santa Fe Railway Company ("BNSF").  Sompo, 540 F. Supp. 2d at 489-90.  Each waybill generated by BNSF listed either Yang Ming or NYK as the shipper and consignee of the goods.  Id. at 490.  BNSF carried

---

        [5]    Yang Ming issued multiple bills of lading to Kubota -- one for each container of cargo in the shipment.  (See Howard Sompo Decl. Ex. 3).

the cargo to Dallas, Texas, where it transferred the containers to defendant Norfolk Southern Railway Company ("NSR") for the final leg of inland carriage.  Id.  Both NYK and Yang Ming had retained NSR to provide rail transportation of goods pursuant to general agreements, known as an Intermodal Transportation Agreements ("ITAs"), previously executed in 2003 and 2004, respectively.  Id.  (See also Howard Sompo Decl. Exs. 13-14). The train carrying the containers was operated by defendant Kansas City Southern Railway Company ("KCSR") on behalf of NSR pursuant to an agreement between NSR and KCSR.  Sompo, 540 F. Supp. 2d at 490 n.2.

   2.   **Nipponkoa-Insured Cargo**

        Nipponkoa insured the shipment of auto parts manufactured by Enplas Corporation ("Enplas") and engine parts manufactured by Fuji OOZX Inc. ("Fuji") from Japan to locations in Georgia and Tennessee.  (See Nipponkoa's Resp. to Defs.' Rule 56.1 Statement ¶¶ 4-6, 20, 30).  Enplas and Fuji each hired Nippon Express to transport their respective goods.  (Nipponkoa's Resp. to Defs.' Rule 56.1 Statement ¶ 7; Exs. 2, 4, 6 to Decl. of Charles L. Howard in Supp. of Defs.' Mot. for Summ. J. in Nipponkoa ("Howard Nipponkoa Decl.")).  Nippon Express issued bills of lading to both Enplas and Fuji and, in turn, contracted

Yang Ming to execute shipment of the goods.  (Nipponkoa's Resp.
to Defs.' Rule 56.1 Statement ¶¶ 7-8; Howard <u>Nipponkoa</u> Decl. Exs.
2-6).  The cargo was transported to the Port of Long Beach,
California aboard the same vessel as the Sompo-insured cargo
shipped by Yang Ming.  (<u>See</u> Howard <u>Nipponkoa</u> Decl. Exs. 2, 4).
From there, the inland carriage of the goods, including transfer
to NSR in Dallas, was identical to that of the Sompo-insured
cargo described in the above section.  (<u>See</u> Nipponkoa's Resp. to
Defs.' Rule 56.1 Statement ¶¶ 10-12).

**B.    Procedural History**

On September 10, 2009, this Court granted summary
judgment to plaintiffs on their claims under the Carmack
Amendment.   <u>See</u> <u>Sompo</u>, 652 F. Supp. 2d at 546.  This Court based
its decision on Second Circuit precedent holding that the Carmack
Amendment applied "to the domestic inland portion of a foreign
shipment regardless of the shipment's point of origin."   <u>Sompo</u>
<u>Japan Ins. Co. of Am. v. Union Pac. R.R.</u>, 456 F.3d 54, 68 (2d
Cir. 2006).  The parties had agreed that plaintiffs' other claims
were preempted by the Carmack Amendment.   <u>See</u> <u>Sompo</u>, 652 F. Supp.
2d at 540, 545-46.

The Supreme Court later abrogated that precedent,
holding that "the [Carmack] amendment does not apply to a

- 7 -

shipment originating overseas under a single through bill of lading." Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp., 130 S. Ct. 2433, 2442 (2010); see also Royal & Sun Alliance, 612 F.3d at 140, 144 (recognizing Regal-Beloit).  The Second Circuit subsequently vacated this Court's grant of summary judgment. Nipponkoa, 394 F. App'x at 752.  Because "plaintiffs-appellees . . . raised further grounds they claim[ed] would support the judgment regardless of Regal-Beloit, but . . . did not present these grounds below," the Second Circuit remanded the case for further proceedings so that this Court would "have the first opportunity to address them."  Id.  On remand, the parties cross-moved for summary judgment in both cases.

## DISCUSSION

A.   Summary Judgment Standard

         The standards governing motions for summary judgment are well-settled.  A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986).  Summary judgment should be denied "if the evidence is such that a reasonable jury could return a verdict" in favor of the non-moving party.  See

- 8 -

NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 178-79 (2d Cir. 2008).  In deciding a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor.  In re "Agent Orange" Prod. Liab. Litig., 517 F.3d 76, 87 (2d Cir. 2008).  The non-moving party cannot, however, "escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture."  W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (internal citations and quotation marks omitted).

B.   **Carmack Amendment Claims**[6]

        Under Regal-Beloit, the Carmack Amendment "does not apply to a shipment originating overseas under a single through bill of lading."  130 S. Ct. at 2422; see also Royal & Sun Alliance, 612 F.3d at 140, 144 (recognizing Regal-Beloit).  Here, the shipments at issue originated overseas and were governed by

_____

        [6]    Although it appears the Second Circuit only remanded plaintiffs' additional claims, see Nipponkoa, 394 F. App'x at 752, defendants, nevertheless, move for summary judgment with respect to plaintiffs' claims under the Carmack Amendment (see Defs.' Mem. in Sompo at 8; Defs.' Mem. in Nipponkoa at 8).  To avoid any doubt, I briefly address those claims here.

- 9 -

through bills of lading.  Accordingly, defendants' motions for
summary judgment are granted with respect to plaintiffs' claims
for relief under the Carmack Amendment.

C.    **Contract, Tort, and Bailment Claims**

        Defendants also move for summary judgment dismissing
plaintiffs' remaining claims, arguing, in part, that liability
limitations they describe as "covenants not to sue" in the bills
of lading for the shipments at issue bar plaintiffs from suing
any entity other than the carrier that issued the bill to the
shipping party.  In other words, according to defendants,
plaintiffs only have recourse to sue Yang Ming, NYK, Sumitrans,
and Nippon Express.  On that basis, defendants assert that, as
inland rail carriers contracted by the original upstream carrier
or intermediary upstream carrier[7] and not the shipping party,
they cannot be sued by plaintiffs.  Defendants also contend that
these covenants not to sue apply to them through so-called
"Himalaya Clauses" in each bill of lading that extend such

_____

        [7]    Here, only Yang Ming and NYK contracted with
defendants.  Yang Ming performed as both an original carrier and
an intermediary carrier, as hired by Sumitrans and Nippon
Express.  NYK performed as an original carrier.  See Background
Section (A), supra.

liability limitations to downstream parties, such as defendants, contracted to complete carriage of the goods.[8]

Plaintiffs argue that the Nippon Express bill of lading contains no such covenant not to sue and that the Yang Ming bill of lading is ambiguous and should be construed so as not to include a covenant not to sue. Plaintiffs further assert that, regardless, all such covenants in the four governing bills of lading are void under the Harter Act. See 46 U.S.C. § 30702 et seq.

---

[8]    I reject plaintiffs' contention that because defendants failed to raise the covenants not to sue as an affirmative defense in their Answer, in the prior proceedings and summary judgment motions, and on appeal, defendants waived the issue. There is no evidence that defendants acted in bad faith nor will the Court's consideration of the covenants at this juncture prejudice the plaintiffs or unduly delay the proceedings.  See Saks v. Franklin Covey Co., 316 F.3d 337, 350 (2d Cir. 2003) ("[A] district court may still entertain affirmative defenses at the summary judgment stage in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings."). Further, all parties previously conceded that plaintiffs' common law claims were preempted by the Carmack Amendment, as applied under the law in effect at the time. Sompo, 652 F. Supp. 2d at 540, 545-46.  Therefore, the Court has not yet addressed any additional claims on the merits as instructed to do so on remand by the Second Circuit.  See Nipponkoa, 394 F. App'x at 752 ("The parties . . . have agreed that we should decline to reach these [additional claims] so that the district court may have the first opportunity to address them on remand.").

For the reasons that follow, I hold that the relevant terms of the Yang Ming bill of lading constitute an agreement by plaintiffs' insured not to sue any party other than the carrier that issued the bill. I further hold that the Nippon Express bill of lading is ambiguous with respect to such a liability limitation. Moreover, I conclude that such liability limitations that restrict suit by plaintiffs' insureds to the carrier that issued the bill are valid and enforceable.

### 1.    Interpretation of the Bills of Lading

#### a.    Applicable Law

A multi-modal bill of lading requiring "substantial carriage of goods by sea" is a maritime contract. See Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 27 (2004) ("[S]o long as a bill of lading requires substantial carriage of goods by sea, . . . it is a maritime contract. Its character as a maritime contract is not defeated simply because it also provides for some land carriage."). Federal law controls the interpretation of maritime contracts when "the dispute is not inherently local." Id. at 22-23.

Generally, "contracts for carriage of goods by sea must be construed like any other contracts: by their terms and consistent with the intent of the parties." Id. at 31.

Potential ambiguities should be interpreted to give "reasonable and effective meaning to all terms of a contract" and to avoid "leav[ing] a portion of the writing useless or inexplicable." Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd., 230 F.3d 549, 558 (2d Cir. 2000). Bills of lading, however, are "contracts of adhesion and, as such, are strictly construed against the carrier." Allied Chem. Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro, 775 F.2d 476, 482 (2d Cir. 1985).

### b. **Application**

Plaintiffs only contest the interpretation of the language contained in the Yang Ming and Nippon Express bills of lading. (See Sompo Mem. at 20-23; Nipponkoa Mem. at 2-3). They do not dispute that the NYK and Sumitrans bills of lading contain covenants not to sue any party other than the carrier that issued the bill -- here, NYK and Sumitrans. (See Sompo Mem. at 20-23; Nipponkoa Mem. at 2-3). Accordingly, I only address the Yang Ming and Nippon Express bills of lading, each in turn below.

### i. **Yang Ming Bill of Lading**

The Yang Ming bill of lading expressly limits the liability of any entity Yang Ming engages to perform carriage of goods such that only Yang Ming can be held liable for damage to

the goods during transit.  I interpret such a limitation to be an express agreement by the plaintiffs' insureds not to seek to hold any entity other than Yang Ming liable for damage to the goods in question.

Section 4(2) of the Yang Ming bill of lading provides the following:

> It is understood and agreed that, <u>other than the Carrier</u>, no Person, firm or corporation or other legal entity whatsoever (including the Master, officers and crew of the vessel, <u>agents</u>, <u>Underlying Carriers</u>, <u>Sub-Contractors</u>, and/or any other <u>independent contractors</u> whatsoever utilized in the Carriage) is, or shall be deemed to be, liable with respect to the Goods as Carrier, bailee or otherwise.

(Howard <u>Sompo</u> Decl. Ex. 9 (emphasis added)).  This section clearly provides that, for liability purposes, only the Carrier -- in this case, Yang Ming -- can be sued, regardless of whether the Carrier employed "Underlying Carriers," "Sub-Contractors," or used other entities, such as "independent contractors," to transport the goods.

Plaintiffs' argument -- that the bill of lading's definition of "Carrier" ultimately encompasses rail carriers, and therefore, the bill permits suit against defendants (<u>see</u> Sompo Mem. at 20-22; Nipponkoa Mem. at 2-3) -- is without merit. Specifically, plaintiffs reason that because "rail carrier" is

included in the definition of "Underlying Carrier,"[9] which is, in turn, included in the definition of "Carrier,"[10] defendants ultimately qualify as the "Carrier" for liability purposes under Section 4(2) of the bill and therefore are eligible to be sued. (See Sompo Mem. at 20-21).   Under plaintiffs' argument, though, a rail carrier qualifies as the "Carrier" because it is categorized as an "Underlying Carrier."   In that regard, as discussed above, Section 4(2) expressly bars holding "Underlying Carriers," much less any entity engaged by the Carrier, liable.   The phrase "Underlying Carriers" appears in Section 4(2) in the parenthetical as a specification of the entities that are not liable.

_____

[9]      Section 1(17) of the Yang Ming bill of lading defines "Underlying Carrier" to include "any water, rail, motor, air or other carrier utilized by the Carrier for any parts of the transportation [sic] the shipment covered by this Bill."   (Howard Sompo Decl. Ex. 9).

[10]     Section 1(3) of the Yang Ming bill of lading defines "Carrier" as follows:

> the party on whose behalf this Bill is
> issued, as well as the Vessel and/or her
> Owner, demise charterer (if bound thereby),
> the time charterer and an [sic] substituted
> or Underlying Carrier whether any of them is
> acting as Carrier or bailee.

(Howard Sompo Decl. Ex. 9).

- 15 -

To the extent there is ambiguity as to when an "Underlying Carrier" is also considered the "Carrier," resolving this ambiguity in plaintiffs' favor in the context of liability would render Section 4(2) "useless or inexplicable." Hartford Fire Ins. Co., 230 F.3d at 558. Moreover, under the present shipping arrangement, there can be no question that the Carrier "on whose behalf this [bill of lading] was issued" (see Howard Sompo Decl. Ex. 9 at Section 1(3) (definition of "Carrier") (emphasis added)) was indeed Yang Ming and not NSR or KCSR and that plaintiffs' insureds understood as much in hiring Yang Ming to transport their goods.

Accordingly, I hold that Section 4(2) of the Yang Ming bill of lading constituted an express agreement by plaintiffs not to sue any entity other than Yang Ming, including the defendant rail carriers, for damage to the goods in question.

### ii.  Nippon Express Bill of Lading

Unlike the Yang Ming bill of lading, the Nippon Express bill is ambiguous and susceptible to different interpretations as to what entities may be sued under its terms. Therefore, I deny the parties' cross-motions for summary judgement on claims arising from the Nippon Express shipments -- specifically, the

Hitachi/Unisia shipment in <u>Sompo</u> and the Enplas and Fuji

shipments in <u>Nipponkoa</u>.

We begin with the plain language of the bill of lading.

See <u>Kirby</u>, 543 U.S. at 31-32. Section 4.2 of the Nippon Express

bill of lading provides the following:

> The Carrier shall be responsible for the acts
> and omissions of its agents or servants when,
> such agents or servants are acting within the
> scope of their employment as if such acts and
> omissions were its own and also shall be
> responsible for the acts and omissions of any
> other persons whose services it makes use of
> in the performance of the contract evidenced
> by this bill of Lading.

(Howard <u>Sompo</u> Decl. Ex. 11). Section 1(a) of the bill defines

"Carrier" as follows:

> "Carrier" means Nippon Express U.S.A.
> (Illinois), Inc., the underlying Carrier, the
> ship, her owner, Master, operator, demise
> charterer and if bound thereby, the time
> charterer and any substitute carrier,
> whether, the owner, operator, charterer or
> Master shall be acting as carrier or bailee,
> as well as any of the agents, servants,
> and/or employees of the foregoing parties,
> including, but not limited to, stevedores,
> container yards, container freight stations,
> <u>Intermodal inland carriers</u> (<u>rail</u>, truck,
> local truckers and barge).

(<u>Id.</u> Ex. 11 (emphasis added)). Plaintiffs argue that the bill's

inclusion of inland rail carriers under the definition of

"Carrier" and Section 4.2's statement that the "Carrier shall be

held responsible," makes defendants, as inland rail carriers, "undeniably liable" for damage to the insured goods under the terms of the bill.  (Sompo Mem. at 22-23; see also Nipponkoa Mem. at 2-3).

The plain wording of the bill of lading is ambiguous. Section 4.2 contemplates "Carrier" as a single entity that shall be responsible for all other entities it employs in the carriage of goods, whether those entities are agents, servants, or otherwise.  The provision arguably implies that the Carrier is the responsible party in place of those entities.  Such an interpretation, however, arguably must read the word "only" (or similarly restrictive terms) into the provision -- i.e., that the Carrier and "only" the Carrier shall be responsible.  Otherwise, the provision, as drafted, does not necessarily preclude other entities from also being held responsible for damage to the goods in transport -- even though the Carrier is responsible.

Section 1(a), on the other hand, includes a range of entities in the definition of "Carrier," thus broadly expanding, as plaintiffs argue, Section 4.2 to provide that "[t]he Carrier [and all its agents, servants, or otherwise] shall be responsible for the acts and omissions of [their] agents or servants."  (See Howard Sompo Decl. Ex. 11).  Such an interpretation would

arguably expand responsibility to an ever widening circle of parties.

The point is that these provisions are ambiguous.  In such instances, we look to evidence of the intent of the parties. See <u>JA Apparel Corp. v. Abboud</u>, 568 F.3d 390, 397 (2d Cir. 2009). Based on the record before me, however, there is insufficient evidence to discern such intent, and therefore, summary judgment on this issue is not proper.  See <u>id.</u> at 399 (holding that, in light of "conflicting interpretations" of and "ambiguity" in contract, "parties were entitled to submit extrinsic evidence as to the intent with which they entered the [a]greement").  I raise below some indicia of intent that, albeit not determinative for summary judgment purposes, may be relevant and inform the parties' submissions of additional evidence on this point.

First, Section 7.3(b) of the Nippon Express bill specifically contemplates liability for damage occurring during the inland carriage of goods by any entity <u>other than</u> the "Carrier," such as an "inland carrier":

> If it can be proved where the loss or damage occurred, the liability of the Carrier for the loss [of] or damage to the goods will be as follows: . . . [w]ith respect to loss or damage occurring during the period of carriage by land . . . in any country for which this carrier has assumed responsibility of carriage, in accordance with the applicable law of that country, the inland

> carrier's contract of carriage and tariffs in
> force, and this Bill of Lading.

(Howard <u>Sompo</u> Decl. Ex. 11).  Here, the plain language appears to

expressly consider an inland carrier, such as a rail carrier, to

be a separate entity from the "Carrier" and not interchangeable

for liability purposes.  Like Section 4.2, however, the bill's

definition of "Carrier" contravenes this provision.

Second, Section 7.3(b) also directs that liability

during the inland carriage of goods shall be determined in

accordance with the inland carrier's contract of carriage.  Here,

Nippon Express, as an NVOCC, engaged Yang Ming to perform the

physical shipment of the goods.  Yang Ming hired NSR for the

relevant portion of inland carriage pursuant to the standing ITA

executed between NSR and Yang Ming.  <u>See</u> Background Section (A),

<u>supra</u>.  The ITA incorporates by reference NSR's Intermodal

Transportation Rules Circular No. 2.  (<u>See</u> Howard <u>Sompo</u> Decl. Ex.

13 at NSGENL 0001).  Section 8.3.3(j) of the Circular states that

"[NSR] will not be liable for any loss, damage, or delay to

lading to any party other than the Rail Services Buyer" and that

it "will not be under any obligation to process any claim by any

person other than the Rail Services Buyer."  (<u>Id.</u> Ex. 25 at

NSGENL 0024).  As the party with whom NSR contracted, Yang Ming

is the "Rail Services Buyer," not plaintiffs' insureds.  (See id. Ex. 13).  Therefore, the ITA, as the applicable contract for inland carriage under Section 7.3(b) of the Nippon Express bill of lading, evidences the intent of at least the defendants that, under the present shipping arrangement, plaintiffs only look to Nippon Express in seeking damages for the cargo.[11]

Finally, I note that industry practice and custom regarding multimodal through bills of lading may be relevant in determining the intent of the parties here.  See Christiana Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co., 979 F.2d 268, 274 (2d Cir. 1992).  The Supreme Court in Kirby acknowledged the "popularity of 'through' bills of lading, in which cargo owners can contract for transportation across oceans and to inland destinations in a single transaction" instead of having "to

---

[11]     While I have previously expressed concern regarding the shippers' notice of either the ITAs or the rail carrier circulars in the context of Carmack liability, I have also acknowledged in the same vein that "[i]t is not lost on the Court that the parties contracting directly with the insureds and the rail carriers . . . are not parties in this case."  Sompo Japan Ins. Co., 540 F. Supp. 2d at 500; see also Kirby, 543 U.S. at 35 ("It seems logical that [the freight forwarder] -- the only party that definitely knew about and was party to both of the bills of lading at issue here -- should bear responsibility for any gap between the liability limitations in the bills.").  Nevertheless, I view the ITAs and circulars in this context as merely relevant in discerning the intent of the parties.

negotiate a separate contract -- and to find an American railroad itself -- for the land leg." 543 U.S. at 25-26.  To work, however, this "efficient choice," see id. at 26, necessitates a similarly efficient structure for liability under that single contract.  Cf. Regal-Beloit, 130 S. Ct. at 2447-48 (discussing efficiency implications of applying different liability regimes to different phases of international, multimodal transport).  To what extent the parties intended to achieve such efficiencies here through a single through bill of lading may be relevant.

Consequently, additional evidence is needed to determine the intent of the parties and whether the terms of the Nippon Express bill effectively limit who plaintiffs may sue under the bill, thus precluding summary judgment.  See Scholastic, Inc. v. Harris, 259 F.3d 73, 83 (2d Cir. 2001) ("When the language of a contract is ambiguous and there is relevant extrinsic evidence regarding the actual intent of the parties, an issue of fact is presented for a jury to resolve, thereby precluding summary judgment.").  Accordingly, I deny the parties' cross-motions for summary judgement on claims arising from the Nippon Express shipments -- specifically, the Hitachi/Unisia shipment in Sompo and the Enplas and Fuji shipments in Nipponkoa.

## 2.   Enforceability of the Covenants Not to Sue

Plaintiffs assert that even if the Nippon Express and Yang Ming bills of lading are interpreted to prohibit suit against defendants, all such terms in any of the bills of lading in these matters are void under the Harter Act, 46 U.S.C. § 30702 et seq., which plaintiffs contend governs the shipments in question. (See Sompo Mem. at 23-31; Nipponkoa Mem. at 2-3). I need not reach the question of whether the Harter Act applies,[12] as even if it does, the Act does not bar such provisions. Moreover, to the extent the parties suggest that the Carriage of

---

[12]   There is some question as to the applicability of the Harter Act to the shipment at issue here as "numerous courts have concluded . . . that the Harter Act does not apply to the inland phase of a multimodal carriage." Fed. Ins. Co. v. Great White Fleet (US) Ltd., No. 07 Civ. 2415 (GEL), 2008 WL 2980029, at *9 (S.D.N.Y. Aug. 1, 2008) (collecting cases and citing, inter alia, Great Am. Ins. Co. of N.Y. v. A/P Moller-Maersk A/S, 482 F. Supp. 2d 357 (S.D.N.Y. 2007); Sony Computer Entm't Inc. v. Nippon Express U.S.A. (Ill.), Inc., 313 F. Supp. 2d 333 (S.D.N.Y. 2004); Colgate Palmolive Co. v. M/V Atl. Conveyor, No. 95 Civ. 1497 (MBM), 1996 WL 742861, at *3 (S.D.N.Y. Dec. 31, 1996)). In all such cases, "the loss occurred after the completion of the ocean carriage." Id. at *10. But see Anvil Knitwear, Inc. v. Crowley Am. Transp., Inc., No. 00 Civ. 3243 (NRB), 2001 WL 856607, at *4 (S.D.N.Y. July, 27, 2001) (applying Harter Act to a clause governing liability for loss of cargo hijacked in foreign country during short inland portion of intermodal shipment just prior to ocean carriage); see also Great White Fleet, 2008 WL 2980029, at *10 (discussing how Supreme Court's holding in Kirby "expanded the inland reach of general maritime law" and could "call into question the logic" of not applying the Harter Act to the inland phase of a multimodal shipment).

Goods by Sea Act ("COGSA"), 46 U.S.C. § 30701 note, applies or that certain bills of lading incorporate the Hague Rules,[13] I conclude that neither statutory regime prohibits the liability limitations in question.

### a.  Applicable Law

#### i.  Himalaya Clauses

A Himalaya Clause is a contractual provision in a bill of lading that extends the bill's liability limitations to downstream parties contracted by the carrier to assist in the carriage of goods.  Kirby, 543 U.S. at 20 & n.2.  "A single Himalaya Clause can cover both sea and land carriers downstream." Id. at 29.  In Kirby, the Supreme Court held, in part, that an inland rail carrier subcontracted by an intermediary ocean carrier could be the "intended beneficiary" of Himalaya Clauses in both (1) the bill of lading issued to the cargo owner by the initial freight forwarder and (2) the bill of lading issued by the intermediary ocean carrier to the freight forwarder.  Id. at 31-32, 34-36.  Consequently, the rail carrier was "entitled to

---

[13]     The Hague Rules are formally known as the International Convention for the Unification of Certain Rules Relating to Bills of Lading, Aug. 25, 1924, 51 Stat. 233, 120 L.N.T.S. 155 [hereinafter the Hague Rules].

the protection of liability limitations" in both bills of lading.
Id. at 36.

ii.  **The Harter Act, COGSA, and the Hague Rules**

Under the Harter Act, "[a] carrier may not insert in a
bill of lading or shipping document a provision avoiding its
liability for loss or damage arising from negligence or fault in
loading, stowage, custody, care, or proper delivery." 46 U.S.C.
§ 30704.  The Act, however, does not void "provisions limiting a
carrier's liability, but only those absolving a carrier of
liability for its own negligence." Great White Fleet, 2008 WL
2980029, at *11 (emphasis in original) (citing Ansaldo San
Giorgio I v. Rheinstrom Bros., 294 U.S. 494, 4994-97 (1935)).

Similarly, COGSA voids any provision in a shipping
contract "relieving" or "lessening" the carrier's liability
"arising from negligence, fault, or failure in [its] duties and
obligations." COGSA § 3(8), 46 U.S.C. § 30701 note.  COGSA is
also the United States' codification of the Hague Rules, and
therefore, the Hague Rules are "virtually identical." Fed. Ins.
Co. v. Union Pac. R.R., 651 F.3d 1175, 1178 n.5, 1179 (9th Cir.
2011).  The Hague Rules' prohibition on such liability
limitations mirrors that of COGSA.  Compare COGSA § 3(8), 46

U.S.C. § 30701 note, <u>with</u> Hague Rules, art. 3(8), 51 Stat. at
250, 120 L.N.T.S. at 165.

     The Ninth Circuit recently held in <u>Federal Insurance</u>
<u>Co. v. Union Pacific Railroad Co.</u> that "the Hague Rules and COGSA
permit a carrier to accept exclusive liability for the negligence
of its subcontractors." 651 F.3d at 1180.  In affirming the
district court's enforcement of the covenant not to sue, the
court relied on the Supreme Court's distinction in <u>Vimar Seguros</u>
<u>y Reaseguros, S.A. v. M/V Sky Reefer</u>, 515 U.S. 528 (1995),[14]
"between impermissible contracts that reduce the carrier's
obligations and enforceable contracts that affect only the
'mechanisms' of enforcing a shipper's rights." <u>Fed Ins. Co.</u>, 651
F.3d at 1179-80.  It concluded that a covenant requiring suit
against the carrier is an "enforcement mechanism rather than a
reduction of the carrier's obligations to the cargo owner," and
therefore, is permissible.  <u>Id.</u> at 1180 (internal quotation marks
omitted).

-------------------------------------------------------------

     [14]    In <u>Sky Reefer</u>, the Court upheld a bill of lading's
clause directing arbitration in a foreign country, holding that
nothing prevents the parties from enforcing their duties and
obligations under COGSA in a particular manner.  515 U.S. at 535
("By its terms, [COGSA] establishes certain duties and
obligations, separate and apart from the mechanisms for their
enforcement.").

Other courts have reached similar conclusions with respect to the enforcement of clauses prohibiting suit against entities other than the carrier.  See Nipponkoa Ins. Co. v. Norfolk S. Ry. Co., 794 F. Supp. 2d 838, 843-44 (S.D. Ohio 2011); Mattel, Inc. v. BNSF Ry. Co., Nos. CV 10-0681-R, 10-3127-R, 2011 WL 90164, at *4 (C.D. Cal. Jan. 3, 2011); St. Paul Travelers Ins. Co. v. M/V Madame Butterfly, 700 F. Supp. 2d 496, 505 (S.D.N.Y. 2010); Fed. Ins. Co. v. Union Pac. R.R., 590 F. Supp. 2d 1292, 1294-95 (C.D. Cal. 2008); Ltd. Brands, Inc. v. F.C. (Flying Cargo) Int'l Transp. Ltd., No. C2-04-632, 2006 WL 783459, at *8 & n.7 (S.D. Ohio Mar. 27, 2006); Allianz CP Gen. Ins. Co. v. Blue Anchor Line, No. 02 Civ. 2238 (NRB), 2004 WL 1048228, at *6 (S.D.N.Y. May 7, 2004).

### b.  Application

First, as an initial matter, I find -- and the parties do not dispute -- that each bill of lading contains a valid Himalaya Clause extending the bill's liability limitations, including the limitations on what entity can be sued under the bill, if enforceable, to downstream carriers, such as defendants. (See Howard Sompo Decl. Exs. 9 at Section 4(2), 10 at Section 6(2), 11 at Section 10.2, 12 at Section 5(2)).

Second, I agree with the Ninth Circuit's rationale in Federal Insurance Co.  Here, the various restrictions barring suit against defendants are enforceable and do not violate any of the foregoing statutory regimes, including COGSA and the Hague Rules as well as the Harter Act, because plaintiffs can still seek full recovery of damages from the carrier that issued the bill of lading.  See Fed. Ins. Co., 651 F.3d at 1179-80.  In other words, these clauses do not allow the carrier to "avoid," "lessen," or "relieve" its liability to plaintiffs.  See COGSA § 3(8), 46 U.S.C. § 30701 note; id. § 30702; Hague Rules, art. 3(8), 51 Stat. at 250, 120 L.N.T.S. at 165.  They merely direct suit against the carrier and leave the carrier to seek indemnification from the parties with whom it contracted to complete carriage of the goods.  In short, plaintiffs are not "without a remedy" for their injury.  See Nipponkoa Ins. Co., 794 F. Supp. 2d at 843.

Plaintiffs cite Royal & Sun Alliance Ins. PLC v. Ocean World Lines, Inc., 572 F. Supp. 2d 379 (S.D.N.Y. 2008), aff'd, 612 F.3d 138 (2d Cir. 2010), to no avail.  (See Pls.' Combined Reply Mem. at 12-13).  There, the through bill of lading issued to the cargo owner by the NVOCC did not contain a covenant not to sue.  Royal & Sun Alliance, 572 F. Supp. 2d at 397-98.  The NVOCC

subsequently hired Yang Ming to perform the ocean carriage of the goods.  See id. at 384-85.  Yang Ming issued a bill of lading to the NVOCC with liability terms identical to the ones at issue here.  See id.  The district court rejected Yang Ming's argument that its bill of lading barred the cargo owner from suing the trucking company subcontracted by Yang Ming to perform inland carriage of the goods.  See id. at 397-98.  It reasoned that the bill of lading between the NVOCC and the cargo owner contained no such limitation and that the NVOCC "had no authority . . . to give up [the cargo owner's] right to sue by accepting the contradictory term in Yang Ming's bill of lading."  Id.  That is not the case here.  Under the present shipping arrangement, plaintiffs' insureds entered into bills of lading in which they agreed not to sue any entity other than the carrier that issued the bill.  See Nipponkoa Ins. Co., 794 F. Supp. 2d at 844 (distinguishing Royal & Sun Alliance on identical grounds in response to the same argument by plaintiff Nipponkoa).

Similarly, plaintiffs' citation to United States v. Atlantic Mutual Insurance Co. for the "'general rule of law that common carriers cannot stipulate for immunity from their own or their agents' negligence'" (Sompo Mem. at 32 (quoting United States v. Atl. Mut. Ins. Co., 343 U.S. 236, 239 (1952)); see also

Pls.' Combined Reply Mem. at 4-5) is also of no consequence here.

In <u>Atlantic Mutual</u>, the Supreme Court invalidated a "both-to-blame" clause which ultimately "deprive[d]" cargo owners of a portion of any monetary judgment they obtain in a separate action against a "noncarrying vessel" that collides with the vessel transporting the cargo owner's goods.[15]  <u>Atlantic Mut. Ins. Co.</u>, 343 U.S. at 239 & n.5, 241-42.  Here, the provisions limiting suit to the carrier that issued the bill of lading do not deprive cargo owners of any portion of a potential damages award. Plaintiffs can still recover in full from the carrier that issued the bill of lading to the insureds, and that carrier, in turn, can seek indemnification from downstream entities, such as defendants.  <u>See</u> <u>Nipponkoa Ins. Co.</u>, 794 F. Supp. 2d at 843 (distinguishing <u>Atlantic Mut. Ins. Co.</u> on identical grounds in response to the same argument by plaintiff Nipponkoa and concluding that "the rule against stipulations of immunity is not contravened by a clause that creates no immunity").

---

[15]     In the event two ships collided and both were found negligent, the clause required a cargo owner to indemnify the ship carrying its goods against any loss or liability to the other vessel, to the extent that loss or liability represented payment of a claim for damages to the cargo owner that the other vessel sought to recover from the carrying ship.  <u>Atl. Mut. Ins. Co.</u>, 343 U.S. at 239 & n.5.

Accordingly, I hold that such liability limitations are enforceable with respect to defendants and do not violate any of the statutory regimes raised in the parties' arguments or implicated in the bills of lading at issue.

### 3. Common Law and Public Policy Grounds

Plaintiffs additionally argue that, notwithstanding liability limitations, they have a right, as a matter of common law and public policy, to sue defendants in tort and bailment. (See generally Pls.' Combined Reply Mem. at 4-6; Sompo Mem. at 34-35). I reject this argument as it applies to shipments governed under the Yang Ming, NYK, and Sumitrans bills of lading.[16]

Although it is "well established that in certain situations a claim for cargo damage could sound in tort as well as in contract," Associated Metals & Minerals Corp. v. Alexander's Unity MV, 41 F.3d 1007, 1016 (5th Cir. 1995), here, that argument does not overcome the fact that plaintiffs agreed to sue only the carrier that issued the bill of lading, see Nipponkoa Ins. Co., 794 F. Supp. 2d at 844 n.2 ("Nipponkoa's

_____

[16]    I defer ruling on this argument as it applies to shipments governed under the Nippon Express bill of lading until resolution of the disputed interpretation of the Nippon Express bill of lading.

assertion that it may bring suit against Norfolk Southern as a tortfeasor is correct, but does not help it avoid the consequences of the covenant not to sue." (internal citation omitted)).

### CONCLUSION

The contested provisions in the Yang Ming bill of lading preclude suit against any entities other than Yang Ming, the carrier that issued the bill.  I further hold such liability limitations, as stated in the Yang Ming, NYK, and Sumitrans bills of lading to be valid and enforceable.  Therefore, Sompo, as subrogee of Kubota, Hoshizaki, and Canon, may not sue defendants for damages sustained to the relevant goods during their inland carriage.  As this conclusion is dispositive of all of Sompo's claims arising from such shipments, I decline to address the parties' remaining arguments on such claims.

The contested provisions in the Nippon Express bill of lading are ambiguous and require additional evidence of the parties' intent, thus precluding summary judgment on the claims arising from the Nippon Express shipments -- specifically, the Sompo-insured Unisia/Hitachi shipment and the Nipponkoa-insured Enplas and Fuji shipments.  In addition, I defer ruling on the parties' additional arguments regarding plaintiffs' contract,

tort, and bailment claims until resolution of the disputed interpretation of the Nippon express bill of lading.

For the foregoing reasons, defendants' motions for summary judgment are granted in part with respect to claims arising from the Kubota, Canon, and Hoshizaki shipments and denied in part with respect to claims arising from the Unisia/Hitachi shipment in Sompo Japan Ins., Inc. v. Norfolk S. Ry. Co., No. 07 Civ. 2735 (DC).   Plaintiffs' cross-motions for summary judgment are denied.   All claims against defendants arising from the Kubota, Canon, and Hoshizaki shipments are dismissed.

In addition, defendants' motions and plaintiffs' cross motions for summary judgment are denied in Nipponkoa Ins. Co., v. Norfolk S. Ry. Co., No. 07 Civ. 10498 (DC).

SO ORDERED.

Dated:   New York, New York
         September 4, 2012

DENNY CHIN
United States Circuit Judge
Sitting by Designation

- 33 -

**APPEARANCES**

Attorneys for Sompo Japan Insurance, Inc., Sompo Japan Insurance
Company of America, and Nipponkoa Insurance Company, Limited:

> MALOOF BROWNE & EAGAN LLC
>             By:  David T. Maloof, Esq.
>                  Thomas M. Eagan, Esq.
>     411 Theodore Fremd Avenue, Suite 190
>     Rye, New York  10580

Attorneys for Norfolk Southern Railway Company, Norfolk Southern
Corporation, and the Kansas City Southern Railway Company:

> KEENAN COHEN & HOWARD P.C.
>             By:  Paul D. Keenan, Esq.
>                  Charles L. Howard, Esq.
>     One Pitcairn Place, Suite 2400
>     165 Township Line Road
>     Jenkintown, Pennsylvania  19046
>
>                  - and -
>
>     GUTTERMAN & ASSOCIATES
>             By:  Barry N. Gutterman, Esq.
>     The Lincoln Building
>     60 East 42nd Street, 46th Floor
>     New York, New York  10165